Dan Stormer, Esq. [S.B. #101967]
Mary Tanagho Ross, Esq. [S.B. #280657]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California  91103
Telephone:  (626) 585-9600
Facsimile:  (626) 577-7079
Emails:  dstormer@hadsellstormer.com
         mross@hadsellstormer.com


Agnieszka Fryszman [DC: 459208]
*pro hac vice application pending*
Alysson Ford Ouoba
*pro hac vice application forthcoming*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, District of Columbia  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
Emails:  afryszman@cohenmilstein.com
         aouoba@cohenmilstein.com

Attorneys for Plaintiffs

[Additional Counsel Continued on Next Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| Keo Ratha, Sem Kosal, Sophea Bun, Yem Ban, Nol Nakry, Phan Sophea, and Sok Sang, <br><br> Plaintiffs, <br><br> vs. <br><br> Phatthana Seafood Co., Ltd.; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe Ltd., <br><br> Defendants. | Case No: <br><br> **COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT

1 | [Additional Counsel Cont. from previous page]

2

3 | Anthony DiCaprio  [SD NY: 1872621 and ND NY: 507797]
| *pro hac vice application forthcoming*
4 | Attorney at Law
| 64 Purchase Street
5 | Rye, New York  10580
| Telephone:  (917) 439-5166

6

7 | Paul L. Hoffman [S.B. #71244]
| Catherine E. Sweetser [S.B. #271142]
8 | SCHONBRUN SEPLOW
|  HARRIS & HOFFMAN LLP
9 | 723 Ocean Front Walk
| Venice, California  90291
10 | Telephone:  (310) 396-0731
| Facsimile:  (310) 399-7040
11 | Email:  hoffpaul@aol.com
|          catherine.sdshhh@gmail.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

## COMPLAINT

The above-named Plaintiffs, by, and through, their undersigned attorneys, bring this action on behalf of themselves against Defendants Phatthana Seafood Co., Ltd.; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe Ltd. alleging as follows:

## INTRODUCTION

1.      This is an action brought by survivors of human trafficking.

2.      The Plaintiffs, villagers in rural Cambodia, were recruited for work at factories in Thailand producing shrimp and seafood for export to the United States. Instead of the good jobs at good wages they were promised, the men and women became victims of human trafficking, forced labor, involuntary servitude, and peonage.

3.      The Defendants, including corporations based in California, were participants in a joint venture that in violation of U.S. law knowingly profited from the import and sale of shrimp and seafood produced with trafficked labor.

4.      The United States government, international organizations, non-governmental organizations, and media outlets have highlighted the problems of trafficking and forced labor at Thai shrimp and seafood factories.  Rural villagers from neighboring countries, including Cambodia, were promised good jobs in exchange for the payment of recruitment fees.  To finance the fees, the villagers borrowed from the recruiter or took out loans, using their farm land as collateral.  But once the villagers crossed the border and arrived at the factory, their passports were confiscated and held by the factory managers.  In addition, the villagers learned that they would be paid less than promised and that their already meager wages would be further reduced by unexpected salary deductions for housing, fees, and other charges. The men and women worked long hours in harsh conditions.  They were packed into crowded housing with inadequate sanitation facilities. When the villagers sought to leave the factory and return home because they were not making enough money to support their

1

COMPLAINT

families back home, they were not permitted to do so:  they could not get their passports back and were told that they had to pay off the fees they had incurred—but the reduced pay and unexpected deductions made repayment difficult if not impossible.  Some of the workers did not make enough money even after working over eight hours a day six days a week to afford enough food.  Instead, they were reduced to eating seafood they found washed up on the beach.  Many returned home with nothing to show for their hard labor or, worse yet, having lost the farm land they used as collateral, driving their families deeper into poverty.  The Plaintiffs in this case were victims of this scheme.

5.    The Plaintiffs bring claims under the Trafficking Victims Protection Act, 18 U.S.C. § 1595, and other applicable laws.  The Trafficking Victims Protection Act authorizes victims of human trafficking to file a civil action against whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known was engaged in peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking.

6.    In 2009, and in the following years, the United States Department of Labor listed Thai shrimp on its list of goods produced with forced labor.  Thai fish likewise have been included on this list since 2012.  In 2014, the United States Government Trafficking in Persons Report downgraded Thailand to its lowest rating because Thailand does not comply with the minimum standards for the elimination of trafficking and is not making significant efforts to do so.  The Trafficking in Persons report found that despite widespread international attention to the rampant forced labor and trafficking in the seafood industry, the Thai government had failed to prosecute individuals, identify victims, or address the corruption that facilitates the use of forced labor.  In its 2015 report, the State Department again gave Thailand its lowest rating and expressed concern over ongoing trafficking and forced labor in the seafood industry.  Meanwhile, the U.S. market for Thai shrimp imports was over $1.7

COMPLAINT

1  billion, and the U.S. market for Thai seafood overall was more than $2.5 billion,

2  during the time period when Plaintiffs were trafficked.

3  **PARTIES**

4  **Plaintiffs**

5        7.     Keo Ratha is a citizen of Cambodia.  He was working in Pursat,

6  Cambodia, when he was recruited by an agent of CDM Trading Manpower Co., Ltd.

7  ("CDM") for work in Thailand.  Mr. Ratha had never traveled outside Cambodia.  The

8  agent offered Mr. Ratha a job in the seafood industry paying $250 per month, with the

9  possibility of making more with overtime.  The agent told Mr. Ratha he would work

10  eight hours a day, be provided free accommodation, and would be paid every two

11  weeks.  CDM charged Mr. Ratha $150 to obtain a passport and $200 as a recruitment

12  fee.  CDM told Mr. Ratha that if he was unable to pay the $200 recruitment fee in a

13  lump sum in advance, $250 would be deducted from his salary over time by the

14  employer in Thailand.  Mr. Ratha sold his motorcycle to pay the $150 passport fee and

15  went into debt for the recruitment fee, agreeing that he would repay the recruitment

16  fee via deductions from his future salary.  The fees were near the average annual per

17  capita income for a rural Cambodian.  CDM arranged Mr. Ratha's travel to Thailand

18  by bus.  On the bus, he was accompanied by CDM agents who held Mr. Ratha's

19  passport.  After over 20 hours on the bus, Mr. Ratha arrived at the Phatthana factory in

20  Thailand on October 30, 2011.  Upon arrival, the CDM agents turned Mr. Ratha's

21  passport over to an employee at the factory.  Mr. Ratha started work the next day.  He

22  was paid far less than promised—approximately $135 per month instead of $250.

23  After the salary deductions and rent payments, Mr. Ratha often did not have enough

24  money to buy enough food to eat.  He was hungry much of the time.  The company

25  arranged for Mr. Ratha's housing, he had no choice and no ability to make alternative

26  arrangements.  The accommodations were overcrowded and unsanitary.  There was no

27  bed, so Mr. Ratha slept on a concrete floor.  When it rained, water poured into the

28  room.  There was no hot water and no shower.  At the factory, Mr. Ratha was assigned

3

COMPLAINT

to work with chlorine without being provided adequate protective equipment, which caused him health problems.  Mr. Ratha told his supervisor that he was finding it hard to breathe, but his supervisor ignored him.  He asked to quit several times, but was told he could not leave.  He was also told that he could not get his passport back without paying off his recruitment fee.  Mr. Ratha was afraid that he would be arrested by the Thai police if he fled without his passport, or that he would be sold to a fishing boat as a slave—a fate, unfortunately, not uncommon in the local fishing industry.  In January 2012, after the news media reported on his plight, Mr. Ratha was permitted to return to Cambodia.

8.      Sem Kosal and his wife (Sophea Bun) were living in Battambang, Cambodia when they were recruited to work in Thailand by an agent affiliated with CDM.  Mr. Kosal and his wife had never traveled outside Cambodia.  The agent offered Mr. Kosal and his wife a job in the seafood industry paying between $220 and $300 a month.  The agent told Mr. Kosal that they would work eight hours a day and be provided free accommodation.  The agent showed Mr. Kosal illustrated brochures containing pictures of the promised accommodations.  The recruiter charged Mr. Kosal (and his wife) $350 for obtaining a passport and for the recruitment fee.  The fee was far more than Mr. Kosal could earn in a year in Cambodia.  Mr. Kosal took out a loan, at 3% interest per month, to finance the costs.  Mr. Kosal put up his house and his parent's land as collateral for the loan.  If the loan was not paid, the home and land would be taken.  CDM was responsible for arranging travel to Thailand for Mr. Kosal and his wife.  CDM transported them by bus in December 2010.  CDM agents kept possession of Mr. Kosal's and his wife's passport during their trip, and turned the passports over to Phatthana staff upon arrival at the factory.  Although they had been promised $220 to $300 a month, Mr. Kosal and his wife were paid much less than promised.  They were charged for accommodation, which was not like the pictures in the brochure, but crowded rooms shared with other workers.  The recruiter had promised a bed, mattress and pillows but Mr. Kosal and his wife were provided a bare

4

COMPLAINT

room with a cement floor that was crawling with insects.  Mr. Kosal slept on the cement floor, as did the other workers who shared the room.  The sanitation facilities were inadequate and frequently ran out of water so they could not bathe.  Mr. Kosal and his wife worried that they made so little after the salary deductions and loan repayment charges, they did not have enough to send money home to support their children.  For example, they did not have enough money for medicine when their children were sick.  They worried that if their parents did not take care of the children, the children would starve.  They did not earn enough to send their son, who is deaf, to school.  They made so little, they often did not have enough money to buy sufficient food and went hungry.  Mr. Kosal was eventually able to pay off his loan, so his family would not lose its home and farm land.  Mr. Kosal and his wife returned to Cambodia in July, 2012.

9.     Sophea Bun was living with her husband (Sem Kosal) in Battambang, Cambodia when she, along with her husband, was recruited to work in a Thai factory. She re-alleges and incorporates herein the allegations set forth in paragraph 8 as if fully set forth here.

10.     Yem Ban was living with his wife (Nol Nakry) in Kampot, Cambodia when he and his wife were recruited to work in Thailand.  Mr. Ban and his wife were offered jobs in the seafood industry by an agent for Phatthana.  Neither Mr. Ban nor his wife had ever traveled outside Cambodia.  They did not have passports, but the agent told them not to worry, that Phatthana had assigned him to recruit workers in Cambodia and they would not have any problems.  Mr. Ban and his wife were told they would have to pay for transportation, recruitment and service fees.  They borrowed 3.5 million riel (roughly $700) from a private lender to finance their trip. The interest on the loan was 3% per month.  Mr. Ban was told they would be charged 3,500 Baht for fees (roughly $100), but at the border Mr. Ban and his wife were told by the Phatthana agent to pay almost twice that amount, 6,500 Baht (about $200). The recruiter arranged for Mr. Ban's and his wife's travel to Thailand in 2011.  The

5

COMPLAINT

1  recruiter drove Mr. Ban and his wife to the border in a pick-up truck.  26 people were

2  packed in the truck.  Some of the women were in the back seat.  The other workers

3  were in the truck bed.  The workers had to sit and sleep on each other, packed in like

4  sardines.  The recruiter and his assistants covered the workers with a tarp and told

5  them not to move.  The recruiters put plates and dishes over the tarp covering the

6  workers.  During their journey, the driver watched the back of the truck in his mirror.

7  If he saw someone move, he would stop the truck, get out, and hit the workers with a

8  tire iron.  At some point in the drive, they switched trucks.  The workers were taken

9  across the border.  They stayed at a farm near the border for eight days.  Some of the

10  workers asked to return home, but they weren't allowed to leave.  Instead, they were

11  beaten.  The workers were picked up at the farm in another pick-up truck and driven

12  to the factory.  There were three trucks, each packed with 25 or 26 workers.  When

13  Mr. Ban and his wife arrived at Phatthana, they were told they would be paid 197 Baht

14  per day (about $6), working 13 or 14 days every two weeks, for eight hours a day.

15  They were charged an additional fee, another 3,500 Baht, for work permission.  They

16  were also charged for equipment, such as the knives and needles required for their

17  jobs.  Phatthana provided one set of gloves, but when the gloves tore, which was

18  often, they had to buy the replacements.  They were charged 200 Baht for

19  accommodation that they shared with other workers.  The accommodation was one

20  room—a plywood floor on stilts.  When it rained, water came in through the roof.

21  There was one latrine for 200 workers.  The only available shower was in open air

22  with a water tank.  There was no hot water.  Mr. Ban and his wife were charged for a

23  van that took them from their rooms to the factory.  They were charged whether or not

24  they took the van.  The conditions at work were difficult.  They did not have clean

25  water to drink, and had to stand for hours.  The workers were hungry, and some would

26  faint.  Mr. Ban and his wife were charged a fee for health insurance but if they went to

27  the health clinic, they were charged an additional fee.  If they got sick, their wages

28  were docked.  Mr. Ban and his wife often did not have enough money after the

6

deductions to buy enough food to eat.  He and his wife looked for food, including un-harvested food in the fields or fish washed up on the shore.  Mr. Ban and his wife wanted to return home but did not know how to get back and were afraid they would be arrested because they did not have proper papers.  Eventually, desperate and without other options, they reported themselves to the Thai police as undocumented workers.  The police put them in a prisoner transport truck, took their pictures and thumbprints, and deported them in 2012.  Mr. Ban and his wife had to pay the Thai police at the border in order to be released.  They returned home after working for over a year still in debt.

11.    Nol Nakry was living with her husband (Yem Ban) in Kampot, Cambodia when she, along with her husband, was recruited to work in a Thai factory. She re-alleges and incorporates herein the allegations set forth in paragraph 10 as if fully set forth here.

12.    Phan Sophea was living in Battambang, Cambodia in 2010 when he was recruited to work in Thailand by an agent affiliated with CDM.  Mr. Sophea had not traveled outside Cambodia.  He was recruited along with Mr. Kosal and his wife.  He re-alleges and incorporates the recruitment allegations set forth in paragraph 8.  Like Mr. Kosal, Mr. Sophea took out a loan, at 3% interest per month, to finance the costs. Mr. Sophea put up his family's farmland as collateral for the loan.  The family used the land to grow rice for food.  If the loan was not paid, the land would be taken. CDM arranged for Mr. Sophea's travel to Thailand by bus.  CDM agents accompanied him and had possession of his passport.  The bus ride took a full day and night.  When they arrived at the Phatthana factory, the CDM agents gave Mr. Sophea's passport to Phatthana employees.  Soon after he arrived at the Phatthana factory, Mr. Sophea's mother passed away.  He could not go to her funeral because he did not have enough money to "ransom" his passport back.  He was told he had to deposit 6,000 Baht to get his passport back, money that would be refunded upon return of the passport.  As with Mr. Kosal, Mr. Sophea had been promised free accommodation but instead was

7

charged for accommodation, which was dirty and crowded.  Mr. Sophea was put to work in the factory using chlorine, without being provided effective protective gear. In addition, the factory was very cold.  He developed chronic respiratory problems, which continue to this day.  He cannot afford to see a doctor.  Mr. Sophea returned to Cambodia on or about October 2012 still in debt.  He was not able to repay the money he borrowed to finance the recruitment and passport fees, so his family lost use of the land he put up as collateral.  As a result, they are unable to grow sufficient food.  The family had to resort to watering down portions and going hungry.  They have had to borrow money to buy food, falling further and further behind on their debts.  His sister was forced to drop out of school in the eighth grade to seek work to support the family.

13.     Sok Sang was living in Kampot, Cambodia when he was recruited to work in Thailand by a Phatthana agent in May 2011.  Mr. Sang was offered a job in the seafood industry by an agent for Phatthana.  The job was to pay 300 Baht per day (about $9.00) for eight hours work.  The agent charged Mr. Sang 6,500 Baht (roughly $200) for the cost of travel and for what the agent described as necessary documentation.  The Phatthana agent maintained possession of the work and travel documents.  Mr. Sang borrowed money from a private lender using his home as collateral.  If he did not repay the loan, he would lose his home.  As with Mr. Ban and Ms. Nakry, Mr. Sang was transported by Phatthana agents in a pick-up truck.  Along with other workers, he was stacked like lumber in the back of the pick-up.  He was transported to a forest, where he and other Cambodians were held for about a week. During that time, he borrowed additional money against his future salary from a Phatthana agent.  He needed the money to purchase food and cooking utensils.  The agents in the forest sold food to the Cambodian workers and it was very expensive. At the end of a week, Mr. Sang was picked up and driven to the Phatthana factory. When he arrived at the factory, he learned that he would be paid far less than promised.  Mr. Sang complained about the wages to his supervisor and asked to leave.

8

The supervisor told Mr. Sang that he could not leave.  Mr. Sang asked to leave several times, but was told he could not leave.  He was afraid to leave without work or travel papers, which were held by Phatthana.  Eventually, in April 2012, he was able to return home.

**Defendants**

14.    Defendants are part of a vertically integrated enterprise to produce, transport, and sell seafood products from Thailand in the United States.

15.    Defendant Phatthana Seafood Co., Ltd. is a Thai Corporation with its principal executive offices at 44/2-3 Soi Charoenkrung 69, Yannawa, Sathorn District, Bangkok, Thailand 10120.  Phatthana Seafood manufactures frozen seafood products for export to the United States, including from a factory located in the Songkhla province of Thailand.  Phatthana Seafood is affiliated with Chanthaburi Seafoods Co., Ltd., Chanthaburi Frozen Food Co. Ltd., and Phatthana Frozen Food Co., Ltd. (hereinafter "CSF Group").  The companies in the CSF Group are jointly owned and managed and act as a single unit.  The CSF Group participates in a joint venture with multiple Thai seafood manufacturers and sellers to market and distribute products in the United States through a commonly owned affiliate, Rubicon Resources, LLC. Phatthana Seafood markets and sells its seafood products in the United States through Rubicon Resources, LLC.  Phatthana Seafood also markets and sells seafood products directly to customers in the United States.

16.    S.S. Frozen Food Co., Ltd., is a Thai Corporation with offices and a factory at 70/5 Moo 3, Tambol Kao-Rup-Chang, Muang, Songkhla 90000.  S.S. Frozen Food manufactures frozen seafood products for export to the United States. On information and belief, S.S. Frozen Food shares facilities, resources, and management with Phatthana Seafood.  On information and belief, S.S. Frozen Food is part of the CSF Group and shares the same joint ownership and management.  On information and belief, SS Frozen Food markets and sells its seafood products in the United States through Rubicon Resources, LLC.

9

17.     At the present time, additional corporations responsible for the violations of law detailed herein are unknown to Plaintiffs.  These corporations include certain Thai Corporations that process, ship, and/or manufacture seafood for export to the United States and/or additional corporations that import, purchase or distribute the seafood in the United States.  Doe Corporations 1-5 are liable to Plaintiffs for these violations of law.

18.     Hereinafter, Defendants Phatthana Seafood and S.S. Frozen Food are referred to as "Phatthana."

19.     Defendant Rubicon Resources, LLC ("Rubicon") is incorporated in Delaware and has its principal place of business at 5730 Uplander Way, Culver City, CA 90230.  Rubicon was created by the CSF Group and other Thai seafood companies for the purpose of marketing and distributing seafood products in the United States.  Rubicon imports and distributes seafood, including shrimp and seafood produced by Phatthana, in the United States.  The Thai seafood companies, including the CSF Group, jointly own, participate in and control Rubicon.  For example, one of the directors of Rubicon Resources is also an owner and director of Phatthana.  The Thai seafood companies and Rubicon Resources are part of a vertically integrated enterprise that intentionally projects an image of a single company.  For example, in its marketing materials, Rubicon describes the Thai seafood companies as its "Asia Offices and Factories."  Rubicon and the Thai seafood companies, including Phatthana, are referred to as the "Rubicon Group."

20.     Rubicon serves as Phatthana's agent in the United States for Phatthana's importation of seafood.  Rubicon's role on Phatthana's behalf is extensive:  it actively seeks out new clients on behalf of Phatthana; maintains regular contact with customers; performs market research, advertises, and runs sales promotions; actively monitors inventory levels and product delivery; and works with customers to develop new packaging and market opportunities for seafood products from Thailand, including from Phatthana.  Rubicon places orders for seafood products with the Thai

COMPLAINT

seafood companies, including Phatthana, via Defendant Wales.  Rubicon tracks the status of these shipments from Thailand and maintains contact with the customs broker to ensure all appropriate documents have been processed for entry into the United States.  Rubicon also addresses customers' complaints, including through the issuance of refunds to customers.  Rubicon profits from its participation in the joint venture.

21.     Defendant Wales & Co. Universe Ltd ("Wales") is incorporated in Thailand but is registered to conduct business in California with offices at 5730 Uplander Way, Culver City, CA 90230.  Wales also has an agent for service of process in California.  Wales is a trading company involved in the importation of seafood and other foods to the United States.

22.     Wales and its affiliated companies (the "Wales Group") jointly own and control Defendant Rubicon along with the CSF Group and other Thai seafood companies.  Wales also directly participates in the sales of shrimp and seafood produced by Phatthana.  Wales serves as the primary intermediary between Defendant Rubicon and the Thai seafood companies, including Phatthana, communicating purchasing requirements from Rubicon to the Thai-based seafood manufacturers. Wales also oversees order fulfillment by monitoring shipments until delivery to Rubicon or the United States purchaser.  Wales earns a commission on these sales and profits from its participation in the joint venture.

23.     Defendants actively target the U.S. market to profit from their joint venture, selling their shrimp and other seafood to large U.S. customers like Walmart. Indeed, the Rubicon Group, which includes Phatthana Seafood, sells most of its shrimp to the United States.  On information and belief, S.S. Frozen and the Doe Corporations likewise sell their shrimp and seafood to the United States.

## JURISDICTION AND VENUE

24.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, this action involving questions of federal law; 18 U.S.C. § 1596, this action involving

COMPLAINT

1  an offense under 18 U.S.C. §§ 1581, 1584, 1589, and 1590 and the offender is a

2  national of the United States or present in the United States, irrespective of

3  nationality; and 28 U.S.C. § 1350, this action involving a civil action by an alien for a

4  tort in violation of the law of nations and treaties of the United States.

5      25.    This Court has personal jurisdiction over Defendant Phatthana Seafood

6  because Phatthana Seafood has constant and pervasive contacts with California and

7  the United States so as to render it essentially at home in California and the United

8  States.  In addition, Phatthana Seafood has substantial, continuous and systematic

9  business contacts with California and the United States.  Because Phatthana Seafood

10 has purposefully availed itself of the privileges of conducting activities in California

11 and the United States, and because Plaintiffs' claims arise out of these activities with

12 California and United States, the exercise of personal jurisdiction over Phatthana

13 Seafood is reasonable.  This Court further has personal jurisdiction over Phatthana

14 Seafood because it engaged in business in California and in the United States through

15 its California agent, Rubicon, and because Phatthana Seafood is part of an integrated

16 enterprise with the other Defendants.

17     26.    This Court has personal jurisdiction over Defendant S.S. Frozen Foods

18 for the same reasons alleged in paragraph 25.  Plaintiffs hereby reallege and

19 incorporate by reference the allegations in paragraph 25.

20     27.    This Court has personal jurisdiction over Defendant Rubicon because

21 Rubicon has constant and pervasive contacts in California, including its principal

22 place of business at 5730 Uplander Way, Culver City, CA 90230, so as to render it

23 essentially at home in California.  In addition, Rubicon has substantial, continuous and

24 systematic business contacts within California.  Because Rubicon has purposefully

25 availed itself of the privileges of conducting activities in California, and because

26 Plaintiffs' claims arise out of these activities within California, the exercise of

27 personal jurisdiction over Rubicon is reasonable.

28

12

COMPLAINT

28.     This Court has personal jurisdiction over Defendant Wales, which is registered to conduct business in California, has an agent for the service of process in California, and has offices at 5730 Uplander Way, Culver City, CA 90230.  Wales has constant and pervasive contacts with California and the United States so as to render it essentially at home in California and the United States.  In addition, Wales has substantial, continuous and systematic business contacts within California and the United States.  Because Wales has purposefully availed itself of the privileges of conducting activities in California and the United States, and because Plaintiffs' claims arise out of these activities within California and the United States, the exercise of personal jurisdiction over Wales is reasonable.  This Court further has personal jurisdiction over Wales because it engaged in business in California and the United States through its California agent, Rubicon, and because Wales is part of an integrated enterprise with the other Defendants.

29.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) & (3), (c), and (d).

## FACTUAL ALLEGATIONS

### Trafficking in Persons

30.     Trafficking in human beings is a huge and growing scourge around the world.  The United States government estimates that there are currently more than 20 million victims of human trafficking.[1]

31.     Human traffickers prey on the most vulnerable members of society. Traffickers often trick, coerce, or win the confidence of their victims through promises of a better life,[2] frequently using "bait-and-switch scenarios that trick workers into

---

[1] U.S. Dep't of State, Trafficking in Persons Report 2 (2014) [hereinafter "TIP 2014"]; U.S. Dep't of State, Trafficking in Persons Report 45 (2012) (estimate of modern slavery worldwide increased from 12.3 million victims in 2005 to 20.9 million victims in 2012).

[2] U.S. Dep't of State, Trafficking in Persons Report 8 (2009).

COMPLAINT

jobs that are substantially different than what was promised."[3]  Victims are often lured with false promises of good jobs and better lives, and then forced to work under terrible conditions.[4]

32.     In order to combat trafficking, the United States became a party to the United Nations' Protocol to Prevent, Suppress and Punish Trafficking in Persons, along with 163 other nations.  In addition, Congress enacted and repeatedly reauthorized the Trafficking Victims Protection Act.

**Thailand as a Destination for Trafficked Labor**

33.     Thailand is a destination country for trafficked labor.[5]  The United States Department of State has documented labor trafficking in Thailand, particularly within fishing-related industries.

34.     In its 2014 Trafficking in Persons Report, the United States government downgraded Thailand to the lowest ranking possible (Tier 3) because Thailand does not comply with the minimum standards for the elimination of trafficking and is not making significant efforts to do so.[6]  For example, the 2014 TIP report found that despite widespread media and NGO attention within Thailand to rampant forced labor and trafficking in the seafood industry, the Thai government systematically failed to prosecute individuals, identify victims, or address the corruption that facilitates the use of forced labor in Thailand.  In its 2015 Trafficking in Persons Report, the United States again gave Thailand the lowest possible ranking.[7]

35.     According to the 2014 State Department Trafficking in Persons report, the majority of the trafficking victims within Thailand are migrants from Thailand's

---

[3] U.S. Dep't of State, Trafficking in Persons Report 27 (2011).

[4] U.S. Dep't of Justice, Attorney General's Annual Report to Congress and Assessment of U.S. Government Activities to Combat Trafficking in Persons, Fiscal Year 2012 1 (2014).

[5] TIP 2014 at 372.

[6] *Id.* at 43, 372-73.

[7] U.S. Dep't of State, Trafficking in Persons Report 330 (2015).

14

COMPLAINT

neighboring countries, including Cambodia, who are forced, coerced, or defrauded into labor.[8]

**Trafficking in Thailand's Seafood Industry Is Widely Known And Condemned**

36.     During the relevant time period, Thailand was the world's largest exporter of shrimp, supplying over $3.5 billion worth of shrimp to the world market in 2011.  Thailand also was the third-largest exporter of fish and fishery products, with exports of more than $7.1 billion dollars in 2010.

37.     Since at least 2006, the United States Government has expressed concern about trafficked labor in the Thai seafood industry, particularly the shrimp processing industry.[9]  For example, in 2009, the U.S. Department of Labor placed Thai shrimp on its list of goods produced with forced labor.  Thai shrimp has continued to appear on the Department of Labor's list of goods produced with forced labor every year since 2009.[10]  Thai fish likewise was placed on the Department of Labor's list of goods produced with forced labor in 2012, and has continued to appear on the list in every year since then.

38.     The processing of shrimp and other seafood for export is a highly labor-intensive industry in Thailand.  To keep up with demand, Thailand's multi-billion dollar seafood and shrimp industry relies heavily on migrant laborers.  It is estimated that as much as 90 percent of the workforce in Thailand's seafood processing industry comes from Thailand's neighboring countries, including Cambodia.[11]

39.     Many of these migrant workers have been trafficked and face dangerous, exploitative and abusive working conditions.  These individuals often are subjected to

---

[8] TIP 2014 at 372.

[9] U.S. Dep't of State, Trafficking in Persons Report 243 (2006); U.S. Dep't of State, Trafficking in Persons Report 197 (2007); TIP 2014 at 372.

[10] *See also* Accenture, Exploitative Labor Practices in the Global Shrimp Industry 8 (2013) ("Modern-day slavery is embedded deep in the global shrimp supply chain" and particularly noting problems in Thailand).

[11] Environmental Justice Foundation, The Hidden Cost: Human Rights Abuses in Thailand's Shrimp Industry at 4 (2013).

15

the under or non-payment of wages, excessive fees for permits, unannounced or illegal deductions, long hours, physical threats or abuse, dangerous and unsanitary working conditions, and confiscation of their legal documents.

40.    Since at least 2003, reports by non-governmental organizations, international organizations, media outlets, and the U.S. government repeatedly have exposed problems of trafficking and forced labor in Thai seafood and shrimp factories.  For example, non-governmental organizations, including Human Rights Watch, the Environmental Justice Foundation, and the Solidarity Center, have documented in detail the use of forced labor, debt bondage, and human trafficking in Thai seafood and shrimp processing factories, including in reports in 2003, 2008, and 2010.[12]

41.    In its 2008 report, The True Cost of Shrimp, the Solidarity Center documented how workers who initially choose to migrate to Thailand in search of employment often are subjected to trafficking and involuntary servitude in Thai shrimp factories.  According to the report, a key factor in this process is the use of debt bondage, whereby labor brokers charge excessive fees that the workers are forced to repay through payroll deductions or unpaid labor.  This practice, along with the confiscation of workers' identity documents, prevents workers from leaving or searching for a better job.  The Solidarity Center report documented the use of other illegal and abusive practices in Thai shrimp factories, including the nonpayment of wages, long hours and forced overtime, unexplained deductions from workers' pay, and squalid living conditions.

42.    A 2007 report published by the United Nations Inter-Agency Project on Human Trafficking found the "systematic and institutional exploitation of migrants . .

---

[12] *E.g.*, Environmental Justice Foundation, Smash & Grab:  Conflict, corruption & human rights abuses in the shrimp farming industry (2003); Solidarity Center, The True Cost of Shrimp (2008); Human Rights Watch, From the Tiger to Crocodile: Abuse of Migrant Workers in Thailand (2010).

COMPLAINT

1  . often through debt bondage" in Thai seafood factories.[13]  The report found that once

2  these workers arrive at their destination, they discover that they have been deceived

3  about the amount of fees that will be charged and that their debt is much greater than

4  they had been told.

5      43.    Research in 2009 by the Labour Rights Promotion Network and Johns

6  Hopkins School of Public Health estimated that tens of thousands of migrants in

7  Thailand are forced to work in the shrimp industry in slavery-like conditions that

8  include debt bondage, forced labour, unpaid wages, physical violence, control through

9  threats and withholding of documents.

10     44.    In addition, both U.S. and Thai media outlets, including the New York

11 Times, CNN, Reuters, and the Bangkok Post, have repeatedly reported on human

12 trafficking and forced labor in the Thai seafood industry, particularly the shrimp

13 industry, including numerous reports in 2006, 2007, and 2008.[14]  The Labor Rights

14 Promotion Network described the Thai shrimp industry as "factories fed by people-

15 smuggling rings and labor brokers."[15]  Mark Lagon, then head of the U.S. State

16 Department's Office to Monitor and Combat Trafficking in Persons, described the

17 abuses of shrimp industry workers in Thailand as "modern-day slavery" and

18 concluded that "that the flow of shrimp into the U.S. market is tainted by shrimp that's

19 processed by the hands of those in slavery."[16]

20

21

22     [13] Labor Rights Promotion Network, U.N. Inter-Agency Project on Human
   Trafficking, From Facilitation to Trafficking:  Brokers and Agents in Samut Sakhon,
23 Thailand 2 (2007).

24     [14] *E.g.*, Ed Cropley, *In Thai shrimp industry, child labor and rights abuses persist*,
   New York Times (Apr. 25, 2007); *Report alleges abuses in Asia shrimp industry*,
25 CNN (Apr. 23, 2008); Paul Eckert, *U.S. Official decries shrimp industry 'slavery,'*
   Reuters (Apr. 23, 2008); Erika Fry, *Revolving Through a Broken System*, Bangkok
26 Post (Dec. 9, 2007); Phusadee Arunmas, *Shrimpers Lash Out at Report*, Bangkok Post
   (Apr. 30, 2008).

27     [15] Cropley, *supra* note 14.

28     [16] Eckert, *supra* note 14.

17

COMPLAINT

45.     These reports of trafficking and forced labor were well known within both the Thai and U.S. shrimp and seafood industries.  For example, the Thai Frozen Food Association, of which Phatthana Seafood and S.S. Frozen Foods are members, knew of the U.S. Department of Labor's 2009 placement of Thai shrimp on its list of goods produced with forced labor.  Publication of the Solidarity Center's 2008 report The True Cost of Shrimp also received widespread coverage in both the regular press and shrimp industry outlets, and was well known within both the U.S. and Thai shrimp industries.

46.     Reports on human trafficking in the shrimp industry specifically flagged Phatthana's facility in Thailand's Songhkla province.  Phatthana was described as having a reputation as "the worst factory in the region."[17]

47.     These reports garnered the attention of Human Rights Watch and the United Nations Special Rapporteur on the Human Rights of Migrants, the Special Rapporteur on Contemporary Forms of Slavery, and the Special Rapporteur on Trafficking in Persons.  The United Nations Special Rapporteurs wrote to the Government of Thailand to express concern "over the reported pattern of trafficking of migrant workers for labour exploitation and debt bondage to Thailand," particularly at Phatthana.[18]  Meanwhile, Human Rights Watch wrote letters to both Phatthana and Walmart, which purchased Phatthana's products, to raise concerns about reports of labor abuses at Phatthana, including conditions amounting to debt bondage and human trafficking.  Later reports by Human Rights Watch and Cambodian NGOs further documented and raised concerns about a variety of labor abuses, including debt bondage and human trafficking, at Phatthana.  According to these reports, managers at

---

[17] Community Legal Education Center, Khmer Workers at Phatthana Seafood Factory 5 (Dec. 4, 2012).

[18] Letter from Francois Crepeau, Gulnara Shahinian & Joy Ezeilo, U.N. Special Rapporteurs on the Human Rights of Migrants, Contemporary Forms of Slavery, and Trafficking in Persons, especially women and children, to Gov't of Thailand 2 (May 14, 2012), https://spdb.ohchr.org/hrdb/21st/AL_Thailand_14.05.12_(2.2012).pdf.

COMPLAINT

1  Phatthana took portions of the workers' wages to pay off debts created by excessive

2  placement and transport fees that the workers had been charged by recruiters, and

3  charged various additional fees creating "conditions amounting to debt bondage."[19]

4  Workers, most of whom already had paid large up-front fees to secure employment,

5  had not been informed about these additional fees.  Phatthana also paid workers less

6  than the minimum wage, gave the workers fewer work days than promised, and

7  charged workers fees for dilapidated, shared rooms, even though the workers had been

8  promised free, furnished housing.  As a result, some of the workers were paid so little

9  that they could not afford sufficient food and had to catch minnows and snails for

10  meals.

11      48.    The reports by Human Rights Watch and the Community Legal

12  Education Center also described foul and unsanitary conditions at the Phatthana

13  factory.  For example, workers at Phatthana "were provided inadequate toilet facilities

14  and given insufficient bathroom breaks, obliging them at times to relieve themselves

15  in corners of the factory."[20]  Workers also reported soiling their underwear because of

16  the insufficient toilet facilities and bathroom breaks provided to Phatthana workers.

17      49.    In addition, according to Human Rights Watch and the Community Legal

18  Education Center, Phatthana held onto a portion of its workers' wages in order to

19  prevent the workers from leaving.  Phatthana's management also confiscated workers'

20  official identification documents, including passports and national ID cards, "to

21  prevent workers from running away."[21]  Workers were told they would only get their

22  documents back after their debts were paid off, which Human Rights Watch noted is a

23  key criterion to prove human trafficking.  Some workers who attempted to run away

24

25

26  [19] John Sifton, Human Rights Watch, *Walmart's Human Trafficking Problem* (Sept. 17, 2012), http://www.hrw.org/news/2012/09/17/walmarts-human-trafficking-problem.

27  [20] *Id.*

28  [21] *Id.*

1    were arrested and placed in prison for one month, after which they were sent back to

2    the factory with the bail costs added to their debt.

3        50.    Phatthana and its affiliated companies export their shrimp and seafood to

4    the United States, and reports of forced labor and human trafficking at Phatthana's

5    factory sparked concerns in the United States about companies importing Phatthana

6    shrimp products into the United States.  For example, in April 2012, Human Rights

7    Watch wrote to Walmart to raise concerns about Walmart's importation of

8    Phatthana's shrimp products and find out what steps Walmart was taking to ensure

9    that similar abuses were not occurring in other Walmart supplier factories in Thailand.

10   **Obstacles Facing Trafficked Workers in Thailand**

11       51.    Migrant workers in Thailand are subjected to substantial mistreatment,

12   mistreatment which makes it harder for trafficking victims to receive assistance or

13   escape.  For example, migrant workers face significant restrictions on their freedom of

14   association, expression, and movement.  Migrant workers also are subjected to

15   widespread extortion of money and valuables by the police, as well as beatings and

16   torture while in police custody.

17       52.    Reports by the United States government, non-governmental

18   organizations, and the media have documented the participation of Thai government

19   officials, including the police, in human trafficking and forced labor.  For example, in

20   its 2014 Trafficking in Persons Report, the U.S. Department of State stated that

21   trafficking-related corruption is widespread among Thai law enforcement personnel

22   and cited credible reports that corrupt officials protect food processing facilities from

23   raids and inspections; collude with traffickers; use information from victim interviews

24   to weaken cases; and sell migrants who are unable to pay labor brokers.[22]

25       53.    Police officials in Thailand profit from human trafficking.  For example,

26   in 2013, the Environmental Justice Foundation investigated reports about trafficked

27

28   _____

   [22] 2014 TIP at 374-75.

COMPLAINT

workers at a shrimp factory owned by a police captain.  In another report that year, the Environmental Justice Foundation found evidence that human traffickers sometimes make available trafficking victims to perform work for police officers or at police stations.

54.     Victims who report trafficking to Thai officials risk additional mistreatment and abuse.  For example, according to Human Rights Watch, workers who file labor complaints have been subjected to threats and physical violence by their employers and have been reported to the police for arrest.  In addition, victims who report trafficking risk being punished for immigration violations, according to the 2014 TIP Report by the U.S. Department of State.  The Environmental Justice Foundation also found that some victims have been returned to their traffickers by law enforcement authorities.

**The Plaintiffs' Trafficking**

55.     The United States government describes Cambodia as a source country for labor trafficking.[23]  The State Department's 2014 TIP Report observes that Cambodian migrant workers in Thailand are especially vulnerable to forced labor and debt bondage, and that employers have withheld copies of employment contracts and confiscated passports.[24]

56.     The poor quality of education of many Cambodians and low levels of awareness of the risks of labor migration contribute to Cambodians' vulnerability to human trafficking.  One study on labor exploitation of workers from Cambodia noted that the lack of regulation of brokers in Cambodia makes it "easy to take advantage of the illiterate, uniformed and trusting Cambodian worker from the village."[25]

---

[23] TIP 2014 at 120.

[24] *Id.*

[25] Chen Chen Lee, Coordinated Mekong Ministerial Initiative against Human Trafficking, A Study into Exploitative Labour Brokerage Practices in Cambodia 34 (2007).

21

COMPLAINT

57.    In addition, an assessment of Cambodian migrant workers in part of Thailand funded by the United Nations Inter-Agency Project on Human Trafficking found that newly arrived Cambodian migrants in Thailand are particularly vulnerable to labor abuse because they lack contacts, family, or connections in the area, and have little information about employers.  The study further found that such migrants are easy to exploit in part because of their lack of local language and lack of knowledge of their rights.

58.    As described in detail in paragraphs 7 through 13, the Plaintiffs were living and working in Cambodia when they were recruited by Defendants' agents.  As described above, the Plaintiffs had not traveled outside Cambodia before.  None of the Plaintiffs spoke Thai.  In addition, the Plaintiffs had limited education, none had finished high school.

59.    The agents offered Plaintiffs jobs in Thailand working in the seafood industry.  The agents promised Plaintiff Keo Ratha a salary of $250, plus overtime.  Mr. Kosal and his wife were similarly offered jobs paying between $220 and $300 a month.

60.    The agents also promised free accommodations.  Plaintiff Kosal was shown a glossy brochure depicting the promised accommodations as clean and spacious.

61.    The agents charged each Plaintiff a fee to obtain the promised job.

62.    The recruitment fees were near the average annual per capita income for a rural Cambodian.  The Plaintiffs were told that if they could not pay the fee in a lump sum in advance, their employer in Thailand would deduct the fee plus a service charge from their salary over time.  The Plaintiffs went into debt for the recruitment fee.  They anticipated that they would repay the debt with the salaries promised them and still be able to save money to support their families in Cambodia.  Several Plaintiffs, including Mr. Kosal, Mr. Sophea and Mr. Sang, used their family homes

22

COMPLAINT

and/or farm land as collateral for the loan.  If the loan was not repaid, their families would lose their homes and farms.

63.     The agents transported the Plaintiffs across the border to Thailand.

64.     After Plaintiffs Ban and Nakry were taken to the border, the agents charged them double the anticipated amount.  In addition, as described in paragraphs 10–11, Plaintiffs Ban and Nakry were taken on a harrowing journey, packed like sardines in a pick-up truck, threatened with beatings, and held for days in the jungle. Plaintiffs Ban and Nakry watched fearfully as their fellow workers were beaten with a tire iron by the recruiters.  The workers were not permitted to return home when they asked to be allowed to leave.  While he was kept in the jungle, Plaintiff Sang had to borrow additional funds from the Phatthana agents.  The agents sold expensive food to the workers during their enforced stay in the jungle.

65.     The agents transported the Plaintiffs to the Phatthana factory.  The agents maintained control of Plaintiffs' passports and travel documents.  The trip was over 20 hours long and the Plaintiffs, who had never been outside Cambodia, were far from home in an unfamiliar location.  They did not know how to return and, moreover, could not afford to incur the additional cost of return travel on top of the amounts already owed for recruitment fees.

66.     As described in detail in paragraphs 7–9 and 12, when the Plaintiffs arrived at the Phatthana factory, their passports were taken by an employee at the factory.  Phatthana refused the pleas of several workers who requested their passports be returned.  Phatthana deprived the workers of their passports to prevent them from returning home or seeking other employment in Thailand.

67.     In addition to having their passports confiscated, when the Plaintiffs arrived at the Phatthana factory, they learned that they would not receive their promised salaries, but would be paid far less than promised.  Instead of the promised salaries, the Plaintiffs' wages ranged from 5,000 to 6,000 Baht per month (about $151 to $181)—just over half of what had been promised.  Following the monthly

COMPLAINT

deduction of 3,000 Baht for recruitment fees, Plaintiffs were left with approximately 2,000 to 3,000 Baht each month (about $60 to $90).

68.    The Plaintiffs faced additional, unexpected and mandatory deductions from their pay.  This stream of unexpected deductions further reduced their pay, making it more difficult for the Plaintiffs to get out of debt or to save any money.

69.    First, the Plaintiffs learned that their accommodations would not be free as promised.  The men and women were charged between 200 Baht ($6) and 300 Baht ($9) per month for housing.  In addition to paying for the housing, workers were charged for transportation to and from the factory in vans arranged for by the factory. The charge was levied whether the workers took the van or not.

70.    Plaintiffs also were charged 200 Baht ($6) and 300 Baht ($9) per month for medical care expenses and social services.  However, the workers did not receive the medical care they had been promised.  If the Plaintiffs went to the factory clinic, they had to pay an additional fee for each visit.  Laborers often were not allowed days off when they were ill.  If they did fall sick and miss work, their wages were reduced.

71.    The workers also were required to purchase the supplies they needed to work in the Phatthana factory.  They were charged:  5 Baht ($.15) per pair of gloves, 25 Baht ($.76) per pair of scissors, 10-15 Baht ($.30-.46) per shrimp needles, 15 Baht ($.46) per name card, 45-50 Baht ($1.37-1.52) per cap, and 25 Baht ($.76) per ID card cover.  Plaintiffs had to replace these supplies when the materials wore out or tore, which was often.  Some workers had to buy additional gloves three or four times per week.

72.    In April 2012, the minimum wage in Songkhla, Thailand, was approximately $190 per month.  After the mandatory deductions from Plaintiffs' wages, the Plaintiffs were left with less than half the monthly minimum wage.

73.    After the multiple deductions from their salary, some workers could not afford to purchase enough food and were constantly hungry.  For example, Plaintiffs Ban and Nakry looked for food growing in nearby fields and found snails and fish

COMPLAINT

washed up on the shore in order to eat.  In addition, the workers had to purchase their own cooking supplies, utensils and even a stove.  And because there was not a separate kitchen area in the victims' housing, workers had to cook, eat, and sleep in the same small room.

74.     Not only did Plaintiffs have to pay for housing that was supposed to be provided free of charge, but the accommodations were overcrowded and unsanitary. Small rooms had to be shared.  The rooms did not have beds, so the Plaintiffs slept on the cement floor.  Often, the cement floor was crawling with insects.  During the rainy season, water poured through the roof, flooding the rooms.

75.     The sanitary facilities were inadequate.  There were too few toilets shared by too many workers and the toilets were not clean.  There was no hot water.  There were no separate bathrooms for men and women.  There were no modern showers, only a water tank and tap.  This open air shower had cold water only.

76.     The Phatthana factory is a seafood processing factory where shrimp and other seafood is de-veined, cleaned, boiled, packaged and frozen.  The workers were assigned to:  cutting shrimp, stripping shrimp, or packing, among other tasks.

77.     The workers punched in and out of the factory, but several believed they were shortchanged for time worked.

78.     Guards were stationed at the factory gates.  The guards searched Plaintiffs on the way in and out of the factory.

79.     Workers were required to stand for hours while completing their work. They received time off for lunch, but no other breaks.

80.     The factory was very cold, and the workers had a hard time adapting to the temperature.

81.     Several of the Plaintiffs were assigned to work with chlorine, including Mr. Ratha and Mr. Sophea.  Neither man was provided adequate safety equipment. Both men suffered respiratory problems from chlorine exposure.  Both men found it

1   hard to breathe and developed long-lasting health problems.  The Plaintiffs saw people

2   collapse from chlorine exposure.

3       82.    Workers were not provided with clean water to drink; when thirsty, the

4   workers had to make do with dirty water.

5       83.    The factory had only a handful of toilet facilities located at a considerable

6   distance from the main factory, and workers often were denied permission to use

7   them.  As a result, the workers frequently relieved themselves in the corners of the

8   factory, creating a foul and unsanitary work environment.  At times, workers soiled

9   their underwear because they were unable to use the toilets.  Even when workers were

10  allowed to use the bathroom, the factory deducted a portion of their wages if the

11  workers took too long.

12      84.    Workers who complained were threatened.  The company threated to call

13  the police.  Several Plaintiffs saw or heard workers punished by being ordered first to

14  strip and then to crawl without their clothes across a long strip of rough concrete,

15  leaving their elbows and knees bloody.  Plaintiffs were intimidated and afraid.

16      85.    Many of the workers wanted to quit during their time at Phatthana and

17  return home to Cambodia.  However, Phatthana staff refused to let them leave.  For

18  example, Plaintiff Keo Ratha asked to quit soon after he arrived at Phatthana.  He was

19  told that he could not leave.  He was also told that he could not get his passport back

20  until his recruitment service fee was paid off.  Plaintiff Kosal also asked to quit.

21  Phatthana staff also told him that he could not leave without paying off the

22  recruitment service fee.  Plaintiff Sang also asked his supervisor if he could leave on

23  multiple occasions.  Each time, his supervisor told him he could not leave.

24      86.    Plaintiffs Ban and Nakry wanted to return home to Cambodia.  However,

25  they had no money to repay the recruitment service fee or to pay for transportation

26  home, nor did they have passports.  They were afraid.  Eventually, they reported

27  themselves to the police, were arrested, and deported.

28

COMPLAINT

87.     Plaintiffs returned home after laboring for Phatthana with nothing to show for their hard work.

88.     Plaintiffs and their families are worse off than they were before the trafficking.  For example, Mr. Sophea returned to Cambodia still in debt and without any means to repay his debt.  As a result, his family lost their land and are unable to grow sufficient food, and his sister was forced to drop out of school in order to help support the family.

**Defendants benefitted from trafficked labor, including that of Plaintiffs**

89.     Defendants are part of a joint venture to produce shrimp and seafood for and export shrimp and seafood to the U.S. market.  In 2004, the United States government found that this joint venture is one of largest exporters of shrimp from Thailand to the United States, a market that was then worth $872 million.  By 2011, when Plaintiffs were trafficked, the market for Thai shrimp in the United States had grown to over $1.7 billion and the total market for Thai seafood was over $2.5 billion.

90.     Obtaining workers through international recruitment was key to Defendants' ability to compete in the shrimp and seafood market.

91.     Defendants benefitted from the low-cost labor provided by Plaintiffs and the other foreign workers.

92.     Defendants' conduct provided a competitive advantage in the U.S. market.  By using trafficked and forced labor to keep costs low, Defendants were able to obtain and maintain a substantial share of the U.S. market.  Defendants continued the alleged conduct, despite their knowledge that the workers, including Plaintiffs, were victims of trafficking and forced labor. Defendants sought and benefitted from the use of trafficked and forced labor, and purposefully continued to do so over time.

93.     Defendants knew that the workers at the Phatthana factory, including the Plaintiffs, were paid a lower wage than promised; had their passports confiscated; were charged additional, unanticipated and previously undisclosed fees and expenses,

COMPLAINT

1  including being charged for the promised free housing; and were compelled to stay

2  because they and their families were in debt to labor recruiters.

3       94.    The Thai Defendants, directly and through their agents, knowingly

4  utilized deceptive recruitment; charged excessive recruitment fees; confiscated

5  passports; paid the workers less than they had been promised; levied additional,

6  previously undisclosed fees and expenses, including charging for housing, and

7  deducted these amounts from the worker's already meager pay; and refused Plaintiffs'

8  requests to return home.  The Thai Defendants knowingly subjected the workers at the

9  Phatthana factory, including the Plaintiffs, to trafficking and forced labor.

10       95.    The U.S. Defendants knew that the workers at the Phatthana factory,

11  including the Plaintiffs, were subject to practices indicative of trafficking, including

12  deceptive recruiting, confiscation of passports, and coercive recruitment fees.

13       96.    Knowing that the shrimp and seafood was produced with trafficked and

14  forced labor, the U.S. Defendants provided a market and worked to expand that

15  market.  The U.S. Defendants did so knowing the conduct would continue, benefitting

16  from it, and intending to benefit from it.

17       97.    The human rights abuses of trafficking in persons and forced labor were a

18  foreseeable consequence of the U.S. Defendants' purposeful and continued venture

19  with Phatthana.  The U.S. Defendants willingly accepted that risk in order to benefit

20  and profit from their common venture.

21       98.    Defendants Rubicon and Wales participated in and profited from their

22  common venture with Phatthana to sell Thai seafood and shrimp in the American

23  market.

24       99.    The conduct of the U.S. Defendants had a substantial effect in bringing

25  about the violations alleged herein.  But for their conduct, the abuses alleged herein

26  would not have occurred as they did.

27       100.   During the relevant time period, Defendants took no effective steps to

28  eliminate the abuses.

COMPLAINT

1   101.   This shrimp and seafood, produced with forced labor and tainted by

2   trafficking, makes it way to large stores in the United States, including Walmart, and

3   to U.S. consumers.

## CAUSES OF ACTION

### COUNT I
**Violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA")**
**18 U.S.C. § 1595**
**Against Defendants Phatthana Seafood,**
**S.S. Frozen Food Co., and Doe Corporations 1-5**

9   102.   Plaintiffs reallege and incorporate by reference the allegations set forth

10  above as if fully set forth here.

11  103.   Plaintiffs are victims of peonage, forced labor, involuntary servitude and

12  human trafficking in violations of Title 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1592

13  and 1593A.

14  104.   Plaintiffs were especially vulnerable because they had not traveled

15  abroad before, did not speak the local language, and did not know anyone, other than

16  their travel companions, in Thailand who could help them.  Plaintiffs also were

17  especially vulnerable because of their limited education, inability to read and write,

18  and because their families were too poor and too isolated to provide assistance from

19  afar.

20  105.   Plaintiffs also were vulnerable because they were migrant workers in a

21  country known for the mistreatment and abuse of migrants.  Plaintiffs feared that if

22  they attempted to leave, they might be kidnapped and sold to fishing boats, where they

23  could be subjected to violence and forced to labor without pay for years.  Plaintiffs

24  further feared that if they attempted to leave they might be arrested, abused, extorted,

25  and/or deported by the police.

26  106.   Plaintiffs were rendered more vulnerable by Phatthana's confiscation of

27  their passports.  Without their passports, Plaintiffs feared that they would be arrested,

28  abused, extorted, and/or deported by the police if they attempted to leave Phatthana.

29

COMPLAINT

107.  Defendants' conduct was knowing.

108.  Defendants knowingly benefitted from participation in a venture which Defendants knew or should have known was engaged in peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking.  Defendants received financial benefit as well as the benefit of a steady stream of labor, from participation in the conduct alleged herein.

109.  Defendants and/or their agents held Plaintiffs in a condition of peonage. As described above, Plaintiffs were charged recruitment, service and transportation fees in order to obtain their jobs at Phatthana.  Plaintiffs took out loans in order to finance these fees.  Phatthana deducted a monthly amount from Plaintiffs' pay in order to repay the debt.  Plaintiffs also were charged additional, unexpected fees for lodging, medical care and supplies.  When Plaintiffs sought to leave the Phatthana factory, they were not permitted to do so without paying off their debts.  Phatthana coerced Plaintiffs to work in order to satisfy the debt.

110.  Phatthana held Plaintiffs in a condition of involuntary servitude. Plaintiffs provided labor involuntarily to benefit Phatthana.

111.  Phatthana obtained the labor and services of Plaintiffs by force, threats of force, threats of serious harm and physical restraint against Plaintiffs.

112.  Phatthana, along with its agents, obtained the labor and services of Plaintiffs by means of a scheme, plan or pattern intended to cause the Plaintiffs to believe that, if Plaintiffs did not perform such labor or services, that Plaintiffs would suffer serious harm or physical restraint and that Plaintiffs' family members would suffer serious harm.

113.  Phatthana obtained the labor and services of Plaintiffs by means of the abuse or threatened abuse of law or legal process.

114.  Phatthana and/or its agents removed, confiscated and possessed the passports of Plaintiffs Ratha, Kosal, Bun, and Sophea to prevent or restrict Plaintiffs' ability to travel and in order to maintain the labor and services of Plaintiffs.  Phatthana

and/or its agents refused to return the passports upon request.  Plaintiffs were afraid to flee without their passports.

115.   Plaintiff Ratha was told he could not get his passport back without paying off his recruitment fee.  Plaintiff Sophea was told he would have to pay a deposit to ransom his passport back, and he could not afford the amount.

116.   Phatthana and/or its agents informed Plaintiffs Ban, Nakry and Sang that they did not need passports because the agent was authorized to recruit workers in Cambodia.  Once Plaintiffs arrived at Phatthana, they realized they did not have the necessary immigration documents, were effectively undocumented, and therefore were afraid to flee.

117.   Phatthana and/or its agents knowingly recruited, harbored, transported, provided, and obtained the Plaintiffs for labor or services by means of violations of Title 18, Chapter 77.

118.   Phatthana and/or its agents physically restrained the Plaintiffs, including by holding Plaintiffs Ban, Nakry and Sang in the jungle; confiscating and withholding the passports of Plaintiffs Ratha, Kosal, Bun and Sophea; and preventing all of the Plaintiffs from freely leaving the Phatthana factory.  Defendants did not permit Plaintiffs to return home, despite repeated requests.

119.   Phatthana and/or its agents transported Plaintiffs from Cambodia to the Phatthana factory with the promise of lucrative jobs, indebted Plaintiffs, charged excessive fees, and paid Plaintiffs less than promised, in order to maintain the labor and services of Plaintiffs.  Defendants and/or their agents obtained Plaintiffs' labor by means of this scheme, plan or pattern.

120.   Without the promised salaries, Plaintiffs were afraid they would be unable to support their families in Cambodia and unable to pay back their loans.

121.   As a result of the conduct of Defendants' and their agents, Plaintiffs have suffered damages in an amount to be determined at trial.

COMPLAINT

122.   Plaintiffs are entitled to recover damages and reasonable attorneys' fees for the wrongful conduct of Defendants and their agents.

**COUNT II**
**Violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA")**
**18 U.S.C. § 1595**
**Against Defendants Rubicon and Wales**

123.   Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth here.

124.   Plaintiffs are victims of peonage, forced labor, involuntary servitude and human trafficking in violations of Title 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1592 and 1593A.

125.   Defendants Rubicon and Wales knowingly benefitted from participation in a venture which Defendants knew or should have known was engaged in peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking.  Defendants received financial benefit as well as the benefit of a steady stream of imported shrimp and seafood for market, from their participation in the venture.

126.   Defendant Rubicon was created for the purpose of marketing and distributing seafood products in the United States from Thai seafood companies, including Phatthana.  Rubicon served as Phatthana's agent in the United States for Phatthana's importation of seafood.  Defendant Rubicon profits from these sales.

127.   Defendant Wales serves as the intermediary between Defendant Rubicon and the Thai seafood companies, including Phatthana.  Wales takes purchase orders from Rubicon and communicates these to the Thai seafood companies.  Upon information and belief, Wales earns a commission on Phatthana's sales to Rubicon Resources.

128.   All of the Defendants were part of an integrated enterprise to produce, transport, and sell shrimp to the United States.

COMPLAINT

129.   All of the Defendants knew that the enterprise was engaged in peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking.

130.   As a result of the conduct of Defendants and their agents, Plaintiffs have suffered damages in an amount to be determined at trial.

131.   Plaintiffs are entitled to recover damages and reasonable attorneys' fees for the wrongful conduct of Defendants and their agents.

**Count III**
**Alien Tort Statute ("ATS")**
**28 U.S.C. § 1350**
**Against All Defendants**

132.   Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth fully here.

133.   Plaintiffs are aliens.

134.   Defendants' actions as set forth above constitute the torts of trafficking in persons, involuntary servitude, and forced labor.

135.   Trafficking in persons is a modern day form of slavery, and along with involuntary servitude and forced labor constitutes a tort in violation of the law of nations and/or in violation of treaties of the United States.

136.   The law of nations, including customary international law, is reflected, expressed and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, including but not limited to the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Nov. 15, 2000, G.A. Res. 55/25, Annex II to the United Nations Convention Against Transnational Organized Crime, U.N. GAOR Supp. (No. 49), U.N. Doc. A/45/49 (Vol. I) (2001); Convention Concerning the Abolition of Forced Labor, June 25, 1957, 320 U.N.T.S. 291; Supplemental Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, Sept. 27, 1956, 266 U.N.T.S. 3;  Convention for the Suppression of the Traffic in Persons And of the Exploitation

33

of the Prostitution of Others (1951); Convention Concerning Forced or Compulsory Labour, June 28, 1930, 39 U.N.T.S. 55; Convention to Suppress the Slave Trade and Slavery (1926); Universal Declaration of Human Rights, G.A. Res. 217A (Ill.), U.N. Doc. A/810, at 71 (1948); the International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171, 61 I.L.M. 368;  and the International Labour Organisation (ILO) on Fundamental Principles and Rights at Work, International Labour Conference (ILC) 86th Sess., June 19, 1998, § 2(c), 37 I.L.M 1233.

137.   As set forth in detail above, Defendants engaged in and/or are responsible for acts, including by their agents, that constitute the recruitment, transportation, transfer, harboring or receipt of Plaintiffs.  These acts were conducted by means of the threat or use of force or other means of coercion, abduction, fraud, deception, and the abuse of power or a position of vulnerability.  The acts were taken for the purpose of exploitation, including for the purposes of obtaining labor and services from Plaintiffs. Defendants and their agents benefitted from the trafficking by keeping labor costs low, at the expense of the individuals trafficked, including Plaintiffs.

138.   Plaintiffs suffered injuries and damages as a result of these actions by Defendants.

139.   As set forth in detail above, Plaintiffs' claims touch and concern the United States because the conduct alleged was undertaken for the purpose of manufacturing and importing shrimp and seafood into the United States for sale to U.S. consumers.  Defendant's conduct provided a competitive advantage in the U.S. market.  By using trafficked and forced labor, Defendants were able to keep costs low, and thereby obtain and maintain a substantial share of the U.S. market.

140.   Plaintiffs' claims also touch and concern the United States because defendants are nationals of or conduct business in the United States, profited from the alleged conduct in the United States, and/or participated in the joint venture in the United States.

COMPLAINT

1

**PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiffs pray this Court will enter an order:

3     141.    Entering judgment in favor of each of the Plaintiffs on all counts of the

4   Complaint;

5     142.    Awarding each of the Plaintiffs monetary damages, subject to proof and

6   in an amount to be determined at trial, including but not limited to fees and costs paid,

7   debts incurred, and wages promised but not paid;

8     143.    Awarding each of the Plaintiffs consequential damages, including but not

9   limited to the loss of assets and of educational and business opportunities as a result of

10   Defendants' illegal conduct;

11     144.    Awarding each of the Plaintiffs damages for the mental anguish and pain

12   and suffering Plaintiffs experienced as a result of being trafficked and forced to labor

13   against their will;

14     145.    Awarding each of the Plaintiffs punitive and exemplary damages;

15     146.    Awarding Plaintiffs any and all other damages allowed by law according

16   to proof to be determined at time of trial in this matter;

17     147.    Awarding Plaintiffs reasonable attorneys' fees and costs;

18     148.    Awarding such other relief as the Court deems just and equitable.

19

**JURY DEMAND**

20     149.    Plaintiffs respectfully demand a trial by jury of all issues for which they

21   have a right to demand a trial by jury.

22

23   Dated:  June 15, 2016                        Respectfully Submitted,

24                                                HADSELL STORMER RENICK LLP

25
                                      By:    /s/  Dan Stormer
26                                           Dan Stormer, Esq. [S.B. #101967]
                                             Mary Tanagho Ross, Esq. [S.B. #280657]
27                                           HADSELL STORMER & RENICK LLP
                                             128 N. Fair Oaks Avenue
28

35

COMPLAINT

1
2
3
4

Pasadena, California  91103
Telephone:  (626) 585-9600
Facsimile:  (626) 577-7079
Emails:  dstormer@hadsellstormer.com
             mross@hadsellstormer.com

5
6
7
8
9
10
11
12

Agnieszka Fryszman
Alysson Ford Ouoba
COHEN MILSTEIN SELLERS & TOLL
    PLLC
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, District of Columbia  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
Emails:  afryszman@cohenmilstein.com
             aouoba@cohenmilstein.com

13
14
15
16

Anthony DiCaprio
Attorney at Law
64 Purchase Street
Rye, New York  10580
Telephone:  (917) 439-5166

17
18
19
20
21
22
23

Paul L. Hoffman [S.B. #71244]
Catherine E. Sweetser [S.B. #271142]
SCHONBRUN SEPLOW HARRIS &
    HOFFMAN LLP
723 Ocean Front Walk
Venice, California  90291
Telephone:  (310) 396-0731
Facsimile:  (310) 399-7040
Email:  hoffpaul@aol.com
             catherine.sdshhh@gmail.com

24
25

***Attorneys for Plaintiffs***

26
27
28

COMPLAINT