Dan Stormer, Esq. [S.B. #101967]
Mary Tanagho Ross, Esq. [S.B. #280657]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California  91103
Telephone:  (626) 585-9600
Facsimile:  (626) 577-7079
Emails:  dstormer@hadsellstormer.com
           mross@hadsellstormer.com

Agnieszka Fryszman
*Admitted pro hac vice*
Michele Keegan
*Admitted pro hac vice*
Laurie Ball Cooper, Esq. [S.B. #275293]
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, District of Columbia  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
Emails:  afryszman@cohenmilstein.com
           mlkeegan@cohenmilstein.com
           lballcooper@cohenmilstein.com

Attorneys for Plaintiffs

[Additional Counsel Continued on Next Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| Keo Ratha, Sem Kosal, Sophea Bun, Yem Ban, Nol Nakry, Phan Sophea, and Sok Sang, <br><br> Plaintiffs, <br><br> vs. <br><br> Phatthana Seafood Co., Ltd.; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe Ltd., <br><br> Defendants. | Case No:  2:16-cv-04271-JFW-AS [Assigned to the Honorable John F. Walter] <br><br> **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS RUBICON RESOURCES, LLC AND WALES & CO. UNIVERSE, LTD.'S MOTION FOR SUMMARY JUDGMENT** <br><br> Complaint filed: June 15, 2016 <br> Disc. Cut-Off: November 20, 2017 <br> Motion Cut-Off: December 18, 2017 <br> Pre-Trial Conf.: January 5, 2018 <br> Trial Date: January 16, 2018 |

1  Additional Counsel Cont. from previous page]

2

3  Anthony DiCaprio
   *Admitted pro hac vice*
   Attorney at Law
4  64 Purchase Street
   Rye, New York  10580
5  Telephone:  (917) 439-5166

6

7  Paul L. Hoffman [S.B. #71244]
   Catherine E. Sweetser [S.B. #271142]
   SCHONBRUN SEPLOW
8    HARRIS & HOFFMAN LLP
   11543 W. Olympic Blvd.
9  Los Angeles, CA 90064
   Telephone:  (310) 396-0731
10 Facsimile:  (310) 399-7040
   Email:  hoffpaul@aol.com
11          catherine.sdshhh@gmail.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    STANDARD OF REVIEW ..................................................................... 2

II.   SUMMARY OF FACTS ...................................................................... 3

  A.   Defendants Do Not Dispute Plaintiffs' Underlying Claims of
       Peonage, Forced Labor, Involuntary Servitude, and Human
       Trafficking ................................................................................. 3

  B.   Rubicon, Wales, and Phatthana are Participants in a Venture ................... 4

  C.   Rubicon and Wales Knew or Should have Known of the Peonage,
       Forced Labor, Involuntary Servitude and Human Trafficking at the
       Songkhla Factories ...................................................................... 4

  D.   Defendants Benefitted From their Participation in the Venture ................ 5

  E.   Rubicon and Wales are Present in the United States ................................ 5

III.  LEGAL ARGUMENT .......................................................................... 5

  A.   Defendants Rubicon and Wales are Liable for Benefitting from
       their Participation in a Venture that they Knew or Should Have
       Known was Engaged in Conduct Prohibited by the TVPRA,
       including Peonage, Forced Labor, and Human Trafficking ..................... 7

  B.   Substantial Evidence Demonstrates that Defendants Rubicon and
       Wales Knew or Should have Known that Defendant Phatthana was
       utilizing Trafficked and Forced Labor at its Songkhla factories ............. 10

       1.   Defendants Did Not Act in Response to the Red Flags ................. 17

       2.   Purported Reliance on Audits and Foreign Government
            Investigations that were Unrelated to the TVPRA violations,
            inadequate, and too late does nothing to diminish
            Defendants Knowledge .................................................. 18

  C.   Defendants Satisfy the Benefit Requirement ..................................... 21

## TABLE OF CONTENTS

**Page**

IV.   CONCLUSION ................................................................................................23

## TABLE OF AUTHORITIES

**Page**

### CASES

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) .............................................................................. 3

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ........................................................................... 2, 3

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................ 13

*BASF Corp. v. Aristo, Inc.*,
  2012 WL 2420999 (N.D. Ind. 2012) .................................................. 12

*Bistline v. Jeffs*,
  2017 WL 108039 (D. Utah Jan. 11, 2017) ........................................... 9

*Blackthorne v. Posner*,
  883 F. Supp. 1443 (D. Or. 1995) ....................................................... 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................... 2, 3

*GO Computer v. Microsoft Corp.*,
  508 F.3d 170 (4th Cir. 2007) ............................................................. 11

*Henson v. Santander Consumer USA Inc.*,
  137 S. Ct. 1718 (2017) ......................................................................... 7

*Huston v. Procter & Gamble Paper Prod. Corp.*,
  568 F.3d 100 (3d Cir. 2009) .............................................................. 10

*IBP, Inc. v. Alvarez*,
  546 U.S. 21 (2005) ................................................................................ 7

*Jean-Charles v. Perlitz*,
  937 F. Supp. 2d 276 (D. Conn. 2013) .............................................. 8, 11

*Khan v. Holder*,
  584 F.3d 773 (9th Cir. 2009) ............................................................. 11

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  568 U.S. 519 (2013) .............................................................................. 7

# TABLE OF AUTHORITIES

**Page**

*Marmolejo-Campos v. Holder*,
   558 F.3d 903 (9th Cir. 2009) ........................................................................ 10

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
   2011 WL 13153190 (C.D. Cal. May 12, 2011) ............................ 2, 8, 12

*Pusey v. Dallas Corp.*,
   938 F.2d 498 (4th Cir. 1991) ........................................................................ 11

*Ricchio v. McLean*,
   853 F.3d 553 (1st. Cir. 2017) ......................................................... 8, 11, 21

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*,
   66 A.3d 963 (Del. Ch. 2013) ........................................................................ 13

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
   627 F. Supp. 2d 1096 (N.D. Cal. 2008) .................................................. 11

*Swinton v. Potomac Corp.*,
   270 F.3d 794 (9th Cir. 2001) ........................................................................ 10

*Trimmer v. Barnes & Noble, Inc.*,
   31 F. Supp. 3d 618 (S.D.N.Y. 2014) ................................................. 10, 15

*U.S. v. Afyare*,
   632 Fed. Appx. 272 (6th Cir. 2016) .......................................................... 9

*U.S. v. Estrada-Tepal*,
   57 F. Supp. 3d 164 (2014) ............................................................................... 8

*U.S. v. Jennings*,
   280 Fed. Appx. 836 (11th Cir. 2008) ...................................................... 21

*United States v. Cook*,
   782 F.3d 983 (8th Cir. 2015) ........................................................................ 21

*United States v. Dynamic Visions, Inc.*,
   216 F. Supp. 3d 1 (D.D.C. 2016) ..................................................... 13, 18

*United States v. Uresti-Hernandez*,
   968 F.2d 1042 (10th Cir. 1992) .................................................................. 12

*United States v. Zlatogur*,
   271 F.3d 1025 (11th Cir. 2001) .................................................................. 12

# TABLE OF AUTHORITIES

**Page**

*Velez v. Sanchez*,
    693 F.3d 308 (2d Cir. 2012) ................................................................... 12

*Viegas v. Holder*,
    699 F.3d 798 (4th Cir. 2012) .................................................................. 11

*Wilson v. J.P. Allen Co.*,
    57 F. Supp. 3d 1249 (C.D. Cal. 2014) .................................................... 10

### STATUTES

18 U.S.C. § 1581 .......................................................................................... 3

18 U.S.C. § 1584 .......................................................................................... 3

18 U.S.C. § 1589 ........................................................................... 3, 8, 12, 21

18 U.S.C. § 1590 .......................................................................................... 3

18 U.S.C. § 1591 ...................................................................................... 7, 9

18 U.S.C. § 1593A ..................................................................................... 21

18 U.S.C. § 1594 ..................................................................................... 2, 21

18 U.S.C. § 1595 .................................................................................. *passim*

### OTHER AUTHORITIES

154 Cong. Rec. H10904 (daily ed. Dec. 10, 2008) .................................... 12

H.R. Rep. 110-430 (2007) ............................................................................ 6

H.R. Rep. No. 110-430 (2007) ..................................................................... 6

Laura Ezell, Human Trafficking in Multinational Supply Chains,
    69 Vand. L. Rev. 499 (2016) ................................................................... 6

Phusadee Arunmas, *Shrimpers Lash Out at Report*,
    BANGKOK POST, Apr. 30, 2008 .............................................................. 14

U.S. Dep't of Justice, "Louisiana Motel Owner Pleads Guilty," July 1,
    2015, available at www.Justice.gov ......................................................... 8

1    The United States is a leader in the global fight against international human

2    trafficking, a violation of domestic and international law that relies on cross border

3    networks. In order to more effectively combat human trafficking in global supply

4    chains, the United States enacted and expanded the Trafficking Victims Protection Act

5    to permit victims to bring suit in U.S. district courts and to ensure accountability over

6    the entire trafficking chain. *See* 18 U.S.C. §§ 1595-96. As a result, the TVPRA

7    expressly imposes liability on those who financially benefit from trafficking, forced

8    labor, or peonage in overseas supply chains. *Id.* As this Court previously found,

9    Congress expanded the TVPRA "to allow a trafficking victim to bring an action

10   against those who knowingly benefitted from a violation of the TVPRA."  Order

11   Denying in Part Defs.' Mot. to Dismiss Compl. at 5, Dkt. 56 (Nov. 9, 2016).

12   Defendants' concessions and ample evidence support each and every element of

13   Plaintiffs' TVPRA claims against Rubicon and Wales, such that summary judgment

14   cannot be granted here.

15   The simple facts are:

16   (1) It is undisputed that Plaintiffs have stated a valid claim for violations of the

17   TVPRA. Defendants declined to move for summary judgment on the Trafficking

18   claims of four Plaintiffs, conceding that their claims "cannot be resolved on summary

19   judgment." Def. Phatthana Seafood Co., Ltd.'s Notice of Mot. and Mot. for Summ. J.

20   at 2 fn. 4, Dkt. 147 (Nov. 20, 2017) (claims of Plaintiffs Sem Kosal, Sophea Bun and

21   Phan Sophea); *see also* Def. S.S. Frozen Food Co., Ltd.'s Notice of Mot. and Mot. for

22   Summ. J., Dkt. 145 (Nov. 20, 2017) (claim of Plaintiff Keo Ratha).

23   (2) It is undisputed that Rubicon and Wales are present in the United States.

24   Order at 7, Dkt 56 ("Defendants do not dispute that this criteria is met by both

25   Rubicon, which is a Delaware corporation and has an office in California, and Wales,

26   which also has an office in California").

27   (3) Ample evidence demonstrates that Defendants Rubicon and Wales knew or

28   should have known of the human trafficking, peonage, and forced labor – conduct that

1  Defendants did not challenge in their summary judgment motion – at the factories,

2  such that summary judgment cannot be granted on this basis.

3      (4) Defendants ignore the statutory language defining "venture" in the TVPRA

4  and fail to cite the relevant standard in this jurisdiction for liability: "Congress simply

5  included the separate terms 'perpetrator' and 'whoever knowingly benefits' in § 1595

6  to make clear that civil liability extends to both active participants and passive

7  beneficiaries of TVPA violations." *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,

8  2011 WL 13153190, at *11 (C.D. Cal. May 12, 2011).

9      (5) Wales concedes it benefited from the venture, satisfying one element of the

10  statute. Defs. Rubicon Resources, LLC and Wales & Co. Universe, Ltd.'s Notice of

11  Mot. and Mot. for Summ. J. at 15, Dkt. 146 (Nov. 20, 2017); Defs. Rubicon and

12  Wales' Statement of Uncontroverted Facts at No. 16, Dkt. 146-1 (Nov. 20, 2017).

13      (6) Rubicon concedes it attempted to benefit from the venture. Dkt. 146 at 13;

14  SUF ¶10. This is all the statute requires. *See* 18 U.S.C. §§ 1594 (attempt treated as

15  completed act) & 1596 (jurisdiction over attempt). Nonetheless, substantial evidence

16  shows Rubicon also benefitted from completed sales and from access to the large

17  supply of shrimp from the Thai factories, which enabled it to land contracts with

18  major retailers.

19      Summary Judgment cannot be granted against Plaintiffs.

20  **I.    STANDARD OF REVIEW**

21      Summary judgment is an extreme remedy that is only available if "there is no

22  genuine issue as to any material fact and that the moving party is entitled to a

23  judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

24  The inquiry performed is a "threshold inquiry" to determine whether there are genuine

25  factual issues that "may reasonably be resolved in favor of either party." *Anderson v.*

26  *Liberty Lobby, Inc*. 477 U.S. 242, 250 (1986). "If reasonable minds could differ as to

27  the import of the evidence," the motion must be denied. *Id*. at 250-51. The moving

28  party "always bears the initial responsibility of informing the district court of the basis

1   for its motion, and identifying those portions of 'the pleadings, depositions, answers to

2   interrogatories, and admissions on file, together with the affidavits, if any,' which it

3   believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp*.,

4   477 U.S. at 323. It is never enough to conclusorily assert that the plaintiff has no

5   evidence. *Id*. at 328 (Justice White, concurring).

6        Any doubt as to the existence of a genuine issue for trial should be resolved

7   against the moving party and the inferences to be drawn from the underlying facts

8   must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H.*

9   *Kress & Co.,* 398 U.S. 144, 158-59 (1970). Defendants do not meet this burden here.

10  Plaintiffs present sufficient evidence to require that the issues in this case be

11  determined by a jury. *Anderson*, 477 U.S. at 250.

## II.   SUMMARY OF FACTS

> A.   <u>Defendants Do Not Dispute Plaintiffs' Underlying Claims of Peonage, Forced Labor, Involuntary Servitude, and Human Trafficking</u>

15       Defendants have not moved for summary judgment on the claims that Plaintiffs

16  Keo Ratha, Sem Kosal, Sophea Bun, and Phan Sophea were subjected to peonage,

17  forced labor, involuntary servitude, and human trafficking in violation of the TVPRA,

18  18 U.S.C. §§ 1581, 1584, 1589 & 1590, conceding the claims cannot be resolved on

19  summary judgment. Dkt. 147 at 2, fn.4; Dkt. 145. Plaintiffs have alleged, and

20  Defendants do not challenge, that they were compelled to work to pay off a debt, their

21  passports were withheld and not returned when requested, they were threatened with

22  arrest, witnessed beatings, and that Plaintiffs were paid less than promised, housed in

23  deplorable conditions, and assessed charges, including charges associated with their

24  substandard housing, that further lowered their meager pay.  ASOF ¶18.[1]

---

27   [1] Moreover, evidence opposing summary judgment need not be presented in admissible form
28  so long as it can be presented in admissible form, at trial.  *See, e.g., Fraser v. Goodale*, 342 F. 3d
     1032, 1037 (9th Cir. 2003).

B.     Rubicon, Wales, and Phatthana are Participants in a Venture

It is undisputed that Rubicon was formed to market and sell seafood to U.S. customers. SUF ¶5. It is undisputed that Phatthana was engaged in this venture and that shrimp from its factories were produced for and sold by Rubicon in the United States. *Id.* ¶10; ASOF ¶ 37. It is also undisputed for the purposes of this motion that, as noted above, Phatthana utilized trafficked and forced labor in order to produce the shrimp and seafood for the venture. *Supra* at 3. It is undisputed that Wales was a formal member of Rubicon [SUF ¶5].

C.     Rubicon and Wales Knew or Should have Known of the Peonage, Forced Labor, Involuntary Servitude and Human Trafficking at the Songkhla Factories

It cannot seriously be disputed that Defendants knew or should have known of the peonage, forced labor and trafficking violations involving the Plaintiffs.  It is undisputed that management of Rubicon kept informed about the seafood industry and was aware of supply chain concerns through a variety of means.  ASOF ¶ 58. It is also undisputed that Rubicon and Wales were aware of the U.S. State Department Trafficking in Person's Report (TIP Report) and its reporting on Thailand, which has put Thai shrimp on a list of goods believed to be produced by forced labor since 2009. ASOF ¶¶ 74-75.

Nor do Defendants dispute that numerous NGO reports and media reports have highlighted the problem of forced labor and human trafficking in the Thai shrimp and seafood industry, including reports that specifically mention Phatthana and/or Rubicon.  ASOF ¶ 64. Specifically, it is undisputed that Rubicon CEO Brian Wynn read news sources that routinely covered the issues of human trafficking in the Thai seafood industry and highlighted Phatthana specifically. ASOF ¶ 77. It is also undisputed that Rubicon employees regularly visited the factories in Thailand, including the Songkhla factories, and had the opportunity to observe workers.  ASOF ¶¶ 83-84. Further, it is undisputed that Defendants did not conduct any internal

investigations of their own into abuses at the factories. ASOF ¶ 73.

### D.   Defendants Benefitted From their Participation in the Venture

It is undisputed that Wales benefitted "financially, or by receiving anything of value from its participation in the venture", including by profiting from shrimp produced by Plaintiffs' forced labor. [SUF ¶16].

It is undisputed that Rubicon attempted to profit financially from the same shipments of shrimp produced by Plaintiffs' forced labor. [SUF ¶10].  Although the shipments were rejected by Walmart due to Walmart's concerns about forced labor, ASOF ¶ 28, attempted benefit is covered by the statute.  In addition, the volume of shrimp from Songkhla was part of Rubicon's ability to obtain and deliver on the contract with Walmart: Rubicon benefitted from access to the large, reliable supply of shrimp from the Thai factories, which enabled it to land contracts with major retailers. And even the returned shipments conferred a benefit, as did the 2013 shipments.

### E.   Rubicon and Wales are Present in the United States

This Court has already held that it is undisputed that Rubicon and Wales are present in the United States. Order at 7, Dkt 56.

## III.   LEGAL ARGUMENT

Defendants have moved for summary judgment on Count II of Plaintiffs' Complaint, which sets out the claims against Defendants Rubicon and Wales. Compl., Dkt. 1 (June 15, 2016). In short, Plaintiffs allege that "Defendants Rubicon and Wales knowingly benefitted from participation in a venture which Defendants knew or should have known was engaged in peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking. Defendants received financial benefit as well as the benefit of a steady stream of imported shrimp and seafood for market, from their participation in the venture." *Id.* at ¶ 125.

This Court found Plaintiffs' allegations to be sufficient at the motion to dismiss stage. Order at 8, Dkt. 56. Each and every one of those allegations is now supported

1    by substantial evidence in the record, such that summary judgment cannot be granted.

2            Defendants include a great deal of extraneous detail in their motion, including

3    about corporate structure principles.  Dkt 146 at 8-9. These arguments are largely not

4    relevant to Count II, the claims against Rubicon and Wales.  The facts amassed by

5    Plaintiffs demonstrate that the case against Defendants is straightforward and

6    Plaintiffs have shown that each one of their Complaint allegations is amply supported,

7    precluding judgment as a matter of law against Plaintiffs.

8            Congress has repeatedly expanded the scope of the TVPRA to combat human

9    trafficking, finding in the 2008 reauthorization that each year up to four million

10   persons are trafficked into forced labor and calling it the ''dark side of globalization.''

11   H.R. Rep. 110-430 at 33 (2007). Among the most significant amendments in 2008

12   was the expansion of the civil remedy in order to create an economic deterrent. The

13   Foreign Affairs Committee noted in its Committee Report that the amendment would

14   "enhanc[e] the civil action by providing that an action is also available against any

15   person who knowingly benefits from trafficking."  H.R. Rep. No. 110-430 at 55

16   (2007); *see also* Laura Ezell, Human Trafficking in Multinational Supply Chains, 69

17   Vand. L. Rev. 499, 502 (2016) ("Since the 2008 TVPRA, a corporation can be held

18   directly liable for financial benefit …. The TVPRA applies to corporations that

19   financially benefit from trafficked labor even if the labor-trafficking violation

20   occurred abroad or was perpetrated in the supply chain of the corporation by a

21   separate legal entity."). As amended, the TVPRA includes, as described below, broad

22   definitions of the term "venture" and "benefit," and also provides for liability on the

23   basis of what the defendant "should have known" so that beneficiaries cannot escape

24   the remedial reach of the statute by ignoring red flags or turning a blind eye to forced

25   labor. This case is not about as Defendants assert, Dkt. 146 at 3, "commerce with

26   companies in developing countries" but about knowingly benefitting from conduct

27   that the defendants knew or should have known consisted of peonage, forced labor

28   and human trafficking in violation of U.S. law. Defendants' motion mischaracterizes

- 6 -

1   Plaintiffs' claims, which fall squarely within the scope of the TVPRA and are amply

2   supported by substantial evidence, necessitating trial by jury.

3       A.   <u>Defendants Rubicon and Wales are Liable for Benefitting from their
            Participation in a Venture that they Knew or Should Have Known was
4           Engaged in Conduct Prohibited by the TVPRA, including Peonage,
            Forced Labor, and Human Trafficking</u>

5

6       The TVPRA statute defines "venture" as "any group of two or more individuals

7   associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(5).[2] Thus the

8   plain text states the "venture" need not be a formal incorporated entity such as a

9   formal "joint venture."[3]

10      It is not disputed that Defendants Rubicon and Wales were associated in fact

11  with Phatthana. *Supra* at 5. It is undisputed that the parties were engaged in a venture

12  to produce, market, and sell shrimp in the United States. ASOF ¶ 23. The venture was

13  a long term venture, lasting several years, and involved close cooperation between the

14  parties at all stages. ASOF ¶ 24. Plaintiffs allege that this venture relied upon their

15  trafficked and forced labor, and Defendants do not challenge Plaintiffs' evidence on

16  this issue in their motion. *Supra* at 3. Plaintiffs further allege, and present below

17  substantial evidence in support of their allegations, that Defendants Rubicon and

18  Wales knew or should have known about the forced labor, trafficking, and peonage at

19  the Phatthana factory. Benefitting from such wrongdoing is exactly what the TVPRA

20  prohibits.

21      Defendants argue that the "venture" must be solely a criminal venture and that

22  "participation" must consist of operating and managing the factories where the

23  trafficking occurred "or at the very least engaging in acts that further the completion

24  _____

25      [2] This definition is codified in § 1591, but applicable throughout the TVPRA sections, which
    use the same term. Courts employ a "usual presumption that 'identical words used in different parts
26  of the same statute' carry 'the same meaning.'" *Henson v. Santander Consumer USA Inc.*, 137 S.
    Ct. 1718, 1723 (2017) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)); *see also Kirtsaeng v.*
27  *John Wiley & Sons, Inc.*, 568 U.S. 519, 537 (2013) ("'[W]e normally presume that the [a statutory
    phrase carries] the same meaning when [it] appear[s] in different but related sections.").

28      [3] Although it is not necessary, a joint venture also exists here.

of the crime." That is not what the caselaw holds.

In this jurisdiction, in *Nunag-Tanedo*, a case involving Filipino teachers recruited to work in U.S. schools, the court interpreted the knowing benefit from participation in a venture provision of the statute as follows: "It appears that Congress simply included the separate terms 'perpetrator' and 'whoever knowingly benefits' in § 1595 to make clear that civil liability extends to both active participants and passive beneficiaries of TVPA violations … In other words, just as statutes such as § 1589 allow for criminal liability against both active participants and passive beneficiaries of TVPA violations, § 1595 makes clear that it does the same for civil liability through the use of the separate terms 'perpetrator' and 'whoever knowingly benefits.'" *Nunag-Tanedo*, 2011 WL 13153190, at *11. Similarly, Fairfield University was held to have participated in a venture that it should have known was engaged in trafficking in a case involving abuse of Haitian boys at a school because it financially benefitted from the school. *See Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 288 (D. Conn. 2013). The common purpose of venture was education rather than sex trafficking and the University played no role in the abuse. *Id.* at 280 (University provided financial support to the school, marketed it as a mission, sent U.S. student volunteers to work there). *See also U.S. v. Estrada-Tepal*, 57 F. Supp. 3d 164, 169-170 (2014) (absent from the TVPRA is any requirement that a defendant have the desire or criminal purpose to further trafficking, one need only have knowledge or disregard). Both criminal and civil cases have proceeded against motel owners who profited from renting rooms to men who they knew or should have known were engaged in sex trafficking. *E.g., Ricchio v. McLean*, 853 F.3d 553, 557 (1st. Cir. 2017) (Souter, J., by designation) (defendants knowingly benefitted from their participation in a venture by way of payment for the motel room); Plea Agreement and Factual Basis, *United States v. Patel*, Crim. No. 13-286 "R" (E.D. La 2015) (guilty plea obtained).[4]

---

[4] *See also* U.S. Dep't of Justice, "Louisiana Motel Owner Pleads Guilty," July 1, 2015, available at www.Justice.gov

1    Defendants observe that there is scant case law on this relatively new provision

2  and cite out of jurisdiction cases that are wholly dissimilar. *Bistline v. Jeffs*, 2017 WL

3  108039, *2 (D. Utah Jan. 11, 2017), concerned claims against the attorneys who

4  represented the Fundamentalist Church of Latter Day Saints, assisting in the

5  amendment of its Trust document and providing criminal representation to

6  individuals. The Utah court relied on RICO caselaw to find that allegations of

7  providing such legal services do not meet the pleading requirements for a venture.

8  Plaintiffs here do not bring suit against Defendants' counsel and this Court has already

9  held that Plaintiffs' allegations adequately pled a venture. Plaintiffs have not changed

10  their allegations or their arguments.

11    Defendants also rely on an unpublished case, *U.S. v. Afyare*, 632 Fed. Appx.

12  272 (6th Cir. 2016), involving sprawling conspiracy charges and cite a portion of the

13  ruling that includes the elements of conspiracy (including that the defendant intends to

14  accomplish the goal of the conspiracy and perform an overt act, *see e.g.* 9th Cir Model

15  Criminal Instruction 8.20, *Conspiracy*). Dkt. 146 at 12. Moreover, *Afyare* concerned §

16  1591, a differently structured provision than the TVRPA provisions at issue here.

17  Section 1591 requires participation in a venture that utilized specified conduct

18  (including advertising, patronizing, and solicitation that are not included in the other

19  TVPRA prohibitions) that "will be used to cause the person to engage in a commercial

20  sex act." The Sixth Circuit was critical of the prosecution's attempt to introduce

21  evidence of defendants being seen together or one defendant driving a car registered

22  to another and concluded the evidence raised constitutional guilt by association

23  concerns. *Afyare*, 632 Fed. Appx. at 272. Here, we have companies clearly involved in

24  a "venture" of importing seafood. That venture depended on the use of peonage and

25  forced or trafficked labor, and each Defendant knew or should have known and

26  benefitted from its use. This case does not raise any of the countervailing

27  constitutional issues caused by the government's overbroad arguments that were

28  criticized in *Afyare*.

**B.** <u>Substantial Evidence Demonstrates that Defendants Rubicon and Wales Knew or Should have Known that Defendant Phatthana was utilizing Trafficked and Forced Labor at its Songkhla factories</u>

The TVPRA civil action provision requires a *mens rea* of "knew or should have known." 18 U.S.C. § 1595. Defendants Rubicon and Wales argue that the evidence is insufficient to show that they "knew or should have known that forced labor was occurring." Dkt. 146 at 14. [5] To the contrary, substantial evidence supports Plaintiffs' allegations that Rubicon and Wales not only should have known but in fact did know of the violations and the specific abuses – including debt bondage and passport withholding – at the Songkhla factories. Moreover, this question is not susceptible to summary judgment. Whether a defendant "knew or should have known" is generally a question of fact for the jury. *Wilson v. J.P. Allen Co.*, 57 F. Supp. 3d 1249, 1254 (C.D. Cal. 2014); *Blackthorne v. Posner*, 883 F. Supp. 1443, 1455 (D. Or. 1995).

It is well settled that corporate knowledge can be demonstrated by showing the knowledge of management-level employees. See, e.g., *Swinton v. Potomac Corp.*, 270 F.3d 794, 804 (9th Cir. 2001); *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 105 (3d Cir. 2009). As described in more detail below, high level corporate managers at Rubicon and Wales knew of the abuses at the Songkhla factory at the time that Plaintiffs labored there.

It is also well-settled that "should have known" is a negligence standard. *Marmolejo-Campos v. Holder*, 558 F.3d 903, 912 (9th Cir. 2009) ("should have known" is a negligence standard); *Swinton*, 270 F.3d at 803; (9th Cir. 2001)("should have known" standard is akin to negligence); *Trimmer v. Barnes & Noble, Inc.*, 31 F. Supp. 3d 618, 627 (S.D.N.Y. 2014) ("'[s]hould have known' implies a negligence or 'reasonable person' standard"). The relevant question for establishing that Wales or Rubicon should have known about the allegations is whether a reasonable corporation

---

[5] As detailed below, Plaintiffs are not required to show that Defendants Rubicon and Wales recklessly disregarded evidence of forced labor, but nonetheless can meet even this standard here.

1   doing business in the United States and Thailand, in the shrimp industry, would have

2   known of the allegations. *See Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp.

3   2d 1096, 1109–10 (N.D. Cal. 2008). In a variety of contexts, courts have looked to

4   "red flags" to determine whether a party "should have known." *E.g.*, *GO Computer v.*

5   *Microsoft Corp.*, 508 F.3d 170, 172 (4th Cir. 2007) (red flags can put a party on

6   notice).

7          These "red flags" that put a party on notice can consist of government

8   investigations, media reports, newspaper stories, ngo reports, statements from

9   customers, and industry rumors, and are adequate to establish that a party knew or

10  should have known.  *See Khan v. Holder*, 584 F.3d 773, 785 (9th Cir. 2009)

11  (newspaper accounts regarding terrorist activities constituted substantial evidence that

12  petitioner knew or reasonably should have known of those activities); *Viegas v.*

13  *Holder*, 699 F.3d 798, 803 (4th Cir. 2012) (petitioner should have known of terrorist

14  activities based on "common knowledge" and reports of violence from "government-

15  controlled media sources" even where such sources were not credited by petitioner);

16  *GO Computer*, 508 F.3d at 172 (red flags include government investigations,

17  statements from customers, and industry rumors that would have prompted "a

18  reasonably diligent person" to investigate); *see also Pusey v. Dallas Corp.*, 938 F.2d

19  498, 501 (4th Cir. 1991) (party "on inquiry notice . . . must be held to [have]

20  constructive knowledge").

21         Notably, Defendants do not dispute that the factory defendants knew of the

22  violations and abuses, declining to move for summary judgment on that ground. In

23  addition to the reports, the frequent communications and the on-site visits between

24  Defendants Rubicon and Wales, on one hand, and the Songkhla factories on the other,

25  are also sufficient to show "knew or should have known." *See, e.g., Jean-Charles*, 937

26  F. Supp. 2d at 288; *Ricchio*, 853 F.3d at 555, 557 (denying motion to dismiss in part

27  because of allegation that defendants' office had a clear view of the locus of abuse of

28  a sexual trafficking victim, which supported the inference that they knew of or

1  recklessly disregarded her abuse); *Nunag-Tanedo*, 2011 WL 13153646, at *5, *9 (one

2  defendant's travel to Philippines as part of victims' recruitment, along with other

3  facts, including efforts to silence criticism of other defendants related to TVPRA

4  violations, sufficient for knew or should have known).

5        Plaintiffs are not required to show "reckless disregard" – which Defendants

6  implicitly concede in their briefing but then include in their "Conclusions of Law."

7  *Compare* Dkt. 146 *with* Proposed Conclusions of Law at ¶¶ 24, 27, 31, 34, Dkt. 146-1.

8  The "should have known" standard for civil liability in 18 U.S.C. 1595 supersedes the

9  "reckless disregard" standard for criminal liability for financial benefit from forced

10  labor articulated in 18 U.S.C. 1589.  *See Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir.

11  2012) (noting that 2008 amendments to Section 1595 "remove[d] references to

12  specific crimes and therefore expand[ed] its scope to include forced labor")). As a

13  result, there is no need for Plaintiffs to show Defendants Wales and Rubicon acted

14  with reckless disregard of the fact that their venture included forced labor. However,

15  even if Plaintiffs were required to establish reckless disregard, substantial evidence

16  precluding summary judgment likewise exists.  Moreover, this state of mind question

17  is a factual question for the jury to decide. *E.g. BASF Corp. v. Aristo, Inc.*, 2012 WL

18  2420999, at *3 (N.D. Ind. 2012).

19        The Ninth Circuit Model Criminal Jury Instructions describe "reckless

20  disregard" as "being aware of facts which, if considered and weighed in a reasonable

21  manner, indicate a substantial and unjustifiable risk" of the alleged conduct.

22  Comment to Ninth Circuit Model Criminal Jury Instruction 9.1 (citing *United States v.*

23  *Zlatogur*, 271 F.3d 1025, 1029 (11th Cir. 2001), *cert. denied*, 535 U.S. 946 (2002);

24  *United States v. Uresti-Hernandez*, 968 F.2d 1042, 1046 (10th Cir. 1992)); *see also*

25  154 Cong. Rec. H10904 (daily ed. Dec. 10, 2008) (statement of Rep. Berman) (the

26  "recklessly disregarded" standard has "the advantage of reaching those who turn a

27  willfully blind eye toward" trafficking). As is the case with respect to constructive

28  knowledge, "red flags" related to underlying violations of the law that are not

1   diligently pursued can establish reckless disregard. *See, e.g.*, *United States v. Dynamic*
2   *Visions, Inc.*, 216 F. Supp. 3d 1, 15 (D.D.C. 2016) ("Disregarding these red flags
3   further shows that Dynamic Visions acted with reckless disregard for the truth."); *In*
4   *re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488 (S.D.N.Y.
5   2004) ("red flags" were sufficient to alert "high-level officials" of a company to
6   fraudulent financial reports, which was sufficient to allege recklessness); *Rich ex rel.*
7   *Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 983 (Del. Ch. 2013).

8       Substantial evidence supports that Defendants Rubicon and Wales knew or
9   should have known of (and, for that matter, recklessly disregarded) the violations at
10  the Songkhla factory.  Plaintiffs are therefore entitled to present these claims to a jury.

11      Rubicon CEO Brian Wynn testified that he and Rubicon[6] kept informed about
12  the seafood industry and were aware of supply chain concerns through a variety of
13  means, including published reports; a variety of news sources; discussions with
14  customers, industry colleagues, NGOs, and sustainability groups; and conferences.
15  ASOF ¶ 58. For example, Wynn testified that he was aware of the U.S. State
16  Department Trafficking in Person's Report (TIP Report) and specifically of its
17  reporting on Thailand. *Id.*

18      Since 2008, the TIP report has specifically highlighted trafficking and forced
19  labor as pervasive within the seafood and shrimp processing in Thailand.  ASOF ¶76.
20  In addition, the Department of Labor, under a mandate from Congress, investigates
21  and publishes a list of goods that it has reason to believe were produced by forced
22  labor "in order to provide consumers and firms" with this information. ASOF ¶ 74.
23  Thai shrimp has been on that list since 2009.  Numerous NGO reports have also
24  highlighted the problem of forced labor and human trafficking in the Thai shrimp and
25  seafood industry, including a 2008 report that mentioned Defendant Phatthana

26

27      [6] Moreover, Rubicon was not just *any* importer operating in the Thai shrimp industry:
28  Rubicon specifically marketed itself as "sustainable" and as providing "purity from pond to plate" as
    advertised in the CEO's email signature line. SUF ¶ 17.

1   specifically in connection with misrepresentations concerning wages and the use of

2   labor brokers.  ASOF ¶ 77.  These reports received widespread news coverage in the

3   United States and Thailand. For example, Mr. Wynn testified that he read Seafood

4   News, ASOF ¶79, which routinely covered the issue of human trafficking in the Thai

5   seafood industry, including articles that discussed reports of passport withholding at

6   Phatthana and noted that "Phatthana Seafood Co is reported to be part of the Rubicon

7   group," as well as articles that discussed reports alleging that Cambodian migrant

8   workers were victims of forced labor, naming Rubicon's customers as receiving the

9   shrimp made by forced labor, and quoting the President of Wales in response to the

10   allegations. ASOF ¶80.

11        Wales' majority owner and managing director K. Poj was active in the Thai

12   Frozen Foods Association (TFFA), including serving as its president starting in 2008.

13   ASOF ¶ 81. The TFFA was active in lobbying the Department of State and

14   Department of Labor to remove Thai shrimp from their reports and K. Poj was

15   frequently quoted in the newspaper, including on allegations concerning Phatthana.

16   ASOF ¶¶ 54, 56, 82 (Phusadee Arunmas, *Shrimpers Lash Out at Report*, BANGKOK

17   POST, Apr. 30, 2008).

18        The prevalence of forced labor, debt bondage, passport withholding, and human

19   trafficking in the Thai shrimp and seafood processing industry is well documented and

20   has been systematically reported on and studied for the past ten years.  *E.g.*, ASOF ¶

21   54, 56; Resp. SUF ¶ 11. There can be no doubt that Defendants were aware of these

22   reports.  Moreover, as shown below, Defendants not only ignored the general

23   industry-specific, country-specific, and factory-specific information that should have

24   put them on notice, but also ignored information from their own visits and

25   communications with the factory defendants.    For example, Rubicon CEO Brian

26   Wynn testified Rubicon staff visited the factories in Thailand "on a regular basis."

27   ASOF ¶ 83. Indeed, he testified that he himself visited the factory floors and had

28   opportunities to observe workers. *Id*. Thus, Mr. Wynn had the opportunity himself to

1    observe the risk factors for trafficking, including reliance on migrant workers. Mr.

2    Wynn also testified that top manager Gregg Small visited the Songkhla factory

3    "multiple times." ASOF ¶ 84.  Mr. Small was particularly "hands-on" and visited the

4    factory in order to prepare it for audits. *E.g* . ASOF ¶ 102.  Mr. Small also asked for

5    and received regular reports, including inspection documents, from Phatthana. ASOF

6    ¶ 58.  Physical visits satisfy both "knew or should have known" and the higher

7    standard of reckless disregard. *Supra* at 17.

8        Emails between Rubicon and Wales provide additional evidence that Rubicon

9    and Wales should have been early on notice of violations at the Songkhla plant

10   because they were already aware that other PTN factories in Thailand failed to comply

11   with corporate ethical standards and audits were "finding the same types of problems

12   across the various plants."  ASOF ¶ 86. Knowledge of repeated, similar violations in

13   multiple similar factories in Thailand, without adequate efforts to ensure similar

14   violations did not recur in the Songkhla factories, is sufficient to show not only that

15   Rubicon and Wales should have known about the trafficking but also that they met the

16   higher standard of reckless disregard. *See Trimmer*, 31 F. Supp. 3d at 629 (denying

17   summary judgment on reckless disregard based on evidence showing employee

18   reclassifications in one state to comply with labor laws but not in other states).

19       The emails demonstrate actual knowledge as well. High-level Rubicon

20   managers, including the CEO, corresponded about the problems at the Songkhla

21   factory via e-mail, substantial evidence that they knew of the specific trafficking-

22   related violations impacting these Plaintiffs no later than February 2012. These emails

23   include, for example, correspondence circulating and discussing press coverage of the

24   workers at Phatthana's Songkhla factory, alleging they had been cheated, were

25   receiving less pay than promised, and wanted to leave but were waiting for the

26   company to answer their requests for their passports back  -- annotated with the

27   comment, "Not good PR!."  ASOF ¶ 87.  A later Bangkok Post editorial that

28   specifically criticized Phatthana for "seizing worker documents" was annotated by a

1   Rubicon manager with the comment "ouch…" ASOF ¶ 88. An internal email among

2   high level Rubicon managers noted "We don't want that audit prior to our trip because

3   the PTN plant just received" a poor grade on another audit, and "I don't want to

4   receive a negative report at this time. . . . Something is wrong with the Human

5   Resources system with the PTN group." ASOF ¶89.

6       Multiple emails indicate concerns from customers about the allegations: "Pls

7   keep internal until BW decides how to formalize response to both major retail

8   accounts asking about the situation" and noting that Sam's Club cancelled its trip to

9   Thailand due to "the PTN labor issue," a decision that CEO Brian Wynn described as

10  "a dangerous step backwards for our group." ASOF ¶ 90 .  Brian Wynn then

11  instructed all staff at Rubicon to provide "no comment" to inquiries about the situation

12  at Phatthana. AFOS ¶ 92. Meanwhile, a summary of the allegations at Phatthana from

13  an industry consultant was circulated among Rubicon top managers.  That summary

14  stated "The 'debt' bondage'. . . is in my estimation probably the most significant issue

15  in this entire matter" and "warrants significant investigation. ASOF ¶ 93. Finally, an

16  email sent by CEO Brian Wynn to top Rubicon management acknowledged "our

17  primary source of supply is already on the radar for bad labor practices." ASOF ¶94.

18      Thus, at a time when the plaintiffs in this action were at Phatthana's factory, the

19  evidence shows that Rubicon had actual knowledge of the peonage, forced labor, and

20  trafficking violations involving those Plaintiffs.

21      Emails also demonstrate that Wales had actual knowledge of the violations at

22  the Phatthana factories.  As noted above, Wales' majority owner and managing

23  director was a leader of the TFFA. ASOF ¶ 59. The TFFA assisted Phatthana in its

24  media strategy, including by putting out statements in early 2102 in response to

25  Plaintiff Keo Ratha reporting to the Phnom Penh Post that "hundreds of Cambodians

26  at Pathana Frozen Food Factory wanted to leave but were unable to get their passports

27  back." ASOF ¶¶81-82. In addition, Rubicon was in contact with Wales to transmit

28  concerns about customer complaints regarding allegations concerning passport

1  withholding: "Pls think carefully & Pls advise how we will respond to Wal Mart &

2  other major retailers". ASOF ¶53.  Later, indicating the extent of Wales' knowledge

3  and involvement, Rubicon staff sent an email to K. Poj, the owner of Wales,

4  requesting that he attend a United Nations anti-trafficking summit on behalf of

5  Rubicon. ASOF ¶ 95. At that summit, which was also attended by a top Rubicon

6  manager, Rubicon and Phatthana were described as "the target" because "NGOs

7  repeated brought up PTN (Songhkla) as an example of all thing[s] wrong with the

8  Thai law, document withholding and proper salaries." ASOF ¶ 95.  In addition, K.

9  Poj's deposition testimony confirmed this knowledge. P. Aramwattananont Dep. for

10 Wales 30(b)(6),102:2-16.  Substantial evidence thus supports Wales' actual

11 knowledge of the peonage, forced labor, and trafficking violations involving

12 Plaintiffs.

13                1.       Defendants Did Not Act in Response to the Red Flags

14       Defendants took no independent steps in response to the red flags. The evidence

15 is clear that Defendants Wales and Rubicon conducted no internal investigations of

16 their own into abuses at the factories.  SUF ¶11; P. Aramwattananont Dep. for Wales

17 30(b)(6),102:2-16; B. Wynn Dep. for Rubicon Resources 30(b)(6), 75:17-24, 93:10-

18 11. Rubicon's CEO testified on behalf of the corporation that Rubicon knew about

19 supply chain concerns, but that he could not recall if Rubicon ever asked Phatthana to

20 certify that there was no forced labor in its supply chain; could not recall if the

21 purchase orders contained any prohibitions on human trafficking or forced labor (they

22 do not); could not recall if Rubicon had trained employees on how to identify human

23 trafficking, debt bondage, or forced labor; did not have an executive assigned to anti-

24 trafficking efforts; had never dropped a supplier due to human trafficking or forced

25 labor allegations; could not recall any risk assessments that looked into human

26 trafficking or forced labor; and could not recall if Rubicon conducted any

27 investigation after a "significant investigation" was recommended by an industry

28

1   consultant (no). ASOF ¶ 93. In short, Rubicon's CEO agreed that Rubicon did not do

2   anything to ensure there weren't problems with labor recruitment and management at

3   Songkhla because "we were not involved." *Id.*  A jury could plainly conclude this is

4   reckless disregard and, indeed, courts have granted summary judgment for plaintiffs

5   where defendants have disregarded red flags. *See, e.g.*, *Dynamic Visions*, 216 F.

6   Supp. 3d at 15 ("Disregarding these red flags further shows that Dynamic Visions

7   acted with reckless disregard for the truth." )

8            2.    Purported Reliance on Audits and Foreign Government
9                  Investigations that were Unrelated to the TVPRA violations,
                   inadequate, and too late does nothing to diminish Defendants
10                 Knowledge

11          Defendants make much of their reliance on audits and investigations conducted

12   after the media brought attention to the abuses at the factory, but Defendants cite no

13   authority that reliance on such third party audits and post-hoc investigations is

14   relevant to whether they "should have known" during the relevant time period.

15          In addition, Defendants' argument in this respect has at least two other

16   fundamental flaws. First, only two audits took place during the relevant time period,

17   and those audits did not include any evaluations of debt bondage, forced labor, or

18   human trafficking (beyond one question concerning child labor, which is not at issue).

19   Resp. SUF ¶11, ASOF¶100. For example, one audit had no social responsibility

20   component at all and the other only covered worker safety, compliance with wage and

21   benefit laws and regulations, and one question on child labor. *Id*. The audit did not

22   include questions on debt bondage, forced labor, or human trafficking. *Id*. Second, the

23   audits and investigations fell short of minimum standards in ways that should have

24   been obvious and apparent to Defendants, rendering Defendants' reliance on them

25   unreasonable. The auditors did not interview significant numbers of workers, they did

26   not conduct interviews in private spaces, and they did not use professional, impartial

27   interpreters.  ASOF ¶100, 101. Rubicon not only knew of these shortcomings because

28   they were clear on the face of the audit reports, ASOF ¶100, 101, but Rubicon also

1   specifically was involved in the audit process, including visiting during the pre-audit

2   period, ASOF ¶102.  In addition, Rubicon guided the audits, even requesting, for

3   example, that auditors not speak Thai language. ASOF ¶103.

4        Finally, the governmental investigations, as well as the other audits, did not

5   occur until the spring and summer of 2012, well after the media attention to the

6   problems at Songhkla, and far too late to mitigate Rubicon and Wales' willful

7   blindness or constructive knowledge of the abuses.  ASOF ¶104. It is not surprising

8   that after the harsh glare of the media spotlight, attention from the United Nations, the

9   Thai government, and many non-governmental organizations that Phatthana raised

10  wages, improved the abysmal conditions, and undertook a PR and lobbying effort.

11  ASOF ¶105. Much of this effort was coordinated by Rubicon. *Id*. (Rubicon managers

12  circulated an article about passport withholding at Songhkla with a note "this is where

13  our Creative/Legal should spring into action." Another email states Rubicon has been

14  working "to defuse the story" and solicits statements from the TFFA and others in

15  support of Phatthana).  ASOF ¶106.

16       Moreover, in light of the widespread recognition and condemnation of

17  corruption in both the Thai and Cambodian governments, Defendants' reliance on

18  such investigations was especially unreasonable.  ASOF ¶108. Indeed, the U.S.

19  Department of State repeatedly found that "corruption remained widespread among

20  Thai law enforcement personnel, creating an enabling environment for human

21  trafficking to prosper" and often noted that officials protected seafood facilities from

22  raids and inspections. ASOF ¶107; *see also* ASOF at ¶108 (with regard to Cambodia:

23  "Endemic corruption at all levels continued to impede anti-trafficking endeavours and

24  local observers believe it to be the cause of impunity afforded to firms engaging in

25  illegal recruitment practices that contribute to trafficking.") The State Department

26  specifically cited reports of corrupt officials protecting seafood facilities, colluding

27  with traffickers, and using victim testimony to weaken cases. ASOF ¶109, 110.

28       More significantly, the State Department has repeatedly found that Thai law

enforcement was not adequately trained to identify indicators of trafficking. ASOF ¶109 ( "Law enforcement officers often believed that physical detention or confinement was the essential element to confirm trafficking and failed to recognized exploitive debt or manipulation of undocumented migrants' fear of deportation as non-physical forms of coercion used in human trafficking.").  *See also* ASOF ¶110.

Unsurprisingly, these investigations were also inadequate in that they failed to comply with basic standards for investigations. *See* ASOF ¶110. Indeed, one investigator testified that he did not see the living conditions of the workers, "If I've inspected and found the living quarter in this condition, the report could have been different." ASOF ¶111. Finally, some of these investigations found that the factory had in fact broken the law. For example, the Department of Labor Protection and Welfare concluded that the deductions from workers' wages assessed by Phatthana "were not consistent with the provisions of the Labor Protection Act 1998."  ASOF ¶112, Resp. SUF 17. The Royal Thai Government's own report to the United Nations, while it argued that no trafficking crimes had been committed, also concluded that Phatthana had withheld worker passports with "wrongfulness"; had illegally deducted workers' wages; violated the 1975 Labor Act and been ordered to comply by the Songkhla Provincial Labor Protection Office; and was under investigation by the Ministry of Labor. ASOF ¶112, Resp. SUF 17.This is hardly a clean bill of health and, frankly, concedes the elements of a trafficking offense.

As a result of all of these shortcomings, Defendants have not established that their reliance on external audits or investigations in this case were "reasonably diligent" such that they necessarily absolved the Defendants of liability. In fact, the evidence is sufficient that a jury could reasonably find that not only were the audits and investigations inadequate, but also that Rubicon and Wales knew or should have known that they were inadequate and could not reasonably rely on them to conclude there were not violations of the TVPRA at the Songkhla factories.

C.    Defendants Satisfy the Benefit Requirement

The TVPRA imposes liability on whoever "benefits, financially or by receiving anything of value." 18 U.S.C. §§ 1589(b), 1593A, 1595. An attempted benefit satisfies the statute. 18 U.S.C. §§ 1594 (an attempt is treated as a completed violation); 1596 ("or any attempt"); *see also Ricchio*, 853 F.3d at 557-58 (citing "attempt" provisions in concluding that the objective "need not be satisfied for liability to attach").

The benefit need not be substantial or related to financial profit. *E.g. United States v. Cook*, 782 F.3d 983, 988 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 262 (2015) (no authority for contention that only those who receive payment are covered by benefit: "The phrase 'anything of value' is extremely broad" and extends to, among other things, anticipation of future sexual encounters, photographs); *U.S. v. Jennings*, 280 Fed. Appx. 836, 844 (11th Cir. 2008) (Jennings benefitted from the gas used to drive approximately 30 miles).[7]

Here, it is undisputed that Wales profited from the sale of shrimp processed with forced labor at the Songkla factory. ASOF ¶16. Defendants' suggestion that Wales did not receive enough of a financial benefit to satisfy the statute reads into §1595 a litmus test that simply does not exist. Thus, the benefit element as to Wales is met.

Rubicon also benefitted and does not dispute that it attempted to benefit from shrimp produced at the Songkhla factory. ASOF ¶29. In 2011, while Plaintiffs were laboring at the Songkhla factory, Rubicon secured a contract with the Walmart Company promising access to the "largest shrimp aquaculture production footprint in the world." ASOF ¶30. Rubicon marketed itself as possessing the Songkhla factory.

---

[7] Defendants assert, without authority, a strict time limit on any benefit, for example, that Plaintiffs must show shipments into the United States containing shrimp processed by Plaintiffs or shipped during the same period they were subjected to forced labor. Although plaintiffs meet this alleged standard, there is no such requirement in the statutory scheme. Indeed, such a requirement would introduce complexity in proof that is in conflict with the broad remedial reach of Congressional intent. Defendants cannot dispute that they built capacity and a customer base utilizing Plaintiffs' labor.

ASOF ¶31 (advertising that **"Rubicon has 13 factories that are 100% owned and captive to Rubicon Resources" and listing the Songkhla factory].**  Rubicon CEO Brian Wynn described the Songkhla factory as "our primary source of supply." ASOF ¶94. The volume produced by the Songkhla factory was part of Rubicon's ability to obtain and deliver on that contract. *See* ASOF ¶ 32 ("being able to provide a large, reliable flow of seafood products is a major selling point for Rubicon in winning over large U.S. customers such as Wal-Mart and Sam's Club.").  Indeed, when Sam's Club[8] placed 14 large orders for shrimp in 2011[9] and five orders in 2013, Rubicon sourced those orders from the Phatthana Songkhla factory. ASOF ¶33. Landing the contract with Walmart and being able to fill the orders is a benefit of value. ASOF ¶29.18 U.S.C. § 1595 (benefit includes "anything of value").

Rubicon asserts that it did not profit from the 14 shipments because Walmart rejected the product – a rejection due to Walmart's concern about the forced labor allegations that are the heart of this case. Another shipment was rejected due to salmonella concerns. ASOF ¶34.  Such rejected shipments are a routine and anticipated part of doing business. See Bendick Report ¶55; ASOF ¶35. Companies routinely reflect these losses as unsellable inventory and benefit through reduced tax liability, ASOF ¶ 35, which is another, alternative benefit. ASOF ¶35.

Finally, Rubicon replaced the shrimp with product from its warehoused inventory.  ASOF ¶36. This is typical and illustrates why Rubicon's effort to cabin benefit to the precise shrimp packed by each victim must fail. Rubicon's venture constituted of at least six factories, including Phatthana. ASOF ¶37. Products from multiple factories were stored in the warehouse and orders were routinely filled with product from multiple factories. ASOF ¶38.  No customer ordered product from a particular factory. ASOF ¶39. Rubicon's effort to "limit" the benefit to just the shrimp

---

[8] Sam's Club is part of the Walmart Company.
[9] Defendants concede that the shrimp was processed "during Plaintiffs' tenure" at the Phatthana factory. Dkt. 146 at 3.

received from this factory ignores the economic reality. To sell these fungible products in the United States, the Defendants' venture relies on a "vertically integrated supply chain" allowing them to provide consistent supplies of shrimp and seafood to purchasers in the United States and elsewhere. ASOF ¶41. Defendants benefitted from the overall volume of their production, not from whether any particular batch of shrimp was sold or rejected (and replaced with another batch). ASOF ¶29.  This evidence is more than enough to proceed to trial by jury.

Moreover, it is clear that Rubicon attempted to receive the benefit from these particular shrimp: it received the orders from Walmart and purchased the product from Phatthana, engaged Wales to inspect it, had it shipped to the United States, and acted as Phatthana's agent during the inspection process by the Food and Drug Administration. ASOF ¶28, 42. Although Rubicon's attempt to profit was thwarted by Walmart's concern about the forced labor allegations, Congress plainly included such "attempts" within the ambit of the statute.

Finally, the shrimp processed at Songkhla was frozen and stored, creating some time lag between the production, shipment and ultimate sale. ASOF ¶43. Rubicon reported sales orders from Songkhla in March 2013, which could include inventory processed by Plaintiffs, who had left the plant just a few months prior. ASOF ¶45.

## IV.   CONCLUSION

For the above reasons, Defendants' motion should be denied.


Dated:  November 27, 2017          Respectfully Submitted,


COHEN MILSTEIN SELLERS & TOLL PLLC
HADSELL STORMER & RENICK LLP
ANTHONY DICAPRIO, ATTORNEY AT LAW
SCHONBRUN SEPLOW HARRIS &
HOFFMAN LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:   */s/ Agnieszka Fryszman*_____

Agnieszka Fryszman

Attorneys for Plaintiff