1
2
3
4
5

Dan Stormer, Esq. [S.B. #101967]
Mary Tanagho Ross, Esq. [S.B. #280657]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        mross@hadsellstormer.com

6
7
8
9
10

Agnieszka Fryszman, Esq. [DC #459208]
*Admitted pro hac vice*
Laurie Ball Cooper, Esq. [CA S.B. #275293]
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W. East Tower, Suite 500
Washington, District of Columbia 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Emails: afryszman@cohenmilstein.com
        lballcooper@cohenmilstein.com

11
12

Attorneys for Plaintiffs

13

**UNITED STATES DISTRICT COURT**

14

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 15 Keo Ratha, Sem Kosal, Sophea Bun, Yem Ban, Nol Nakry, Phan Sophea, and Sok Sang,<br>16<br>17         Plaintiffs,<br>18     vs.<br>19 Phatthana Seafood Co., Ltd.; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe Ltd.,<br>20<br>21         Defendants.<br>22 | Case No.: 2:16-CV-04271 JFW (ASX)<br><br>[Assigned to the Honorable John F. Walter – Courtroom 7A]<br><br>**PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' SEPARATE STATEMENT OF UNCONTROVERTED FACTS, SUPPORTING EVIDENCE AND CONCLUSION OF LAW**<br><br>DATE:        December 18, 2017<br>TIME:        1:30 p.m.<br>CRTRM:     7A<br><br>Complaint filed:   June 15, 2016<br>Disc. Cut-Off:     October 31, 2017<br>Motion Cut-Off:  November 20, 2017<br>Trial Date:          January 16, 2018 |

23
24
25
26
27
28

1  [Additional Counsel continued from previous page]

2  Anthony DiCaprio, Esq. [SD NY #1872621 and ND NY #507797]
3  *Admitted pro hac vice*
   Attorney at Law
   64 Purchase Street
4  Rye, New York 10580
   Telephone: (917) 439-5166
5  Emails: ad@humanrightslawyers.com
           anthonydicaprio@gmail.com
6
7  Paul L. Hoffman, Esq. [S.B. #71244]
   Catherine E. Sweetser, Esq. [S.B. #271142]
8  SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
   723 Ocean Front Walk
9  Venice, California 90291
   Telephone: (310) 396-0731
10 Facsimile: (310) 399-7040
   Emails: hoffpaul@aol.com
11         catherine.sdshhh@gmail.com

12 Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Plaintiffs hereby submit the following evidentiary objections to the evidence submitted by Defendants Rubicon Resources and Wales & Co. Universe Ltd. in support of their Motion for Summary Judgment set for hearing on December 18, 2017 before this court:

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| DUF[1] 2 | "Wales performs quality control, sales and marketing primarily for seafood processing factories. Wales itself does not own a seafood processing factory and does not employ production workers or migrant labor."<br><br>Aramwattananont Decl., ¶ 8 | **1. FRE 701 Improper Opinion Testimony as to a Legal Conclusion**<br><br>This evidence is objected to on the ground that the statements made are a legal conclusion. Whether Wales employs production workers or migrant workers is a legal conclusion which Mr. Aramwattananont cannot make.<br><br>*See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004) ("No witness – expert or non-expert – should opine on the ultimate legal conclusion, which is province of the court.").<br><br>**2. Sham Declaration. Fed. R. Civ. P. 56**<br>*Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) (Summary judgment declaration was a sham, and thus district court did not abuse its discretion in disregarding it, where declarant at his prior deposition did not recall answers to multiple questions, including questions on topics central to |

---

[1] Refers to Defendants' Undisputed Material Facts

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
|       |                  | his action, even when he was shown exhibits in attempt to refresh his recollection, but declaration contained comprehensive details about the action without any credible explanation as to how declarant's recollection had been refreshed). |
|       |                  | This evidence is further objected to on the ground that the declaration is a sham declaration in that the statements in the declaration are in direct contradiction to earlier deposition testimony. |
|       |                  | The declaration conflicts with his prior testimony.  For example: |
|       |                  | When he was asked at his deposition if Wales owned factories that produced product, Aramwattananont replied "Yes" stating that there were "[t]wo company, three factories." When he was asked what the names were of the companies, he replied, "Number one, Andaman Seafood."  He stated that Andaman Seafood has "two factories." He testified that the other company is "Sea Wealth Frozen Food" which also has one factory. |
|       |                  | Q. Did Wales own factories that produced product? A. Yes. Q. How many? A. Two company, three factories. Q. What are the two company names? A. Number one, Andaman Seafood. Q. Andaman? A. But the Andaman Seafood have the branch also in the south. |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
|       |                  | Q. So it has two factories? A. For one company. Q. What is the other company name? A. Sea Wealth Frozen Food. Q. Sea Wealth Frozen Food. Okay. Sea Wealth Frozen Food has one factory? A. Yes. Wales 30(b)(6) Dep. 58:3-19. <br><br> "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). This is because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 266 (quoting *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1462 (9th Cir.1985)). <br><br> The sham affidavit rule arises when the declarant's declaration contradicts earlier deposition testimony. *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009); *see Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991) (holding a court may discount a "sham" declaration that "flatly contradicts" prior deposition testimony, and has been provided for the sole purpose of creating a genuine issue of material fact.) The underlying rationale of the sham affidavit rule is that a party may not "manufacture a bogus dispute with himself to defeat |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | summary judgment." *Davis*, 571 F.3d at 928. |
| | | |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| 8 | "Rubicon never acted as Phatthana's agent (in the U.S. or elsewhere) for any purpose (including purchasing, selling, distributing, or marketing Phatthana products)." Wynn Decl., ¶ 4 | **1. Sham Declaration. Fed. R. Civ. P. 56;** *Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) (Summary judgment declaration was a sham, and thus district court did not abuse its discretion in disregarding it, where declarant at his prior deposition did not recall answers to multiple questions, including questions on topics central to his action, even when he was shown exhibits in attempt to refresh his recollection, but declaration contained comprehensive details about the action without any credible explanation as to how declarant's recollection had been refreshed).<br><br>This evidence is objected to on the ground that the declaration is a sham declaration in that the statement in the declaration in paragraph 4 is contradicted by Brian Wynn's own deposition testimony and Rubicon 30(b)(6) deposition testimony.<br><br>"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). This is because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
|       |                  | contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id*. at 266 (quoting *Foster v. Arcata Assocs., Inc*., 772 F.2d 1453, 1462 (9th Cir.1985)). |
|       |                  | The sham affidavit rule arises when the declarant's declaration contradicts earlier deposition testimony. *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009); *see Kennedy v. Allied Mut. Ins. Co*., 952 F.2d 262, 266-67 (9th Cir. 1991) (holding a court may discount a "sham" declaration that "flatly contradicts" prior deposition testimony, and has been provided for the sole purpose of creating a genuine issue of material fact.) The underlying rationale of the sham affidavit rule is that a party may not "manufacture a bogus dispute with himself to defeat summary judgment." *Davis*, 571 F.3d at 928. |
|       |                  | Mr. Wynn's declaration conflicts with prior deposition testimony. For example: |
|       |                  | Q. If you were already selling -- PTN was already selling in the United States, why was Rubicon Resources needed? A. Because we want to sell our product to supermarkets and to provide other services. Q. Was PTN Group selling to any supermarkets prior to Rubicon being established? A. We did not sell directly to supermarkets but through importers. Q. Okay. Did you sell to importers that |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
| | | you didn't own, and so Rubicon was established so that you were going through a company that you owned? A. Partially. Q. When you say "partially," what does that mean? A. Meaning that we also sell to importers, although we establish Rubicon Company. Q. So Rubicon was established just to help you sell more in the United States? A. Yes. Phatthana 30(b)(6) Dep. 26:13-27:14.<br><br>Q. Have you seen the document before? A. Yes, I did. Q. There is an e-mail at the bottom of the page which is from you, addressed to Brian Wynn. Did you write that? A. Yes. Q. Did you write it in English, or did you use some translation service to write it? A. Someone help me to write it. Q. Who helped you? A. I cannot remember. Q. There's an indication here to Mr. Wynn, who is at Rubicon Resources, correct? A. Yes. Q. There's an indication that you're trying to apply for a green ticket for the Songkhla factory. Is that -- that's what we talked about yesterday, correct? A. Yes. Q. What did you need Rubicon Resources to help do? A. As I mentioned yesterday, we need to ship the product, at least five shipments, for inspection by FDA in order to see that there's no error in |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | requirement regarding food safety, and then we could later apply for green ticket. |
| | | Q. And was Rubicon Resources able to help you do that? |
| | | A. Yes, they can send to FDA for random inspection. |
| | | Q. Was it common to ask Rubicon Resources to help you facilitate things with the United States? |
| | | A. Yes. |
| | | Phatthana 30(b)(6) Dep. 280:5-281:20. |
| | | |
| | | A. …The Thai shrimp industry, we have a lot of the product. But to do the production and ship to the customer, the big customer, like Walmart, okay, or Kroger, it need to have a big quantity enough to ship at the time that they want the product. Only my group is not enough. Okay? So we need another group. |
| | | Q. So you needed a group within the company who was actually processing the product in order to get it to America in hopefully the volume, the big volume that Rubicon Resources was going to be helping you sell? |
| | | A. (Moving head up and down.) |
| | | Q. Yes? |
| | | A. Yes. |
| | | MS. KROEGER: Okay. All right. We can take a break. |
| | | THE VIDEOGRAPHER: It is 9:53, and we are off the record. This is video 1. |
| | | * * * |
| | | (Recess from 9:53 a.m. to 10:05 a.m.) |
| | | * * * |
| | | THE VIDEOGRAPHER: It is 10:05. This is the continuation of |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
| | | media 1. We are back on the record. |
| | | BY MS. KROEGER: |
| | | Q. After the Rubicon Resources company was formed, did Rubicon Resources help market the Thai product in the United States? |
| | | A. Yes. |
| | | Q. Was the thought when the company was formed that the product that would be marketed and sold in the United States would come from the factories owned by Mr. Paibool? Was that the purpose of bringing him and his companies into the -- into the mix of ownership? |
| | | A. Not only for him. For all the -- all the part -- all the shareholder group. |
| | | Q. The other shareholder group? Okay. |
| | | A. Yes. For all. |
| | | Q. Was there any product that was to be sold to the United States through the Rubicon Group other than the -- Mr. Paibool's group and the Thai Fish Cold Storage Group? Just those -- just those two factories? |
| | | MR. KREINDLER: And Wales. |
| | | THE WITNESS: And my group. |
| | | Wales 30(b)(6) 55:12-57:22. |
| | | |
| | | Q. What was Rubicon's role in the sale of shrimp? |
| | | A. Wow. Generally speaking, we were to – we were the market engagement, access to the market. So we would engage the customer and try to solve for their unique needs. |
| | | Q. How did you get customers? |
| | | MR. KREINDLER: Objection, vague. |
| | | THE WITNESS: So many ways. |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|-----------------|------------|
| | | BY MS. FRYSZMAN:<br>Q. Did you do marketing?<br>A. Yes.<br>Q. What sort of marketing did you do?<br>A. We've done advertisements in seafood magazines. We've done -- that's probably -- maybe -- we have a website. Most of our bus- -- our customers are -- most of our business is private label, so we run a lot of programs for customers that are unique and specific to them.<br>Rubicon 30(b)(6) Dep. 25:5-23 (Rubicon described itself as "the market engagement, access to the market.").<br><br>Q. Okay. So where are they in the U.S.?<br>A. They are all over the country. Third-party warehouses all over the country.<br>Q. And what's a third-party warehouse?<br>A. It's something not captive.<br>Q. You have -- is it like a storage facility?<br>A. Yes. It would be a cold storage facility.<br>Q. Okay. And where -- are there -- where were there and are there cold storage facilities that serve as inventory storage places for Rubicon Resources, LLC?<br>A. Chicago, Los Angeles, New Jersey, other places. Major cities.<br>Q. Okay. In New Jersey, where in New Jersey?<br>A. I don't know the specific location.<br>Q. Okay. It would be a port?<br>A. Not necessarily.<br>Q. Okay. So just going for the United States inventory, so if a company wants shrimp, who do they contact to get their shrimp, who at Rubicon Resources? Once it's in the United States. What |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
| | | position?<br>A. I mean, are you buying it, or are you distributing it?<br>Q. Let's go with buying it.<br>A. They would contact the representative merchant at Rubicon.<br>Q. Okay. And where -- how many representative merchants are there at Rubicon?<br>A. Today?<br>Q. Yes.<br>A. Approximately eight.<br>Wynn Dep. 112:1-113:7.<br><br>Q. Okay. So for purchasing, they would go to somebody in the merchandising department; correct?<br>A. Correct.<br>Q. And the same was true 2010 through 2012; correct?<br>A. Yes.<br>Q. Okay. And they would say what?<br>A. I want to buy some shrimp.<br>Q. And what would the merchandiser do?<br>A. I want to sell some shrimp.<br>Wynn Dep. 115:17-116:1.<br><br>A. I'm not saying there's any weaknesses, but the merchandiser deals with the buyers of the customers.<br>Q. Okay.<br>A. That's what they engage on. They negotiate price and quantity --<br>Q. Okay. And then --<br>A. -- specifications.<br>Q. -- who handles delivery?<br>A. The replenishment department.<br>Wynn Dep. 116:13-22.<br><br>Q. Okay. So the replenishment |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
|       |                  | department has an order. |
|       |                  | I want one container. What does the replenishment department do as it relates to these warehouses in the U.S.? |
|       |                  | We're going to work backwards to Thailand  just so – |
|       |                  | A. They would -- they'd be responsible for making sure the inventory matches the demands of the customer. |
|       |                  | Q. Okay. So in this case, how do they determine? Do they check with Chicago and Los Angeles and New Jersey, or do they check the closest one to where the customer wants it? |
|       |                  | What do they do? |
|       |                  | A. Different customers have different requirements for delivery. We also use different methods of inventorying. FIFO is an example. |
|       |                  | Q. And what's that? |
|       |                  | A. First in/first out. |
|       |                  | Q. Okay. You didn't use LIFO? |
|       |                  | A. We could have. |
|       |                  | Q. And why didn't you? |
|       |                  | A. It's a function of how you interpret your inventory. There's different factors to that, you know, banking requirements, banking covenants, things like that. |
|       |                  | Q. Okay. Let's just go back to the ordering itself. |
|       |                  | So a customer, Kroger would -- Kroger, that was one of the ones you mentioned? |
|       |                  | A. Yes. |
|       |                  | Q. Okay. Kroger wants in Los Angeles a container of shrimp. |
|       |                  | What does the replenishment department do? |
|       |                  | A. They arrange for its safe delivery. |
|       |                  | Q. Where do they get it from, is my |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | question?<br>A. From inventory.<br>Q. In Los Angeles?<br>A. If that's where the most effective inventory is.<br>Q. Oh, so it might be -- Los Angeles doesn't have enough, then it might be Chicago?<br>A. It could be.<br>Q. Or New Jersey?<br>A. Could be.<br>Q. Okay. So Kroger says to the -- where is the replenishment department physically located?<br>A. Culver City.<br>Q. Okay. So Kroger in Los Angeles calls the replenishment department in Culver City or emails or some way contacts and says, we want a container.<br>        Is there certain types of shrimp?<br>A. Yes.<br>Q. Okay. What are the different types?<br>A. There are different species in different product forms.<br>Q. Anything else?<br>A. There's different sizes and shapes and different specifications.<br>Wynn Dep. 118:4-120:13.<br><br>Q. Okay. So back to ordering the container.<br>        So the replenishment department checks and sees whether they can provide the container of a particular species, size, shape of shrimp that has been ordered by Krogers or Wal-Mart or Trader Joe's, whoever; correct?<br>A. Loosely, yes.<br>Q. Okay. Where -- what would make it tighter?<br>A. They're responsible for maintaining |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | inventory levels is a more accurate way to say what they do. |
| | | Q. Okay. But then once the merchandising person has a sale, then it's turned over to replenishment to find where those products are; correct? |
| | | A. No. The replenishment department's there to maintain inventory levels. |
| | | Q. Okay. But who finds in the inventory where what is ordered is needed? Merchandising or replenishment? |
| | | A. Who finds in the inventory? |
| | | Q. Right. |
| | | A. The replenishment department picks the inventory. |
| | | Q. And what does it mean, to pick the inventory? |
| | | A. Schedules delivery, organizes the orders as the customer needs them. |
| | | Q. Okay. And they determine which warehouse has the product that is being sought? |
| | | A. Yes. |
| | | Q. Okay. Is it -- have we covered how something is ordered and how it gets to the company? Is there any other steps that I'm missing? |
| | | A. Probably. |
| | | Q. Okay. Do you -- can you think of any that -- |
| | | A. No. |
| | | Q. -- I'm missing? |
| | | A. No. |
| | | Q. Okay. Now, is it done any different for people who want to distribute shrimp? |
| | | A. I don't understand. |
| | | Q. We looked at the purchaser. You said there were two types. There was a purchaser, and there was a distributor. Correct? |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | 2 A. I'm unclear.<br>3 Q. Okay. When I asked you earlier how do you get the shrimp from the warehouse, you said it depends on whether you're a purchaser or – there are two types, essentially, and you said a purchaser and a distributor.<br>      Is there -- are there two types?<br>A. Yes.<br>Q. And what are the two types?<br>A. I'm referring to the buying and the selling and distri- -- and -- A, and, B, the distribution of the product.<br>Q. Okay. What does it mean to distribute the product?<br>A. To make sure that it ships from the country of origin on time, to import it successfully, to warehouse it, and then to coordinate the delivery to the customer.<br>Q. So that's also part of purchasing, then; correct? I mean, it's not -- is there something separate?<br>A. That's the replenish- -- that's primarily the replenishment functionality.<br>Q. For the warehouses?<br>A. No. We don't manage the ware- -- we don't -- they're third-party warehouses. We don't manage their business. We manage product to and from.<br>Q. I asked it improperly. Their job is to make sure it gets to the warehouse as inventory?<br>A. Yes.<br>Q. To be either purchased by someone or distributed?<br>A. Correct.<br>Wynn Dep. 123:5-126:11. |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
| | | A. We'd have maybe a meeting, a business meeting, talk about the market conditions and, you know, what we forecast for the future of the market conditions. We'd look at the laboratory, maybe. Q. And why would you look at the laboratory? A. To demonstrate to the customer that we had a rigorous QA laboratory process in the production of the product. Q. Okay. Anything else you recall you looked at during the course of these tours? A. The only thing I could think of is new product, like maybe new product innovation. Q. You might ask if they're doing anything differently or have a new type of product? A. Yeah. Anything new. Can we do something different? Q. So what would be -- what would you do differently with fish? A. Process it in a different way. Q. Shrimp, the same thing? A. Yes. Wynn Dep. 135:22-136:17.<br><br>Q. …If you are sending it in anticipation of the customer's purchase order to Rubicon from the customer, is it still designated to that customer? A. It's designated to a warehouse, a location or destination as I said. It's purchased at a destination. So we -- when we purchase the product or issue our purchase order, it prescribes the destination. Q. Okay. And how do you determine |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | the destination? |
| | | A. Proximity to the customer's distribution. |
| | | Q. And I assume for somebody like Walmart, that's lots of points? |
| | | A. It is. |
| | | Q. Kroger same? |
| | | A. Less points, but several. |
| | | Q. Trader Joe's? |
| | | A. Same. |
| | | Q. Sysco? |
| | | A. Similar. |
| | | Q. And what was the other one? Kroger. So Kroger, Walmart, Trader Joe's -- Sam's Club. That's the other one. |
| | | A. Yeah, they have multiple distribution points, distribution centers. |
| | | Q. Okay. And then it would go to a warehouse awaiting what? |
| | | A. Awaiting its turn in line to ship out to the customer. |
| | | Q. Okay. So if it's been ordered, we want X amount of shrimp, put on the boat, taken to a warehouse, purchase order comes in while it's en route. When it gets there, you just await the pur- -- the customer, saying we want a container of shrimp in San Bernardino. Something like that? |
| | | A. Something like that. |
| | | Q. And is there anything about what said incorrect? |
| | | A. It's not perfectly accurate. |
| | | Q. Okay. Where am I inaccurate? |
| | | A. The customers rely on us to maintain inventory for them, and that inven- -- that demand has seasonality to it. So they -- and they were -- like I said earlier, they run on a shorter ordering system. So we maintain an inventory of |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|-------------------|------------|
| | | about 90 days to satisfy their ongoing demand.<br>Q. Who is the "their"?<br>A. The customers' ongoing demand.<br>Wynn Dep. 146:4-148:1.<br><br>A. Sorry. The customers order from Rubicon, and we --<br>Q. Okay.<br>A. -- maintain an inventory to fill those orders.<br>Wynn Dep. 148:20-24.<br><br>A. It's just a fluid situation. A lot goes into inventory levels; run rates, promotions, foot traffic, a lot of stuff like that.<br>Q. It's what you anticipate you will need?<br>A. Yes.<br>Q. Okay. And you -- so you ship based upon what you anticipate you will need, based on your analysis of the historical rates plus potential things that might take place in the future?<br>A. Yes.<br>Q. And then it goes to the warehouses?<br>A. Yes.<br>Wynn Dep. 153:23-154:9.<br><br>A. There's the importation process.<br>Q. What's that?<br>A. Homeland Security, customs, FDA.<br>Q. But they're not a delivery mechanism. I'm talking about something that gets you from point A to point B. They could be an interference, but they're not likely to be a delivery mechanism, are they?<br>A. But they're a prerequisite.<br>      MR. KREINDLER: When you |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | say "delivery," are you talking about the physical movement of -- |
| | |     MR. STORMER: Yeah. |
| | |     MR. KREINDLER: -- the product to the United States? |
| | | MR. STORMER: Yeah. |
| | | THE WITNESS: Physically, no, they wouldn't be involved. |
| | | BY MR. STORMER: |
| | | Q. Okay. You just have to plan for issues that might develop with Homeland Security? |
| | | A. There could be a sampling, which would be a physical delay. There could be detention of a container, which would be a physical delay. There would be things along the import chain that could stop the cargo. |
| | | Q. Okay. What are the types of things that could stop the cargo? |
| | | A. Random inspection, intentional inspection. |
| | | Q. How does that stop? |
| | | A. Bad paperwork. The FDA would stop the cargo. |
| | | Q. Okay. If they're doing a random inspection, don't they just randomly inspect and let you go on if you pass? |
| | | A. Not always, no. |
| | | Q. What do they do? |
| | | A. It depends on what they're inspecting for. |
| | | Q. What are the types of things they inspect for? |
| | | A. Wholesomeness. |
| | | Q. Wholesomeness? |
| | | A. Yep. |
| | | Q. What's wholesomeness? |
| | | A. Whether you can eat it. |
| | | Q. Oh, okay. |
| | | A. Banned ingredients, antibiotics, |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | hormones, chemicals. General quality organ elliptical qual- -- general organ elliptical quality. Q. Organ elliptical -- A. So it's -- is it what we said it was. Q. Oh, okay. A. And so those things are -- all matter in terms of the distribution. Q. Okay. And those are things you have to plan for in your inventory process? A. Definitely. Q. Okay. Something might take longer, so you have to assure you have sufficient inventory to -- A. Yes. Q. -- cover for it? A. Yes. Wynn Dep. 160:8-162:18. Q. And what is this document? 22 A. It's an email from me to the head of marketing for the PTN Group. Q. And that's Kim Kim? A. It is. Q. And down, it has "Dear Khun Kim," K-H-U-N. Is that a different person or -- A. Kuhn is Mr., Mrs. Q. Oh. In Thai? A. Yes. Q. Okay. You say: "I am confident that we have successfully taken off" -- "Regarding the PTN labor matter, I am confident that we have successfully taken it off of the urgent radar with our major customers." Do you see that? A. Yes. Q. What did you mean by that? A. That after they've thoroughly |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|-----------|
| | | reviewed the issue that was brought up in the press, they believe it was no longer an issue and were comfortable doing business with us. Q. And what were the major customers who had placed Rubicon on the urgent radar? A. Primarily Walmart and Sam's. Wynn Dep. 218:21-219:22. <br><br>Q. What did you mean by Rubicon being truly vertically integrated? A. It's verifiable that they owned part of the business. Q. Who's "they"? A. The PTN Group and the AMS Group. Q. Owned part of what business? A. Rubicon. Wynn Dep. 221:13-20. <br><br>BY MR. STORMER: Q. Now, it says: "Brian,. "Again this is where creative at your direction should draft a Rubicon position." What was creative? A. The creative department. Q. Okay. So they would draft a position on behalf of Rubicon? A. If we made one, they would. Q. And was that part of their job, to be creative? A. Well, creative -- they produce artwork and graphics and decks and things like that. That's also where our copywriter resided. So if we wrote something, then it would go through the copywriter. Q. Okay. And then it says: |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|-------|------------------|------------|
|  |  | "We need to be spot on as it relates to what PTN has and will do in this matter."<br>    Do you see that?<br>A. Yes.<br>Q. And had you decided what it was that PTN had and would do?<br>A. We decided to message to our customers directly and not to the trade. So this discussion with me is about discussing it to the trade, not to the customers individually.<br>Q. Well, then I'm confused because the second sentence says:<br>    "We need to also be prepared to respond to our customers."<br>A. Where is your confusion?<br>Q. Probably based early in life. But in this case, it seems to be saying here that in addition to having creative draft a Rubicon position, you would also respond to the customers?<br>A. This is Mr. Matta putting his point of view across as to how we should proceed.<br>Q. Did you not agree with Mr. Matta?<br>A. We ended up messaging just to the customers.<br>Q. And was there a discussion about that?<br>A. I'm not sure if -- I'm not sure if we had a discussion including Jesse or not.<br>Q. Who's the "we"?<br>A. The company.<br>Q. Okay. And who would that be?<br>A. It would be me and Gregg and perhaps Jesse, maybe Justin Kirby. I probably made the decision to message just to the customers based on the facts of the matter.<br>Wynn Dep. 285:9-287:12. |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | Q. Okay. So did you help PTN Songkhla get the green ticket? A. I don't know if we did or we didn't, but it looks like we agreed to start. Q. And was that for only products that came through Rubicon? A. Their status as a -- their relationship with FDA involves the importer, but it could apply to other importers as well. Wynn Dep. 257:23-258:6 (Rubicon worked to get green tickets for the PTN, and to ensure products from its factories had green tickets and were taken off auto-detention by the FDA). **2. FRE 701 Improper Opinion Testimony as to a Legal Conclusion** The evidence is further objected to as it draws a legal conclusion. Whether Rubicon ever acted as Phatthana's agent is a legal conclusion, in the Court's purview only. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004) ("No witness – expert or non-expert – should opine on the ultimate legal conclusion, which is province of the court."). |
| 9 | Rubicon did not direct or participate in Phatthana's labor recruitment, employment practices, or work conditions at Phatthana's Songkhla factory. Q. Did you ever hear that the workers were charged recruitment fees in order to obtain their employment? A. No. | **1. FRE 701 Improper Opinion Testimony as to a Legal Conclusion** Mr. Wynn is offering an opinion on whether Rubicon directed or participated in Phatthana's labor recruitment, employment practices, or work conditions at Phatthana's Songkhla factory. Whether or not Rubicon's conduct rose to the level of directing or participating is a legal |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
|  | Q. Did you ever hear that the workers were charged deductions to repay those fees? A. We weren't involved in the recruitment of employees in Thailand. Q. Did you ever hear that the workers were charged for needles that they used to do their jobs? A. No. Q. Or for any other equipment? A. No. Q. You didn't hear? A. We weren't involved. Exh. 8, Rubicon 30(b)(6) 9/12/2017 Depo., pp. 65:12-66:1, 86:16-21. | conclusion for the Court. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004) ("No witness – expert or non-expert – should opine on the ultimate legal conclusion, which is province of the court."). |
| 13 | "Wales never acted as Phatthana's agent (in the U.S. or elsewhere) for any purpose (including purchasing, selling, distributing, or marketing Phatthana products)." Aramwattananont Decl., ¶13 | **1. Sham Declaration. Fed. R. Civ. P. 56** *Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) (Summary judgment declaration was a sham, and thus district court did not abuse its discretion in disregarding it, where declarant at his prior deposition did not recall answers to multiple questions, including questions on topics central to his action, even when he was shown exhibits in attempt to refresh his recollection, but declaration contained comprehensive details about the action without any credible explanation as to how declarant's recollection had been refreshed). This evidence is objected to on the ground that the declaration is a sham declaration in that the statement in the declaration in paragraph13 is contradicted by deposition testimony. |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). This is because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 266 (quoting *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1462 (9th Cir.1985)).<br><br>The sham affidavit rule arises when the declarant's declaration contradicts earlier deposition testimony. *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009); *see Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991) (holding a court may discount a "sham" declaration that "flatly contradicts" prior deposition testimony, and has been provided for the sole purpose of creating a genuine issue of material fact.) The underlying rationale of the sham affidavit rule is that a party may not "manufacture a bogus dispute with himself to defeat summary judgment." *Davis*, 571 F.3d at 928.<br><br>The following deposition testimony contradicts the evidence presented:<br><br>Q. …So during this process of Rubicon Resources sends an order to a company packer, a partner packer, with a CC to |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | Wales, where does Wales send its bill for its portion of the commission from the sales? |
| | | A. After shipment, we send a debit note to the packers. |
| | | Wales 30(b)(6) Dep. 73:9-15. |
| | | |
| | | Q. Do you know what is meant by the last two columns here, the WTH tax 3 percent? |
| | | A. Commission tax. |
| | | Q. Commission tax? |
| | | A. To deduct 3 percent. |
| | |     THE REPORTER: I'm sorry. To what? |
| | |     THE WITNESS: To deduct the commission tax, 3 percent. |
| | | BY MS. KROEGER: |
| | | Q. So does that mean that Phatthana Seafood deducted 3 percent before they paid the commission to Wales? |
| | | A. Yes. |
| | | Wales 30(b)(6) Dep. 121:1-15. |
| | | |
| | | Q. Sure. I'm just wondering in the process -- so the Rubicon Resources purchase order comes to Phatthana Seafood with a CC to Wales, and then Wales sends this to Phatthana Seafood saying -- |
| | | A. WR. |
| | | Q. -- "Start tracking it, here's my WR number." Presumably Phatthana Seafood starts processing the product. |
| | | Wales 30(b)(6) Dep. 132:4-12. |
| | | |
| | | Q. All right. Let me -- let me make sure I understand that process. |
| | |     When the -- so on the WR that's sent to Phatthana, I see here that there is a shipment date already filled in of |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | December 26, 2011. What does that indicate to Phatthana, if anything? A. They need to ship within that period. Q. Okay. And then how do they let you know, Wales know, that the shipment is moving? A. After they ship, they have to inform the shipment advise. Q. How do they do that? A. By mail. Wales 30(b)(6) Dep. 133:13-134:6.<br><br>Q. So let me ask you just some general questions. There's an e-mail that is labeled qc@wales-universe.com. Who receives e-mails at that e-mail address? A. This supposed to be the e-mail from PTN for the Phatthana, okay, Group to Rubicon, okay, and CC -- on the CC, involving Wales on the QC. Okay. That QC-Wales. Okay. Khun Pichit is Wales. Wales 30(b)(6) Dep. 142:11-19.<br><br>Q. …Does it apply to -- is it a tax transaction indicating one of those or something else? A. 3 percent. That is mean that Phatthana have already deduct 3 percent. Wales 30(b)(6) Dep. 150:12-16.<br><br>**2. FRE 701 Improper Opinion Testimony as to a Legal Conclusion**<br><br>Whether Wales ever acted as Phatthana's agent is a legal conclusion which is left to the Court to decide.<br><br>The evidence is further objected to as it draws impermissibly a legal conclusion. *See Hangarter v. Provident Life &* |

| PARA. | ITEM OF EVIDENCE | OBJECTIONS |
|---|---|---|
| | | *Accident Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004) ("No witness – expert or non-expert – should opine on the ultimate legal conclusion, which is province of the court."). |

Dated: November 27, 2017                    Respectfully Submitted,

                                            COHEN MILSTEIN SELLERS & TOLL PLLC

                                            ANTHONY DICAPRIO, ATTORNEY AT LAW

                                            SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

                                            HADSELL STORMER & RENICK LLP


                                            By:  ___/s/ - Mary Tanagho Ross_____
                                                    Dan Stormer
                                                    Mary Tanagho Ross
                                            Attorneys for Plaintiffs