**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KEO RATHA; SEM KOSAL; SOPHEA BUN; YEM BAN; NOL NAKRY; PHAN SOPHEA; SOK SANG, *Plaintiffs-Appellants*, | No. 18-55041 |
| | D.C. No. 2:16-cv-04271-JFW-AS |
| v. | |
| PHATTHANA SEAFOOD CO., LTD.; S.S. FROZEN FOOD CO., LTD.; RUBICON RESOURCES, LLC; WALES AND CO. UNIVERSE LTD., *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted September 13, 2019
Pasadena, California

Filed February 25, 2022

Before:  Marsha S. Berzon, Ryan D. Nelson, and
Bridget S. Bade, Circuit Judges.

Opinion by Judge Bade

# SUMMARY[*]

## Trafficking Victims Protection Reauthorization Act

The panel affirmed the district court's grant of summary judgment in favor of defendants in an action brought under the civil remedy provision of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, by Cambodian villagers who alleged that they were trafficked into Thailand and subjected to forced labor at seafood processing factories.

Assuming without deciding that § 1595 may apply extraterritorially, the panel held that plaintiffs did not present a triable issue on the requirements for such application or on the merits of their claims.

18 U.S.C. § 1596 authorizes extraterritorial application of the TVPRA for specific criminal trafficking offenses. The panel assumed without deciding that § 1595 permits a private cause of action for extraterritorial violations of the substantive provisions listed in § 1596 so long as § 1596's other requirements are satisfied.

As to two foreign company defendants, the panel held that plaintiffs' claims against Phatthana Seafood Co. Ltd. failed because Phatthana was not "present in the United States" at any time relevant to this lawsuit as § 1596 requires. Because the success of plaintiffs' claims against S.S. Frozen Food Co. Ltd. depended on the success of their claims against Phatthana, their claims against S.S. Frozen also

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

failed.  The panel held that even assuming § 1596 requires
foreign companies to possess nothing more than minimum
contacts with the United States, plaintiffs did not establish
that Phatthana or S.S. Frozen had sufficient contacts with the
United States to meet that standard.  The panel held that the
record did not support either specific or general jurisdiction
as a basis for finding minimum contacts.  The panel rejected
plaintiffs' argument that Phatthana and S.S. Frozen were
present in the United States through an agency relationship
or joint venture with defendant Rubicon Resources LLC, a
Delaware limited liability company with its principal place
of business in California.

As to defendants Rubicon and Wales and Co. Universe
Ltd., a Thai company registered to conduct business in
California, the panel held that plaintiffs failed to produce
evidence establishing a triable issue of defendants' liability
under § 1595 on a theory that they knowingly benefitted
from Phatthana's alleged human trafficking and forced labor
abuses, financially and by accessing a steady stream of
imported seafood.  The panel held that no reasonable jury
could infer from the evidence that Rubicon benefitted,
financially or otherwise, from Phatthana's alleged TVPRA
violations.  The panel held that plaintiffs did not raise a
triable issue on whether Wales knew or should have known
that Phatthana was engaged in alleged violations of the
TVPRA when it received a benefit from the alleged venture.

The panel further held that the district court did not abuse
its discretion by denying plaintiffs' motion for an extension
of time to respond to defendants' motions for summary
judgment.

## COUNSEL

Paul Hoffman (argued) and Catherine Sweetser, Schonbrun
Seplow Harris Hoffman & Zeldes LLP, Los Angeles,
California; Agnieszka M. Fryszman, Cohen Milstein Sellers
& Toll PLLC, Washington, D.C.; Dan Stormer, Hadsell
Stormer & Renick LLP, Pasadena, California; Anthony
DiCaprio, Rye, New York; for Plaintiffs-Appellants.

Bryan D. Daly (argued), Charles Lawrence Kreindler, and
Barbara E. Taylor, Sheppard Mullin Richter & Hampton
LLP, Los Angeles, California, for Defendants-Appellees.

William J. Aceves, California Western School of Law, San
Diego, California, for Amicus Curiae Human Rights and
Development Foundation.

Scott A. Gilmore and Carmen K. Cheung, Center for Justice
and Accountability, San Francisco, California; Beth Van
Schaack, Stanford University, Stanford, California;
Ralph G. Steinhardt, George Washington University School
of Law, Washington, D.C.; for Amicus Curiae Center for
Justice and Accountability.

Eli Naduris-Weissman, Rothner Segall & Greenstone,
Pasadena, California, for Amici Curiae Solidarity Center,
International Labor Rights Forum, Worker Rights
Consortium, Centro de los Derechos del Migrante,
International Labor Recruitment Working Group, and
EarthRights International.

Anne M. Voigts, King & Spalding LLP, Palo Alto,
California; Amelia G. Yowell, King & Spalding LLP,
Washington, D.C.; for Amici Curiae Freedom Network
USA, Human Trafficking Legal Center, Public Counsel,

Human Trafficking Clinic at the University of Arkansas School of Law, Civil Litigation and Advocacy Clinic at the University of Arkansas School of Law, Professor Janie Chuang, and Professor David Abramowitz.

Robert A. DeHaan, McLean, Virginia, for Amicus Curiae National Fisheries Institute.

## OPINION

BADE, Circuit Judge:

Plaintiffs-Appellants are Cambodian villagers who allege that they were trafficked into Thailand and subjected to forced labor at seafood processing factories.  Plaintiffs allege that Thai companies perpetrated these offenses, and that companies present in the United States knowingly benefitted from their forced labor.  Plaintiffs brought their claims under 18 U.S.C. § 1595,[1] the civil remedy provision of the Trafficking Victims Protection Act ("TVPA"), as reauthorized and amended in the Trafficking Victims Protection Reauthorization Act of 2003 and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008.[2]

We are asked to determine the extraterritorial reach of § 1595 and to construe the terms of that provision.  We assume without deciding that § 1595 may apply

---

[1] Plaintiffs also brought claims under the Alien Tort Statute.  The district court dismissed those claims at the pleading stage, and they are not at issue in this appeal.

[2] We refer to the Trafficking Victims Protection Act, as reauthorized and amended, as the TVPRA.

extraterritorially and conclude that Plaintiffs did not present
a triable issue on the requirements for such application or on
the merits of their claims. Therefore, the district court
properly entered summary judgment against Plaintiffs. We
also conclude that the district court did not abuse its
discretion in denying Plaintiffs' motion for an extension of
time to respond to Defendants' motions for summary
judgment. We affirm.

I

A

In 2000, Congress enacted the TVPA "to 'combat
trafficking in persons, a contemporary manifestation of
slavery whose victims are predominantly women and
children, to ensure just and effective punishment of
traffickers, and to protect their victims.'" *Ditullio v. Boehm*,
662 F.3d 1091, 1094 (9th Cir. 2011) (quoting Pub. L. No.
106-386, § 102, 114 Stat. 1464 (2000) (codified as amended
at 18 U.S.C. §§ 1589–1592)). By enacting this statute,
"Congress created several new federal criminal offenses
intended to more comprehensively and effectively combat
human trafficking." *Roe v. Howard*, 917 F.3d 229, 236 (4th
Cir. 2019).

In 2003, Congress reauthorized and amended the
TVPRA, adding a civil remedy provision codified at
18 U.S.C. § 1595. *See Ditullio*, 662 F.3d at 1094. Initially,
that provision provided civil remedies only for violations of
§ 1589 (forced labor), § 1590 (trafficking), and § 1591 (sex
trafficking of children). *See* Trafficking Victims Protection
Reauthorization Act of 2003, Pub. L. No. 108-193,
§ 4(a)(4)(A), 117 Stat. 2875 (2003). But in 2008, Congress
again reauthorized the TVPRA and amended it to expand the
civil remedies provision, which now provides:

> An individual who is a victim of a violation
> of this chapter may bring a civil action
> against the perpetrator (or whoever
> knowingly benefits, financially or by
> receiving anything of value from
> participation in a venture which that person
> knew or should have known has engaged in
> an act in violation of this chapter) in an
> appropriate district court of the United States
> and may recover damages and reasonable
> attorneys fees.

18 U.S.C. § 1595(a) (providing a civil remedy for the
offenses listed in Title 18, Chapter 77, "Peonage, Slavery,
and Trafficking in Persons"); *see Ditullio*, 662 F.3d at 1094
n.1.

The 2008 amendments also added § 1596, which
authorizes extraterritorial application for specific sections of
the TVPRA. *See* 18 U.S.C. § 1596(a); William Wilberforce
Trafficking Victims Protection Reauthorization Act of 2008,
Pub. L. No. 110-457, § 223(a), 122 Stat. 5044 (2008). This
provision, entitled "Additional jurisdiction in certain
trafficking offenses," provides:

> (a) In general.—In addition to any domestic
> or extra-territorial jurisdiction otherwise
> provided by law, the courts of the United
> States have extra-territorial jurisdiction over
> any offense (or any attempt or conspiracy to
> commit an offense) under section 1581,
> 1583, 1584, 1589, 1590, or 1591 if—
>
>     (1) an alleged offender is a national of the
>     United States or an alien lawfully admitted

for permanent residence (as those terms are
defined in section 101 of the Immigration and
Nationality Act (8 U.S.C. 1101)); or

(2) an alleged offender is present in the
United States, irrespective of the nationality
of the alleged offender.

18 U.S.C. § 1596(a). As a result of the 2008 amendments,
the TVPRA now extends extraterritorial application to
violations of § 1581 (peonage), § 1583 (enticement into
slavery), § 1584 (sale into involuntary servitude), § 1589
(forced labor), § 1590 (trafficking), and § 1591 (sex
trafficking of children), but only if the alleged offender is a
United States citizen, a lawful permanent resident, or is
present in the United States. *See id.*

B

In their complaint, Plaintiffs alleged that they were the
victims of peonage, forced labor, involuntary servitude, and
human trafficking, in violation of 18 U.S.C. §§ 1581, 1584,
1589, 1590, 1592, and 1593A, and they sought damages
under § 1595, the civil remedy provision of the TVPRA.
Plaintiffs further alleged that Defendants-Appellees
Phatthana Seafood Co., Ltd. ("Phatthana") and S.S. Frozen
Food Co., Ltd. ("S.S. Frozen") perpetrated these offenses,
and that Defendants-Appellees Rubicon Resources, LLC
("Rubicon") and Wales & Co. Universe Ltd. ("Wales")
knowingly benefitted from Phatthana's and S.S. Frozen's
unlawful conduct.

Specifically, Plaintiffs say that they were recruited from
their villages to work in factories in Thailand producing
shrimp and seafood for export to the United States. Plaintiffs
were promised well-paying jobs with free accommodations,

but once in Thailand, they became victims of peonage, forced labor, and involuntary servitude. Plaintiffs were paid less than promised, charged for accommodations, charged for other unexpected expenses, unable to leave without their passports, which they were told would not be returned until "recruitment fee[s]" and other amounts were paid, and subjected to harsh conditions. Plaintiffs asserted that these abuses occurred from sometime in 2010 until October 2012. Phatthana's seafood processing factory in Songkhla province, where six of the seven Plaintiffs worked, began operations in August 2010. The seventh Plaintiff, Keo Ratha, worked at an S.S. Frozen seafood processing factory from October 2011 to January 2012.

Phatthana and S.S. Frozen are foreign companies. Phatthana is a Thai company that owned two seafood processing factories in Thailand, including the factory in Songkhla province.[3] Phatthana does not have an address, employees, factories, or other property in the United States. Phatthana had business relationships with Rubicon and Wales, which we describe in more detail below.

S.S. Frozen is also a Thai company and it owned a seafood processing factory in Songkhla province, next to Phatthana's Songkhla factory. S.S. Frozen does not have an address or employees in the United States, and it did not sell any seafood in the United States during the period at issue—August 2010 to October 2012. Unlike Phatthana, S.S. Frozen did not have any business relationships with Rubicon or Wales.

---

[3] Phatthana's seafood processing factory in Songkhla province closed in 2013.

Rubicon is a Delaware limited liability company with its principal place of business in California. Rubicon sought to import shrimp from Phatthana's Songkhla seafood processing factory into the United States. Rubicon coordinated sales and marketing, visited and conducted pre-audits of Phatthana's factories, and arranged for import and shipping of Phatthana's product. But Rubicon did not own any factories, and it did not recruit employees for Phatthana.

In October 2011, Rubicon ordered fourteen containers of shrimp from Phatthana's Songkhla factory for distribution to Walmart. Walmart rejected the shipment because it had concerns about working conditions in the factory. Rubicon returned the shrimp to Thailand. It did not successfully sell any shrimp from Phatthana's Songkhla factory in the United States during the period at issue in this case.

Wales is a Thai company registered to conduct business in California. Wales performs quality control, sales, and marketing for seafood processing factories. During the period at issue, Wales inspected the packaging of the fourteen containers of shrimp that Rubicon ordered from (and ultimately returned to) Phatthana before the shipment left Thailand, and it received a commission for these services.

C

At the outset of this case, the district court denied Defendants' motion to dismiss Plaintiffs' TVPRA claims, under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, because it concluded that § 1596 extends the extraterritorial application of the TVPRA to civil actions brought under § 1595, and that Plaintiffs' complaint sufficiently alleged a claim under that provision. But at the close of discovery, the district court granted Phatthana's and

S.S. Frozen's motions for summary judgment because it found that Plaintiffs had not established that these foreign companies were "present in" the United States, as required by 18 U.S.C. § 1596(a)(2). The district court therefore concluded that it lacked subject matter jurisdiction over the claims against Phatthana and S.S. Frozen.[4]

The district court also granted Rubicon's and Wales's motions for summary judgment because it concluded that Plaintiffs failed to present a triable issue that these companies knowingly benefitted from participating in a venture that they knew or should have known had engaged in TVPRA violations. *See* 18 U.S.C. § 1595(a). Plaintiffs appeal the district court's grant of summary judgment in Defendants' favor and the district court's denial of their motion for an extension of time to respond to Defendants' summary judgment motions.

## II

We review de novo a district court's grant of summary judgment. *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015). We may affirm on any ground supported by the record. *Oyama v. Univ. of Haw.*, 813 F.3d 850, 860 (9th Cir. 2015). We review a district court's denial of a motion for extension of time for abuse of discretion. *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1258 (9th Cir. 2010).

---

[4] The district court also entered summary judgment against Plaintiffs Yem Ban, Nol Nakry, and Sok Sang because it concluded that they failed to present evidence to support their TVPRA claims against Phatthana. Because we resolve the claims against Phatthana and S.S. Frozen on other grounds, we do not address Plaintiffs' arguments that the district court erred in entering summary judgment on the merits of their claims.

III

We consider separately Plaintiffs' claims against the foreign companies, Phatthana and S.S. Frozen, and their claims against the companies present in the United States, Rubicon and Wales.

Plaintiffs, who are Cambodian villagers, allege that Phatthana and S.S. Frozen, both Thai companies, trafficked them into Thailand and then subjected them to peonage, forced labor, and involuntary servitude at their seafood processing factories.  Thus, this case involves allegations by foreign Plaintiffs, against foreign Defendants, based on conduct occurring and injuries suffered in a foreign country. We must first consider the extraterritorial reach of § 1595. *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 329 (2016) (explaining that a statute applies extraterritorially, when it applies "to events occurring and injuries suffered outside the United States").

A

"Congress has the authority to enforce its laws beyond the territorial boundaries of the United States."  *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991), *superseded in part by statute*, Civil Rights Act of 1991, Pub. L. 10-166, 105 Stat. 1074, *as recognized in Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994).  But "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *Id.* (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)).  When asked to decide whether a statute applies extraterritorially, we ordinarily apply a two-step framework. *RJR Nabisco*, 579 U.S. at 329, 337.  At step one, we "presume that a statute applies only domestically" and "ask

'whether the statute gives a clear, affirmative indication' that
rebuts this presumption." *Nestlé USA, Inc. v. Doe*, 141 S.
Ct. 1931, 1936 (2021) (quoting *RJR Nabisco*, 579 U.S.
at 337).  If the statute is not extraterritorial, then we go on to
the second step and ask whether the case involves a
permissible domestic application of the law.  *Id.*

Viewed in isolation, § 1595 is silent as to its
extraterritorial application. *See* 18 U.S.C. § 1595.  Plaintiffs
argue that § 1595 applies extraterritorially because it
incorporates the TVPRA's substantive provisions made
extraterritorial by § 1596.  Under that argument, § 1595's
extraterritoriality depends on § 1596's elements being
satisfied.  In response, Defendants argue that § 1595 "does
not state that it applies extraterritorially," and "it is
appropriate *not* to read extraterritoriality into it."
Defendants further argue that § 1596 "does not state it
applies to civil actions" and by its terms only applies to
criminal prosecutions.

We need not resolve this dispute to decide this case.
Instead, we assume without deciding that Plaintiffs are
correct and that § 1595 permits a private cause of action for
extraterritorial violations of the substantive provisions listed
in § 1596 so long as § 1596's other requirements are
satisfied.[5]  We take this approach for two reasons.

---

[5] Because we assume Plaintiffs are correct that § 1596 contains "a
clear, affirmative indication" that the TVPRA's civil remedy provision
applies to foreign conduct, the first step of the two-step test to determine
whether a federal statute applies extraterritorially is satisfied. *See Nestlé
USA*, 141 S. Ct. at 1936.  "[A] finding of extraterritoriality at step one
will obviate step two's 'focus' inquiry." *RJR Nabisco*, 579 U.S. at 338
n.5; *see also id*. at 337–38 (explaining that it is only necessary to consider
a statute's "focus" if the statute does not apply extraterritorially).

First, the extraterritorial reach of § 1595 does not affect this court's subject matter jurisdiction. Although the parties argue that the viability of Plaintiffs' claims raises a jurisdictional question, and the district court framed the issue in similar terms, the Supreme Court has explained that whether a statute applies abroad concerns "what conduct" the statute prohibits, "which is a merits question." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253–54 (2010). Subject matter jurisdiction, which "refers to a tribunal's power to hear a case," "presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief." *Id.* at 254 (internal quotation marks omitted). Thus, our assumption that § 1595 may reach extraterritorial conduct does not overstep this court's "adjudicatory domain." *See Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs*, 558 U.S. 67, 81 (2009).

Second, we adhere to the "cardinal principle of judicial restraint," which instructs that "if it is not necessary to decide more, it is necessary not to decide more." *Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 617 n.13 (9th Cir. 2017) (quoting *PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)). In addition to any extraterritorial application otherwise provided by law, § 1596 supplies extraterritorial application to §§ 1581, 1583, 1584, 1589, 1590, and 1591, but only if the alleged offender is a United States citizen, a lawful permanent resident, or is present in the United States. 18 U.S.C. § 1596(a). As explained below, we hold that those

Therefore, we do not reach the second step of the extraterritoriality framework and consider whether the case involves a permissible domestic application of § 1595.

requirements are not met with respect to Phatthana and S.S. Frozen.[6]

We therefore decline to decide whether § 1595 applies to foreign conduct because whether it does or not, we are left with the same result: we must affirm the district court's judgment in favor of Phatthana and S.S. Frozen. We will assume in this case that § 1595 applies extraterritorially and leave for another day the question of whether that assumption is correct. *Cf. Whitehouse v. Ill. Cent. R.R. Co.*, 349 U.S. 366, 372–73 (1955) ("These are perplexing questions. Their difficultly admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case.").

### B

We turn now to Plaintiffs' claims that Phatthana and S.S. Frozen trafficked them into Thailand and subjected them to peonage, forced labor, and involuntary servitude at their seafood processing factories. The question here is whether Plaintiffs' claims satisfy § 1596's requirements for extraterritorial application. We hold that Plaintiffs' claims against Phatthana fail because Phatthana was not "present in the United States" at any time relevant to this lawsuit as § 1596 requires. Because the success of Plaintiffs' claims against S.S. Frozen depends on the success of their claims

---

[6] Defendants do not dispute that Rubicon and Wales were "present in" the United States for purposes of the TVPRA but instead, as we discuss later, argue that Plaintiffs failed to raise triable issues on the merits of their § 1595 claims against these Defendants.

against Phatthana, Plaintiffs' claims against S.S. Frozen also fail. [7]

The TVPRA, in § 1596, provides for extraterritorial jurisdiction over §§ 1581, 1583, 1584, 1589, 1590, and 1591, when "an alleged offender is *present in* the United States, irrespective of the nationality of the alleged offender." 18 U.S.C. § 1596(a)(2) (emphasis added). What it means for "an alleged offender" to be "present in the United States" is a question of statutory construction. Therefore, we "begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Hardt v. Reliance Standard Life Ins.*, 560 U.S. 242, 251 (2010) (alteration in original) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)).

The plain meaning of the adjective "present" is "in a particular place." New Oxford American Dictionary 1381 (3d ed. 2010). Phatthana and S.S. Frozen are both Thai companies. Neither had any address, employees, or physical presence in the United States during the period at issue in this case. Nonetheless, Plaintiffs argue that Phatthana and S.S. Frozen were "present in" the United States for purposes of § 1596 on three separate grounds. We find none of these arguments persuasive.

1

Plaintiffs first maintain that we should construe the phrase "present in," as used in § 1596, to not require physical

---

[7] Plaintiffs argue that S.S. Frozen was "present in" the United States because S.S. Frozen and Phatthana were "alter egos" engaged in an "integrated enterprise." Plaintiffs' claims against S.S. Frozen are therefore dependent on their claims against Phatthana.

presence.  Plaintiffs argue that this term is broad and "is understood to mean universal jurisdiction."**8**  They assert that, even though "universal jurisdiction does not require physical presence," the Due Process Clause "imposes some limits on the ability of the United States to exercise universal jurisdiction."  Thus, Plaintiffs say, a foreign corporate defendant is "present in" the United States so long as it has the "minimum contacts" necessary to allow personal jurisdiction under the Due Process Clause.**9**  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

To support their position, Plaintiffs rely primarily on *United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991), but that case hurts more than helps their argument.  As relevant here, the defendant in *Yunis* challenged his conviction under the Hostage Taking Act, 18 U.S.C. § 1203, and argued that

___

**8** "Universal jurisdiction" applies to "certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism."  Restatement (Third) of the Foreign Relations Law of the United States § 404 (1987).

**9** We do not decide whether Plaintiffs' argument rests on a sound premise.  "The Due Process Clause requires that a defendant prosecuted in the United States 'should reasonably anticipate being haled into court in this country.'"  *United States v. Shi*, 525 F.3d 709, 722 (9th Cir. 2008) (quoting *United States v. Moreno-Morillo*, 334 F.3d 819, 827 (9th Cir. 2003)).  In contrast, "[u]niversal jurisdiction is based on the premise that offenses against all states may be punished by any state where the offender *is found*."  *Id.* (emphasis added).  Thus, "[d]ue process does not require a nexus between such an offender and the United States because the universal condemnation of the offender's conduct puts him on notice that his acts will be prosecuted by any state *where he is found*."  *Id.* at 723 (emphasis added).  Plaintiffs present no authority to support their argument that the *International Shoe* definition of presence—i.e., minimum contacts—should be grafted into "universal jurisdiction," and then applied here to define "present in" for purposes of § 1596.

the statute did not authorize jurisdiction over him because he
was not "found in" the United States. *Id.* at 1090; *see also*
18 U.S.C. § 1203(b)(1) (limiting extraterritorial application
of the Hostage Taking Act to three scenarios, one of which
being when "the offender is found in the United States").
The D.C. Circuit rejected the defendant's argument because
the Hostage Taking Act provided an independent basis for
jurisdiction. *Id.*

   *Yunis* discussed the "universal principle" theory of
international law, which authorizes states to prosecute
certain offenses that "the community of nations" recognizes
are of "universal concern," including the slave trade, "even
absent any special connection between the state and the
offense." *Id.* at 1091 (citing Restatement (Third) of the
Foreign Relations Law of the United States §§ 404, 423
(1987)). But *Yunis* considered the "universal principle" in a
context that differs from the one presently before this court.
*See id.* at 1090 (explaining the Hostage Taking Act covered
an offender's conduct when "the offender is *found in* the
United States" (emphasis added) (quoting 18 U.S.C.
§ 1203)). The defendant in *Yunis* did not contend that the
statute's use of the term "found in" indicated that physical
presence in the United States was not required; he instead
argued that he was not "found in" the United States because
he was brought here "by force." *Id.*

   Contrary to Plaintiffs' suggestion that *Yunis* supports an
interpretation of the term "present in" that does not require
physical presence, the court later analyzed a different statute
requiring an offender to be "present in" a specific territory,
and it concluded that the term "present in" has a parallel
meaning to the term "found in." *Id.* at 1091–92. Thus, the
court held, the defendant was "present in" the United States
"once in the United States" physically. *Id.* at 1092. If

anything, then, *Yunis* supports the conclusion that § 1596's use of the term "present in" requires physical presence, not merely the types of minimum contacts that satisfy due process.

Even assuming § 1596(a)(2) requires foreign companies to possess nothing more than minimum contacts with the United States, Plaintiffs have not established that Phatthana or S.S. Frozen have sufficient contacts with the United States to satisfy that standard.[10]  "For a court to exercise personal jurisdiction over a nonresident defendant" in a manner consistent with the Due Process Clause, "that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co.*, 326 U.S. at 316).  In the Ninth Circuit, we measure the extent of a defendant's contacts with a forum "at the time of the events underlying the dispute."  *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987); *accord Farmers Ins. Exch. v. Portage La Prairie Mut. Ins.*, 907 F.2d 911, 913 (9th Cir. 1990).  "The strength of [the] contacts required depends on which of the two categories of personal jurisdiction a litigant invokes:    specific jurisdiction   or   general jurisdiction."  *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015).

---

[10] To be clear, we engage in this analysis not to determine whether we have personal jurisdiction over Phatthana and S.S. Frozen, but because Plaintiffs argue that "present in," as used in § 1596, "is limited to a corporation's place of incorporation, principal place of business, or where it is subject to specific jurisdiction."

"Specific jurisdiction exists when a case 'aris[es] out of
or relate[s] to the defendant's contacts with the forum." *Id.*
(alterations in original) (quoting *Helicopteros Nacionales de
Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). It
therefore "depends on an affiliation between the forum and
the underlying controversy, principally, activity or an
occurrence that takes place in the forum [ ] and is therefore
subject to the [forum's] regulation." *Id.* (quoting *Goodyear
Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919
(2011)).

General jurisdiction is not limited to claims arising out
of or relating to the forum but rather "permits a court to hear
'any and all claims' against a defendant, whether or not the
conduct at issue has any connection to the forum." *Id.*
(quoting *Goodyear*, 564 U.S. at 919). Because the scope of
general jurisdiction, once established, is broader than the
scope for specific jurisdiction, "a plaintiff invoking general
jurisdiction must meet an 'exacting standard' for the
minimum contacts required." *Id.* at 1069 (quoting
*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066,
1074 (9th Cir. 2011)). Courts may exercise general
jurisdiction over a defendant only if the defendant's
connections to the forum state "are so 'continuous and
systematic' as to render [it] essentially at home" in the
forum. *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020
(9th Cir. 2017) (alteration in original) (quoting *Goodyear*,
564 U.S. at 919). The paradigmatic examples of such
connections are when the defendant is incorporated or has its
principal place of business in the forum. *Id.*

The evidence in the record here does not support either
specific or general jurisdiction as a basis for finding
minimum contacts. To establish specific jurisdiction, three
requirements must be satisfied. *Axiom Foods, Inc. v.*

*Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). First, "the defendant must either 'purposefully direct his activities' toward the forum or 'purposefully avail[ ] himself of the privileges of conducting activities in the forum.'" *Id.* (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). Second, "the claim must be one which arises out of or relates to the defendant's forum-related activities." *Id.* (quoting *Dole Food*, 303 F.3d at 1111). And third, "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Id.* (quoting *Dole Food*, 303 F.3d at 1111). We will consider only the first element of specific jurisdiction because it presents the dispositive issue.

Because the TVPRA's "civil remedy provision creates a cause of action that sounds in tort," *Ditullio*, 662 F.3d at 1096, "we employ the purposeful direction test" derived from *Calder v. Jones*, 465 U.S. 783 (1984), *see Axiom Foods*, 874 F.3d at 1069. To satisfy the purposeful direction test, the defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 805 (quoting *Dole Food*, 303 F.3d at 1111).[11]

Here, Plaintiffs have not satisfied the purposeful direction prong of the minimum contacts analysis. They primarily point to Rubicon's order of fourteen containers of shrimp from Phatthana's Songkhla factory for distribution in

---

[11] Although the third prong of the purposeful direction inquiry and the "arise out of or relate to" inquiry are two different steps in the minimum contacts analysis, they are closely related. Satisfying the purposeful direction analysis will often satisfy the "arise out of or relate to" requirement as well. *See Dole Food*, 303 F.3d at 1114.

the United States to Walmart.  Walmart ultimately rejected
that shipment because it had concerns about working
conditions in the Thai factory, and Rubicon returned the
shrimp to Thailand.   Plaintiffs also point to deposition
testimony, emails, and a public database to suggest
Phatthana sold shrimp to buyers in the United States through
importers other than Rubicon, but those documents
generally do not specify any particular sales, the dates of
such sales, or the factories of origin.[12]

Assuming Phatthana's attempt to sell shrimp to
Walmart, and some other sales to entities in the United
States, constituted intentional acts expressly aimed at the
United States, Plaintiffs have produced no evidence
suggesting that those sales caused "harm that [Phatthana]
[knew was] likely to be suffered in the" United States.
*Schwarzenegger*, 374 F.3d at 805 (quoting *Dole Food*,
303 F.3d at 1111).  Plaintiffs' evidence thus does not show
that Phatthana or S.S. Frozen purposefully directed their
activities to the United States in the sense required to
establish specific personal jurisdiction over a personal injury
claim.[13]

---

[12] The only document that provides dates and origins of shrimp
shipments is an excerpt from a Human Rights Watch report containing a
screenshot of an online database.  This screenshot does not include any
shipments from Phatthana's Songkhla factory during the relevant period.

[13] This conclusion still follows even if Phatthana's sales to the
United States were more extensive than Plaintiffs' evidence suggests
because a larger sales footprint in the United States would not change
the fact that the harm caused by Defendants' alleged TVPRA violations
was not suffered in the United States.  *See Schwarzenegger*, 374 F.3d
at 805.

As for Plaintiffs' general jurisdiction argument, Phatthana and S.S. Frozen are not incorporated in the United States, and Plaintiffs have not shown—much less argued—that the United States is their principal place of business, or that their contacts "are so 'continuous and systematic' as to render them essentially at home in the" United States. *Goodyear*, 564 U.S. at 919 (quoting *Int'l Shoe Co.*, 326 U.S. at 317). Thus, even assuming the phrase "present in," as used in § 1596, requires only minimum contacts with the United States, Plaintiffs have not demonstrated that Phatthana and S.S. Frozen have the contacts needed to satisfy that standard.

2

We next consider Plaintiffs' second argument—that Phatthana and S.S. Frozen were present in the United States through an agency relationship or joint venture with Rubicon—and conclude it is unconvincing.

Plaintiffs assert that Phatthana is "present in" the United States for purposes of § 1596 because Rubicon, which *is* present in the United States acted as Phatthana's agent. The district court properly rejected this argument. An agent under California law is "one who represents another, called the principal, in dealings with third persons." Cal. Civ. Code § 2295. "Agency requires that the principal maintain control over the agent's actions," *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013), and generally, "[a] purchaser is not 'acting on behalf of' a supplier in a distribution relationship in which goods are purchased from the supplier for resale," *id.* (quoting Restatement (Third) of Agency § 1.01 cmt. g (2006)).

Plaintiffs contend that Rubicon's marketing activities, on-site visits to Phatthana's factories, management of the

importation and shipping of Phatthana products, and
management of customer relations establish an agency
relationship between Rubicon and Phatthana. But none of
the evidence in the record supports the inference that
Phatthana exercised control over Rubicon's purchasing,
marketing, sales, and customer-relations activities, or that
Phatthana's relationship with Rubicon was anything more
than a purchaser-supplier relationship. While it is true that
Rubicon was registered as Phatthana's "agent" with the Food
and Drug Administration ("FDA"), such an agent acts
merely "as a communications link between FDA and the
foreign facility for both emergency and routine
communications." 21 C.F.R. § 1.227. This narrowly
delineated relationship under federal regulations does not
show that Phatthana exercised the control over Rubicon
necessary to establish a general agency relationship.
Plaintiffs' agency-based argument therefore fails.

Plaintiffs further maintain that Phatthana was present in
the United States because it and Rubicon were engaged in a
joint venture to market and sell shrimp in the United States.
This argument fails largely for the same reasons Plaintiffs'
agency argument fails.

To establish a joint venture under California law,
Plaintiffs must show "an agreement between the parties
under which they have a community of interest, that is, a
joint interest, in a common business undertaking, an
understanding as to the sharing of profits and losses, and a
right of joint control." *Connor v. Great W. Sav. & Loan
Ass'n*, 447 P.2d 609, 615 (Cal. 1968) (quoting *Holtz v.
United Plumbing & Heating Co.*, 319 P.2d 617, 620 (Cal.
1957)); *accord Ramirez v. Long Branch Unified Sch. Dist.*,
129 Cal. Rptr. 2d 128, 137 (Cal. Ct. App. 2002). To support
their joint venture argument, Plaintiffs rely on the same

evidence they cited to support their agency-based claim. As explained, that evidence establishes only that Rubicon and Phatthana were engaged in a purchaser-supplier relationship; it does not create a triable issue that Rubicon and Phatthana would share profits and losses or would be subject to joint control.

To the contrary, the limited liability company agreement creating Rubicon states that Rubicon was formed as a joint venture between Brian Wynn (the CEO and manager of Rubicon), Wales, Thailand Fishery Cold Storage Public Co. (whose share in Rubicon was later transferred to another company), and P&M Holding Co.; that those four entities would share in Rubicon's net income and losses; and that Wynn had "exclusive authority to manage the operations and affairs of" Rubicon. Neither the original agreement nor its subsequent amendments identifies Phatthana as a member of the joint venture.

Plaintiffs rely on filings by "Rubicon Group" submitted to the Commerce Department as part of an antidumping proceeding.[14] The "Rubicon Group" is not synonymous with Rubicon Resources, LLC, but rather is the term used in a Commerce Department antidumping proceeding to describe a collection of "affiliated firms, collapsed for [antidumping] analysis pursuant to 19 C.F.R. § 351.401(f)." *See Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1333 n.3 (Ct. Int'l Trade 2010). Plaintiffs asserts that those

---

[14] Antidumping laws "address harm to domestic manufacturing from foreign goods sold at an unfair price" by imposing a duty on imports. *United States v. Eurodif S. A.*, 555 U.S. 305, 310–11 (2009). Antidumping proceedings, like the one referred to here, involve the government's determination of the duty rates for certain kinds of imports. *See Certain Frozen Warmwater Shrimp from Thailand*, 74 Fed. Reg. 47,551-02, 47,551 (Sept. 16, 2009).

Commerce Department filings show that Phatthana, as well
as other Thai shrimp companies, were "subgroup" members
of the Thailand Fishery Cold Storage group, which in turn
was a member of the Rubicon Group.  The filings state that
"a company within each Rubicon subgroup," including the
signatories to the Rubicon joint venture agreement, "is a
Member (or partner) of Rubicon Resources, and holds a [ ]%
interest in the company," and that "each Rubicon subgroup
encompasses the individual Rubicon Group companies,"
including Phatthana, which is thereby "integrated into the
Rubicon Group business structure."

At most, these filings confirm that there is a joint venture
relationship between the entities named as members of
Rubicon Resources in the Rubicon joint venture agreement
and that there is some relationship between at least one of
those entities and Phatthana.  But neither these filings nor
Plaintiffs' briefs explain what it means for Phatthana to be
"integrated" into the overall Rubicon Group business
structure, or what it means that a Rubicon subgroup
"encompasses" a sub-subgroup such as Phatthana.  Plaintiffs
offers no evidence of any direct agreement between Rubicon
and Phatthana regarding the sharing of profits and losses or
a joint right of control.  In light of the existence of a Rubicon
joint venture agreement that does *not* include Phatthana, as
well as the evidence that Rubicon and Phatthana's
relationship was that of a purchaser and a supplier, these
Commerce Department filings alone cannot support the
inference that Phatthana and Rubicon were engaged in a
joint venture.

3

Plaintiffs' third argument also falls short.  Focusing on
the phrase "an alleged offender" as used in § 1596, Plaintiffs
contend that § 1596 is satisfied so long as *one* of the

defendants involved in the case meets the statutory criteria.
But even if this novel interpretation is sound (and we doubt
that it is), we conclude below that the district court correctly
entered summary judgment on Plaintiffs' claims against
Rubicon and Wales.   Consequently, there are no other
defendants besides Phatthana and S.S. Frozen left to satisfy
§ 1596's requirements, and as we have explained, neither of
those Defendants meet § 1596's demands.[15]

*   *   *

Plaintiffs have not raised a triable issue that Phatthana
and S.S. Frozen were "present in the United States," as
required by 18 U.S.C. § 1596(a)(2), and thus they have not
established that their § 1595 claims against these Defendants
involve a permissible extraterritorial application of the
TVPRA.   We therefore affirm the district court's entry of
summary judgment in favor of Phatthana and S.S. Frozen.

---

[15] Plaintiffs also contend that they assert a "wholly domestic basis
for subject matter jurisdiction" based on a "domestic benefit" arising
from Phatthana's alleged sales to customers in the United States other
than through Rubicon.   To support this theory, Plaintiffs rely on cases in
which defendants residing in the United States benefitted from illegal
conduct that took place abroad.   *See Steele v. Bulova Watch Co.*,
344 U.S. 280, 281, 285–86 (1952) (trademark infringement and unfair
competition "consummated in a foreign country by a citizen and resident
of the United States"); *Vaughan v. Aegis Commc'ns Grp.*, 49 F. Supp.
3d 613, 616, 623 (W.D. Mo. 2014) (corporate defendants based in the
United States "benefited in the U.S." from forced labor "performed in
India").   But as explained, Phatthana and S.S. Frozen were in no way
present in the United States, and thus they did not "benefit in the United
States."   Further, Plaintiffs seek to apply § 1595 "to events occurring and
injuries suffered outside the United States."   *RJR Nabisco*, 579 U.S.
at 329.   Therefore, absent any domestic presence or domestic benefit,
their claims fall squarely within the Supreme Court's definition of
extraterritoriality.   *See id.*

C

We next consider Plaintiffs' claims against Rubicon and Wales. Plaintiffs allege that Rubicon and Wales knowingly benefitted from Phatthana's alleged human trafficking and forced labor abuses, financially and by accessing a steady stream of imported seafood. We conclude that summary judgment for these Defendants was appropriate because Plaintiffs failed to produce evidence establishing a triable issue of Rubicon's or Wales's liability under § 1595.

In § 1595, Congress extended a private right of action to victims of substantive violations of the TVPRA, allowing them to sue the direct perpetrator and anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" the TVPRA. 18 U.S.C. § 1595(a). Neither Rubicon nor Wales are alleged to have perpetrated any TVPRA violations against Plaintiffs. Thus, to withstand Defendants' motions for summary judgment, Plaintiffs needed to present evidence creating a triable issue on whether Rubicon or Wales: (1) knowingly benefitted, (2) from participation in a venture (in this case with Phatthana), (3) which they knew or should have known was engaged in conduct that violated the TVPRA. *Id.* If Plaintiffs failed to raise a triable issue on any of these elements, we need not consider the rest.

We separately address the claims against Rubicon and the claims against Wales. We first explain why no reasonable jury could infer from the evidence that Rubicon benefitted, financially or otherwise, from Phatthana's alleged TVPRA violations. We then explain why Plaintiffs have not raised a triable issue on whether Wales knew or should have known that Phatthana was engaged in alleged

violations of the TVPRA when it received a benefit from the
alleged venture.

1

Plaintiffs assert that there is "sufficient evidence" that
Rubicon benefitted from Phatthana's alleged TVPRA
violations. They point to three distinct benefits that Rubicon
allegedly obtained from its relationship with Phatthana. But
none of those allegations presents a triable issue of material
fact.

Plaintiffs first argue that Rubicon "benefitted from
marketing the shrimp produced by Phatthana." They point
to materials stating that "Rubicon has 13 factories,"
including Phatthana's Songkhla factory, "that are 100%
owned and captive to Rubicon Resources." But the page
touting Rubicon's production capabilities and a "Factory
Index" that includes the Songkhla factory are undated. And
Plaintiffs have offered no evidence or explanation of the
purpose of these materials, when they were produced, or
when (or even whether) they were distributed to potential
customers. Moreover, Plaintiffs' argument rests on
Rubicon's marketing role, not on any ownership or
production role. We thus find these materials insufficient for
a reasonable jury to infer that Rubicon benefitted from its
alleged marketing of Phatthana's products.

We reject Plaintiffs' second argument—that Rubicon
obtained a "competitive advantage" through its association
with Phatthana—for a similar reason. Plaintiffs point to
"[d]eclarations from Louisiana shrimpers attest[ing] to the
competitive advantage and the impact on American
industry" of the Thai shrimp industry. But these general
statements from American shrimpers about international
market conditions do not suggest that Rubicon benefitted

from its alleged venture with Phatthana.  Therefore, we find
the declarations insufficient to present a genuine dispute of
material fact.

Perhaps realizing these deficiencies, Plaintiffs advance a
third argument:    that an *attempt* to benefit satisfies
§ 1595(a)'s "knowingly benefits" requirement.    We
disagree.  The text of § 1595 does not extend liability to
those who *attempt* to benefit from a venture.  *See* 18 U.S.C.
§ 1595(a).  And we cannot read the word "attempt" into
§ 1595 without violating "a fundamental principle of
statutory interpretation that 'absent provision[s] cannot be
supplied by the courts.'" *Rotkiske v. Klemm*, 140 S. Ct. 355,
360–61 (2019) (alteration in original) (quoting Antonin
Scalia & Bryan A. Garner, *Reading Law: The Interpretation
of Legal Texts* 94 (2012)).

Moreover, Congress's decision to impose civil liability
on those who "benefit" but not those who "attempt to
benefit" is significant because attempt liability is plainly
authorized elsewhere in the TVPRA.  *See, e.g.*, 18 U.S.C.
§ 1594(a) ("Whoever attempts to violate section 1581, 1583,
1584, 1589, 1590, or 1591 shall be punishable in the same
manner as a completed violation of that section.").[16]  When
"Congress uses certain language in one part of a statute and
different language in another, it is generally presumed that
Congress acts intentionally." *Nat'l Fed'n of Indep. Bus. v.
Sebelius*, 567 U.S. 519, 544 (2012).  Had Congress intended
to create civil liability under § 1595 for attempts to benefit,

---

[16] We find Plaintiffs' citation to § 1594, without explanation,
unconvincing.  Section 1594 speaks to who might be a "perpetrator" of
a TVPRA violation under § 1595(a).  But it does not suggest that an
attempt to benefit from a perpetrator's TVPRA violation would establish
liability under § 1595(a).

we can reasonably conclude that it would have done so in express terms.  We therefore hold that the phrase "knowingly benefits" as used in § 1595(a) does not encompass attempts to benefit.  Consequently, Plaintiffs' assertion that "[i]t is undisputed that Rubicon *attempted* to sell" fourteen containers of Phatthana shrimp fails to raise a triable issue of material fact.  We therefore affirm the district court's grant of summary judgment in Rubicon's favor.

2

Turning to Plaintiffs' claims against Wales, we conclude that Plaintiffs failed to present evidence to support a reasonable inference that Wales knew or should have known that Phatthana was engaged in conduct violating the TVPRA when it received a benefit from the alleged venture.  Wales admits that on February 23, 2012, it became aware of a news article published in the Phnom Penh Post detailing allegations from Plaintiff Ratha's whistleblower report.[17]  In light of this admission, we bifurcate our analysis into the periods before and after February 23, 2012.   We first conclude that Plaintiffs have not presented a triable issue on whether Wales knew or should have known of Phatthana's alleged TVPRA violations before February 23, 2012.  We then conclude that Plaintiffs have not presented a triable issue on whether Wales benefitted from the alleged venture on or after February 23, 2012.

a

We first consider whether a reasonable factfinder could infer from the evidence that Wales knew or should have

---

[17] We assume without deciding that Wales possessed actual knowledge of the alleged violations on and after February 23, 2012.

known of the alleged labor abuses at Phatthana's Songkhla factory between August 2010 (when the factory started operating) and February 22, 2012 (the day before Rubicon was undisputedly aware of Ratha's whistleblower report). Plaintiffs argue that Wales "received industry-specific, country-specific, and Defendant-specific information sufficient to put any reasonable party on notice" that labor abuses were occurring at the Songkhla factory "well before" the allegations in Ratha's whistleblower report were published in February 2012. They point to reports and articles about labor abuses generally in Thailand, as well as their retained experts' reports, to substantiate their claims.

As we explain in the following sections, this evidence falls short of creating a genuine dispute of material fact on whether Wales knew or should have known of Phatthana's alleged TVPRA violations before February 2012. "[T]he phrase 'knew or should have known' usually connotes negligence." *Mayview Corp. v. Rodstein*, 620 F.2d 1347, 1358 (9th Cir. 1980). And "[n]egligence is a less culpable mental state than actual knowledge . . . or recklessness." *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 833 (9th Cir. 2019). Assuming § 1595 imposes a negligence standard, Plaintiffs' evidence suggests, at most, that Wales should have known of labor abuses in the Thai shrimp industry *generally*. Sweeping generalities about the Thai shrimp industry are too attenuated to support an inference that Wales knew or should have known of the specifically alleged TVPRA violations at the Songkhla factory between 2010 and 2012.

i

Plaintiffs first point to evidence generally establishing that abusive labor practices were common in Thailand, particularly in the shrimp industry. They rely upon the 2009

edition of *The Department of Labor's List of Goods Produced by Child Labor or Forced Labor*, which identified the Thai shrimp industry on a list of 58 countries and 122 goods having a "significant incidence of child labor and forced labor in the production of certain goods." But as this report itself cautions, "a listing of any particular good and country does not indicate that all production of the good in that country involves forced labor or child labor, but rather that there is a significant incidence" of such conduct in that country's industry. And the report makes clear that identifying "specific firms or individuals using child labor or forced labor" is beyond its mandate. The identification of child labor and forced labor as a general problem in the Thai shrimp industry, before the relevant time period, sheds little light on whether labor abuses were occurring at Phatthana's Songkhla factory, let alone whether Wales knew or should have known of such abuses.

Plaintiffs' reliance on a January 2008 report from the AFL-CIO's Solidarity Center, *The Degradation of Work: The True Cost of Shrimp*, is likewise insufficient to overcome their burden at summary judgment. The only reference to Phatthana in this forty-page report appears in a section addressing whether Thai seafood workers earned minimum wage (191 baht per day, as an industry source estimated). The report includes the following statement based on information from a 2005 interview with a worker at a different Phatthana factory: "[A] pay stub from a worker at the Pattana [sic] Seafood Company in Samut Sakhon showed a reported pay of 191 baht per day, but daily take-home pay was closer to 160 baht after deductions for equipment and permits." But Plaintiffs offer no argument or evidence that would allow a reasonable jury to conclude that this reference to one worker's statement, concerning wages at an entirely different processing facility, long before the

time period at issue, should have put Wales on notice that it was working with entities engaged in TVPRA violations.[18]

Plaintiffs assert that news reports referencing the Solidarity Center Report, published between April and June 2008, "identif[ied] Rubicon's customers as the consumers" of shrimp produced in Thailand.  Plaintiffs are correct that one of these articles identified "nine big U.S. supermarket chains" that "sell[ ] Thai shrimp in the U.S.," including Walmart, one of Rubicon's customers.   Another article identified Walmart as a retailer that imports shrimp from Thailand.   This article, however, also stated that the Solidarity Center report "makes clear not all shrimp imports into the United States from Thailand and Bangladesh come from problem plants."  These articles do not identify any Thai companies, much less Phatthana, as a bad actor engaged in labor abuses, and they do not state that Walmart or any of the other U.S. supermarket chains were selling shrimp produced by forced labor.  Therefore, these articles establish nothing more than reported labor abuses in Thailand in 2008 and that some U.S. supermarkets were selling shrimp produced in Thailand.  This evidence cannot support a reasonable inference of Wales's knowledge of

---

[18] Plaintiffs point to an April 2008 article in the Bangkok Post as evidence that Wales knew of the Solidarity Center report because its CEO, who was quoted in the article in his role as President of the Thai Frozen Foods Association, said "the accusations in the report were based on old information and lack of evidence."  But this article establishes only that in 2008, two years before the Phatthana factory in Songkhla opened, Wales and other members of the Thai Frozen Foods Association knew that there were labor abuses in the Thai seafood industry.  It does not support a reasonable inference that Wales knew of alleged labor abuses years later at the Phatthana factory in Songkhla.

alleged labor abuses at the Songkhla factory between 2010 and 2012.

Finally, Plaintiffs cite pages excerpted from the 2010, 2011, and 2012 editions of the *U.S. Department of State's Trafficking in Persons Report*. These reports also fail to include any company-specific information and do not mention Phatthana. Instead, they include Thailand on the Tier Two Watch List and contain general statements about labor abuses in Thailand and the Thai government's response to those problems. The reports thus do not support a reasonable inference of Wales's knowledge of labor abuses at the Songkhla factory from 2010 to 2012.

We conclude that the reports and articles Plaintiffs have identified are insufficient to create a triable issue of fact on Wales's knowledge of Phatthana's alleged labor abuses before February 2012.

ii

Plaintiffs further argue that a reasonable factfinder could infer that Wales negligently failed to investigate whether Phatthana was engaging in labor abuses at the Songkhla factory given the prevalence of labor abuses in the Thai seafood industry. To support this argument, Plaintiffs rely on reports from their retained experts, Luis DeBaca, Marc Bendick, and Samir Goswami.[19] We consider these reports in turn.

---

[19] Although the expert reports focus primarily on what Rubicon knew or should have known about the alleged labor abuses, Plaintiffs assert, and at least one report acknowledges, that Rubicon and Wales had intertwined ownership. Because we must construe the evidence in the light most favorable to Plaintiffs and draw all justifiable inferences in

We find the DeBaca report to be irrelevant to the period before February 23, 2012, because it addresses the adequacy of investigations *after* February 23, 2012, and it only opines in generalities about the 2010 to 2012 timeframe. For example, the report concludes that Wales was "on notice in 2010 . . . that . . . the seafood industry in Thailand was considered a 'hot spot' for human trafficking in all its forms." But these are the "type[s] of conclusory allegation[s]" we have "found insufficient to withstand [a] motion for summary judgment." *Broussard v. Univ. of Cal., at Berkeley*, 192 F.3d 1252, 1259 (9th Cir. 1999).

The Bendick and Goswami reports do opine on the issue at hand, but they are not helpful because they rely on the same generalized evidence of country conditions that we have already determined is insufficient to create a triable issue of material fact. Although the Bendick report explicitly focuses on the 2010–2012 period, its conclusions are generalities based on unsupported assumptions. It states, for example, that Rubicon's senior management "can be assumed to have been fully aware of how prevalent were labor practices such as are alleged at Songkhla," and that Phatthana would have "routinely shared information with Rubicon on production issues [and] labor matters including those involving migrant workers would inevitably be part of that information." The report also lists several ways in which audits of the Songkhla factory in 2011 and 2012 did not meet certain standards, but never opines that such audits were even necessary under the circumstances or that a business's failure to conduct such audits would be negligent.

their favor, we consider these reports to assess whether there is a triable issue that Wales knew or should have known about Phatthana's alleged TVPRA violations.

Similarly, the Goswami report states, without identifying any time period, that the lack of "provisions on forced labor" in purchase orders from Rubicon and Wales "fell short of industry standards at the time" and that Rubicon "did not meet industry standards" in its audits and investigations.  But the report does not offer any factual basis for its conclusory statements about "industry standards."  It therefore fails to raise a genuine issue of material fact.  *See Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1008 (9th Cir. 2007) (holding that an expert affidavit failed to create a factual dispute because the expert did "not state a factual basis for his opinion"); *see also Broussard*, 192 F.3d at 1259.

In sum, Plaintiffs' expert reports fail to bridge the gap between their generalized evidence of labor conditions in the Thai shrimp industry and the specific allegations that Wales knew or should have known of the alleged labor abuses at Phatthana's Songkhla factory before February 23, 2012.[20] We therefore affirm the district court's entry of summary judgment in favor of Wales on Plaintiffs' claims predating February 23, 2012.

b

We now turn to Plaintiffs' claims against Wales to the extent they arise from conduct occurring after February 23, 2012.  As previously noted, we assume here that the evidence supports a finding that Wales knew of the

---

[20] Although "[i]t is undisputed that Rubicon engaged Wales to inspect Phatthana's facilities," the record nowhere indicates whether or when Wales inspected any of Phatthana's factories, let alone the Songkhla factory.  Rather, Wales maintains, and the evidence in the record suggests, that Wales's actual role was limited to inspecting products Phatthana shipped to the United States, not the factory conditions where Phatthana's products were processed.

complained-of TVPRA violations at the Phatthana factory after February 23, 2012, when Wales admits it received a copy of the article describing Ratha's allegations. Therefore, we must ask whether, construing the evidence in the light most favorable to Plaintiffs, there is a triable issue that Wales "knowingly benefit[ted] . . . from participation in" its alleged venture with Phatthana after February 23, 2012.  *See* 18 U.S.C. § 1595(a).  We conclude there is not.

The only benefit Wales obtained from its alleged venture with Phatthana is a commission "for product inspection services rendered in connection with shrimp ordered by Rubicon and processed at Phatthana's Songkhla factory." The purchase orders for those containers of shrimp are dated October 13, 14, and 31, 2011, and include shipping dates ranging from October 2011 to December 2011.  Thus, Wales's inspection of shrimp "destined for the U.S." apparently occurred before the product left Thailand, and therefore before February 23, 2012.

Plaintiffs point to no facts that would support a reasonable inference that Wales inspected those shipments on or after February 23, 2012, or that Wales otherwise benefitted from the alleged venture after it became aware of Ratha's allegations.  To be sure, Wales's president declared that the inspection services took place "in late 2011–early 2012."  Although that statement may be consistent with the *possibility* that Wales knowingly benefitted from the alleged venture after it learned of Ratha's allegations, we find the statement, without more, to be "insufficient to allow a reasonable juror to conclude that [Plaintiffs'] position more likely than not is true."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993); *see also Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("A mere scintilla of evidence will not do, for a jury is permitted to

draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation.").

Because the payment for inspection services is the only benefit Plaintiffs allege Wales received during the relevant time period, and the evidence is insufficient to create a triable issue that this occurred after February 23, 2012, we affirm the district court's summary judgment in favor of Wales.

IV

Finally, we consider whether the district court abused its discretion by denying Plaintiffs' motion for an extension of time to respond to Defendants' motions for summary judgment. Relying on *Ahanchian*, 624 F.3d at 1257–60, Plaintiffs argue that the district court abused its discretion by denying their motion because the Thanksgiving holiday effectively reduced their limited response time to three business days and Defendants' motions were accompanied by hundreds of pages of documents. But the circumstances here are significantly different from those presented in *Ahanchian* and do not support Plaintiffs' claims of prejudice.

In *Ahanchian*, the plaintiff filed his opposition to a motion for summary judgment three days after the filing deadline with a motion for the court to accept the late filing. *Id.* at 1257. The district court denied the plaintiff's motion to file his opposition. *Id.* It then granted the defendant's motion for summary judgment after "review[ing] only the defense evidence, even though it knew the opposition papers were already filed," *id.* at 1258, and awarded significant attorney's fees to defense counsel, *id.* at 1255, 1257–58. We concluded that the district court abused its discretion and "effectively flouted" Ninth Circuit precedent, which "bars

. . . granting summary judgment simply because a party fails to file an opposition or violates a local rule." *Id.* at 1258.

Here, in contrast to the circumstances in *Ahanchian*, Plaintiffs have not shown that the district court flouted precedent or that they were prejudiced by the district court's order denying their motion for an extension. Plaintiffs argue that they were prejudiced because they were rushed in preparing their responses and omitted exhibits from their separate statement of facts. But Plaintiffs stipulated to the motion deadline. And Plaintiffs filed a notice of errata and supplemented their separate statement of facts with additional exhibits they had inadvertently omitted. Critically, unlike in *Ahanchian*, Plaintiffs do not assert that the district court refused to consider any evidence or arguments they submitted in their opposition to summary judgment. Thus, notwithstanding any stringent case management deadlines the Central District of California may impose in accordance with its local rules, the district court's order denying Plaintiffs' motion for an extension was not an abuse of discretion.

## V

The district court did not err by entering summary judgment for Defendants. And the district court did not abuse its discretion by denying Plaintiffs' motion for an extension of time.[21]

**AFFIRMED.**

---

[21] Defendants' Motion to Take Judicial Notice is **DENIED**.