**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| KEO RATHA; SEM KOSAL; SOPHEA BUN; YEM BAN; NOL NAKRY; PHAN SOPHEA; SOK SANG, *Plaintiffs-Appellants*, | No. 18-55041 |
| v. | D.C. No. 2:16-cv-04271-JFW-AS |
| PHATTHANA SEAFOOD CO., LTD.; S.S. FROZEN FOOD CO., LTD.; RUBICON RESOURCES, LLC; WALES AND CO. UNIVERSE LTD., *Defendants-Appellees.* | ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted September 13, 2019
Pasadena, California

Filed February 25, 2022
Amended May 31, 2022

Before: Marsha S. Berzon, Ryan D. Nelson, and
Bridget S. Bade, Circuit Judges.

Order;
Opinion by Judge Bade

**SUMMARY***

**Trafficking Victims Protection Reauthorization Act**

The panel filed (1) an order amending its opinion and denying on behalf of the court a petition for rehearing en banc; and (2) an amended opinion affirming the district court's summary judgment in favor of defendants in an action brought under the civil remedy provision of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, by Cambodian villagers who alleged that they were trafficked into Thailand and subjected to forced labor at seafood processing factories.

Assuming without deciding that § 1595 may apply extraterritorially, the panel held that plaintiffs did not present a triable issue on the requirements for such application or on the merits of their claims.

18 U.S.C. § 1596 authorizes extraterritorial application of the TVPRA for specific criminal trafficking offenses. The panel assumed without deciding that § 1595 permits a private cause of action for extraterritorial violations of the substantive provisions listed in § 1596 so long as § 1596's other requirements are satisfied.

As to two foreign company defendants, the panel held that plaintiffs' claims against Phatthana Seafood Co. Ltd. failed because Phatthana was not "present in the United States" at any time relevant to this lawsuit as § 1596 requires. Because the success of plaintiffs' claims against

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

S.S. Frozen Food Co. Ltd. depended on the success of their claims against Phatthana, their claims against S.S. Frozen also failed.  The panel held that even assuming § 1596 requires foreign companies to possess nothing more than minimum contacts with the United States, plaintiffs did not establish that Phatthana or S.S. Frozen had sufficient contacts with the United States to meet that standard.  The panel held that the record did not support either specific or general jurisdiction as a basis for finding minimum contacts. The panel rejected plaintiffs' argument that Phatthana and S.S. Frozen were present in the United States through an agency relationship or joint venture with defendant Rubicon Resources LLC, a Delaware limited liability company with its principal place of business in California.

As to defendants Rubicon and Wales and Co. Universe Ltd., a Thai company registered to conduct business in California, the panel held that plaintiffs failed to produce evidence establishing a triable issue of defendants' liability under § 1595 on a theory that they knowingly benefitted from Phatthana's alleged human trafficking and forced labor abuses, financially and by accessing a steady stream of imported seafood.  The panel held that no reasonable jury could infer from the evidence that Rubicon benefitted, financially or otherwise, from Phatthana's alleged TVPRA violations.  The panel held that plaintiffs did not raise a triable issue on whether Wales knew or should have known that Phatthana was engaged in alleged violations of the TVPRA when it received a benefit from the alleged venture.

The panel further held that the district court did not abuse its discretion by denying plaintiffs' motion for an extension of time to respond to defendants' motions for summary judgment.

## COUNSEL

Paul Hoffman (argued) and Catherine Sweetser, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Hermosa Beach, California; Agnieszka M. Fryszman and Nichols Jacques, Cohen Milstein Sellers & Toll PLLC, Washington, D.C.; Dan Stormer, Hadsell Stormer & Renick LLP, Pasadena, California; Anthony DiCaprio, Rye, New York; Dan Stormer, Hadsell Stormer & Renick LLP, Pasadena, California; for Plaintiffs-Appellants.

Bryan D. Daly (argued), Charles Lawrence Kreindler, and Barbara E. Taylor, Sheppard Mullin Richter & Hampton LLP, Los Angeles, California, for Defendants-Appellees.

William J. Aceves, California Western School of Law, San Diego, California, for Amicus Curiae Human Rights and Development Foundation.

Daniel McLaughlin, Scott A. Gilmore, Carmen K. Cheung, and Katerina Siefkas, Center for Justice and Accountability, San Francisco, California; Beth Van Schaack, Stanford University, Stanford, California; Ralph G. Steinhardt, George Washington University School of Law, Washington, D.C.; for Amicus Curiae Center for Justice and Accountability.

Eli Naduris-Weissman, Rothner Segall & Greenstone, Pasadena, California, for Amici Curiae Solidarity Center, International Labor Rights Forum, Worker Rights Consortium, Centro de los Derechos del Migrante, International Labor Recruitment Working Group, and EarthRights International.

Anne M. Voigts, King & Spalding LLP, Palo Alto, California; Amelia G. Yowell, King & Spalding LLP, Washington, D.C.; for Amici Curiae Freedom Network USA, Human Trafficking Legal Center, Public Counsel, Human Trafficking Clinic at the University of Arkansas School of Law, Civil Litigation and Advocacy Clinic at the University of Arkansas School of Law, Professor Janie Chuang, and Professor David Abramowitz.

Robert A. DeHaan, McLean, Virginia, for Amicus Curiae National Fisheries Institute.

John Burton, John Burton Law, Pasadena, California; Jennifer J. Rosenbaum, Global Labor Justice – International Labor Rights Forum, Washington, D.C.; for Amici Curiae Human and Workers' Rights Organizations.

Marco Simons, Sean Powers, Richard Herz, Benjamin Hoffman, and Lindsay Bailey, EarthRights International, Washington, D.C., for Amici Curiae Law Professors of Civil Procedure.

**ORDER**

The opinion filed on February 25, 2022, is amended as follows:

On slip opinion page 17, footnote 9, replace <should be grafted into “universal jurisdiction,” and then applied here to define “present in” for purposes of § 1596.> with <should be grafted into “universal jurisdiction.”>.

On slip opinion page 19, line 5, replace <Even assuming § 1596(a)(2)> with <However, we need not decide whether § 1596(a)(2) requires physical presence because even assuming the statute>.

On slip opinion page 19, lines 8–9, delete <with the United States>.

On slip opinion page 30, line 8, replace <venture> with <perpetrator’s TVPRA violation>.

On slip opinion page 30, lines 9–10, insert <the “knowingly benefits” portion of> between <into> and <§ 1595>.

On slip opinion page 30, footnote 16, insert <More specifically, because § 1594(a) creates liability for an attempt to violate some of the TVPRA’s substantive provisions, the term “perpetrator,” as used in § 1595(a), could be read to include those who have only attempted to violate the TVPRA.> between <under § 1595(a).> and <But it>.

On slip opinion page 30, footnote 16, replace <But it> with <But that possibility>.

On slip opinion page 30, footnote 16, insert <knowingly> between <attempt to> and <benefit>.

On slip opinion page 31, line 4, insert a footnote with the following text after <to benefit.>: <Our holding is limited to whether an attempt to "knowingly benefit . . . from participation in a venture which that person knew or should have known" violated the TVPRA is actionable under § 1595(a).>.

The Clerk shall file the amended opinion submitted with this Order.

Appellants' petition for rehearing en banc, Dkt. 93, is otherwise **DENIED**. No further petitions for rehearing may be filed.

---

## OPINION

BADE, Circuit Judge:

Plaintiffs-Appellants are Cambodian villagers who allege that they were trafficked into Thailand and subjected to forced labor at seafood processing factories. Plaintiffs allege that Thai companies perpetrated these offenses, and that companies present in the United States knowingly benefitted from their forced labor. Plaintiffs brought their claims under 18 U.S.C. § 1595,[1] the civil remedy provision of the Trafficking Victims Protection Act ("TVPA"), as reauthorized and amended in the Trafficking Victims

[1] Plaintiffs also brought claims under the Alien Tort Statute. The district court dismissed those claims at the pleading stage, and they are not at issue in this appeal.

Protection Reauthorization Act of 2003 and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008.[2]

We are asked to determine the extraterritorial reach of § 1595 and to construe the terms of that provision. We assume without deciding that § 1595 may apply extraterritorially and conclude that Plaintiffs did not present a triable issue on the requirements for such application or on the merits of their claims. Therefore, the district court properly entered summary judgment against Plaintiffs. We also conclude that the district court did not abuse its discretion in denying Plaintiffs' motion for an extension of time to respond to Defendants' motions for summary judgment. We affirm.

# I

## A

In 2000, Congress enacted the TVPA "to 'combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims.'" *Ditullio v. Boehm*, 662 F.3d 1091, 1094 (9th Cir. 2011) (quoting Pub. L. No. 106-386, § 102, 114 Stat. 1464 (2000) (codified as amended at 18 U.S.C. §§ 1589–1592)). By enacting this statute, "Congress created several new federal criminal offenses intended to more comprehensively and effectively combat

[2] We refer to the Trafficking Victims Protection Act, as reauthorized and amended, as the TVPRA.

human trafficking." *Roe v. Howard*, 917 F.3d 229, 236 (4th Cir. 2019).

In 2003, Congress reauthorized and amended the TVPRA, adding a civil remedy provision codified at 18 U.S.C. § 1595. *See Ditullio*, 662 F.3d at 1094. Initially, that provision provided civil remedies only for violations of § 1589 (forced labor), § 1590 (trafficking), and § 1591 (sex trafficking of children). *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875 (2003). But in 2008, Congress again reauthorized the TVPRA and amended it to expand the civil remedies provision, which now provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a) (providing a civil remedy for the offenses listed in Title 18, Chapter 77, "Peonage, Slavery, and Trafficking in Persons"); *see Ditullio*, 662 F.3d at 1094 n.1.

The 2008 amendments also added § 1596, which authorizes extraterritorial application for specific sections of the TVPRA. *See* 18 U.S.C. § 1596(a); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 223(a), 122 Stat. 5044 (2008). This

provision, entitled "Additional jurisdiction in certain trafficking offenses," provides:

> (a) In general.—In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—
>
> (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or
>
> (2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

18 U.S.C. § 1596(a). As a result of the 2008 amendments, the TVPRA now extends extraterritorial application to violations of § 1581 (peonage), § 1583 (enticement into slavery), § 1584 (sale into involuntary servitude), § 1589 (forced labor), § 1590 (trafficking), and § 1591 (sex trafficking of children), but only if the alleged offender is a United States citizen, a lawful permanent resident, or is present in the United States. *See id.*

B

In their complaint, Plaintiffs alleged that they were the victims of peonage, forced labor, involuntary servitude, and human trafficking, in violation of 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1592, and 1593A, and they sought damages

under § 1595, the civil remedy provision of the TVPRA. Plaintiffs further alleged that Defendants-Appellees Phatthana Seafood Co., Ltd. ("Phatthana") and S.S. Frozen Food Co., Ltd. ("S.S. Frozen") perpetrated these offenses, and that Defendants-Appellees Rubicon Resources, LLC ("Rubicon") and Wales & Co. Universe Ltd. ("Wales") knowingly benefitted from Phatthana's and S.S. Frozen's unlawful conduct.

Specifically, Plaintiffs say that they were recruited from their villages to work in factories in Thailand producing shrimp and seafood for export to the United States. Plaintiffs were promised well-paying jobs with free accommodations, but once in Thailand, they became victims of peonage, forced labor, and involuntary servitude. Plaintiffs were paid less than promised, charged for accommodations, charged for other unexpected expenses, unable to leave without their passports, which they were told would not be returned until "recruitment fee[s]" and other amounts were paid, and subjected to harsh conditions. Plaintiffs asserted that these abuses occurred from sometime in 2010 until October 2012. Phatthana's seafood processing factory in Songkhla province, where six of the seven Plaintiffs worked, began operations in August 2010. The seventh Plaintiff, Keo Ratha, worked at an S.S. Frozen seafood processing factory from October 2011 to January 2012.

Phatthana and S.S. Frozen are foreign companies. Phatthana is a Thai company that owned two seafood processing factories in Thailand, including the factory in Songkhla province.[3] Phatthana does not have an address, employees, factories, or other property in the United States.

[3] Phatthana's seafood processing factory in Songkhla province closed in 2013.

Phatthana had business relationships with Rubicon and Wales, which we describe in more detail below.

S.S. Frozen is also a Thai company and it owned a seafood processing factory in Songkhla province, next to Phatthana's Songkhla factory.  S.S. Frozen does not have an address or employees in the United States, and it did not sell any seafood in the United States during the period at issue—August 2010 to October 2012.  Unlike Phatthana, S.S. Frozen did not have any business relationships with Rubicon or Wales.

Rubicon is a Delaware limited liability company with its principal place of business in California.  Rubicon sought to import shrimp from Phatthana's Songkhla seafood processing factory into the United States.  Rubicon coordinated sales and marketing, visited and conducted pre-audits of Phatthana's factories, and arranged for import and shipping of Phatthana's product.  But Rubicon did not own any factories, and it did not recruit employees for Phatthana.

In October 2011, Rubicon ordered fourteen containers of shrimp from Phatthana's Songkhla factory for distribution to Walmart.  Walmart rejected the shipment because it had concerns about working conditions in the factory.  Rubicon returned the shrimp to Thailand.  It did not successfully sell any shrimp from Phatthana's Songkhla factory in the United States during the period at issue in this case.

Wales is a Thai company registered to conduct business in California.  Wales performs quality control, sales, and marketing for seafood processing factories.  During the period at issue, Wales inspected the packaging of the fourteen containers of shrimp that Rubicon ordered from (and ultimately returned to) Phatthana before the shipment

left Thailand, and it received a commission for these services.

C

At the outset of this case, the district court denied Defendants' motion to dismiss Plaintiffs' TVPRA claims, under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, because it concluded that § 1596 extends the extraterritorial application of the TVPRA to civil actions brought under § 1595, and that Plaintiffs' complaint sufficiently alleged a claim under that provision. But at the close of discovery, the district court granted Phatthana's and S.S. Frozen's motions for summary judgment because it found that Plaintiffs had not established that these foreign companies were "present in" the United States, as required by 18 U.S.C. § 1596(a)(2). The district court therefore concluded that it lacked subject matter jurisdiction over the claims against Phatthana and S.S. Frozen.[4]

The district court also granted Rubicon's and Wales's motions for summary judgment because it concluded that Plaintiffs failed to present a triable issue that these companies knowingly benefitted from participating in a venture that they knew or should have known had engaged in TVPRA violations. *See* 18 U.S.C. § 1595(a). Plaintiffs appeal the district court's grant of summary judgment in Defendants' favor and the district court's denial of their

[4] The district court also entered summary judgment against Plaintiffs Yem Ban, Nol Nakry, and Sok Sang because it concluded that they failed to present evidence to support their TVPRA claims against Phatthana. Because we resolve the claims against Phatthana and S.S. Frozen on other grounds, we do not address Plaintiffs' arguments that the district court erred in entering summary judgment on the merits of their claims.

motion for an extension of time to respond to Defendants' summary judgment motions.

II

We review de novo a district court's grant of summary judgment. *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015). We may affirm on any ground supported by the record. *Oyama v. Univ. of Haw.*, 813 F.3d 850, 860 (9th Cir. 2015). We review a district court's denial of a motion for extension of time for abuse of discretion. *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1258 (9th Cir. 2010).

III

We consider separately Plaintiffs' claims against the foreign companies, Phatthana and S.S. Frozen, and their claims against the companies present in the United States, Rubicon and Wales.

Plaintiffs, who are Cambodian villagers, allege that Phatthana and S.S. Frozen, both Thai companies, trafficked them into Thailand and then subjected them to peonage, forced labor, and involuntary servitude at their seafood processing factories. Thus, this case involves allegations by foreign Plaintiffs, against foreign Defendants, based on conduct occurring and injuries suffered in a foreign country. We must first consider the extraterritorial reach of § 1595. *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 329 (2016) (explaining that a statute applies extraterritorially, when it applies "to events occurring and injuries suffered outside the United States").

A

"Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991), *superseded in part by statute*, Civil Rights Act of 1991, Pub. L. 10-166, 105 Stat. 1074, *as recognized in Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994). But "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id.* (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). When asked to decide whether a statute applies extraterritorially, we ordinarily apply a two-step framework. *RJR Nabisco*, 579 U.S. at 329, 337. At step one, we "presume that a statute applies only domestically" and "ask 'whether the statute gives a clear, affirmative indication' that rebuts this presumption." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1936 (2021) (quoting *RJR Nabisco*, 579 U.S. at 337). If the statute is not extraterritorial, then we go on to the second step and ask whether the case involves a permissible domestic application of the law. *Id.*

Viewed in isolation, § 1595 is silent as to its extraterritorial application. *See* 18 U.S.C. § 1595. Plaintiffs argue that § 1595 applies extraterritorially because it incorporates the TVPRA's substantive provisions made extraterritorial by § 1596. Under that argument, § 1595's extraterritoriality depends on § 1596's elements being satisfied. In response, Defendants argue that § 1595 "does not state that it applies extraterritorially," and "it is appropriate *not* to read extraterritoriality into it." Defendants further argue that § 1596 "does not state it applies to civil actions" and by its terms only applies to criminal prosecutions.

We need not resolve this dispute to decide this case. Instead, we assume without deciding that Plaintiffs are correct and that § 1595 permits a private cause of action for extraterritorial violations of the substantive provisions listed in § 1596 so long as § 1596's other requirements are satisfied.[5] We take this approach for two reasons.

First, the extraterritorial reach of § 1595 does not affect this court's subject matter jurisdiction. Although the parties argue that the viability of Plaintiffs' claims raises a jurisdictional question, and the district court framed the issue in similar terms, the Supreme Court has explained that whether a statute applies abroad concerns "what conduct" the statute prohibits, "which is a merits question." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253–54 (2010). Subject matter jurisdiction, which "refers to a tribunal's power to hear a case," "presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief." *Id.* at 254 (internal quotation marks omitted). Thus, our assumption that § 1595 may reach extraterritorial conduct does not overstep this court's "adjudicatory domain." *See Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs*, 558 U.S. 67, 81 (2009).

[5] Because we assume Plaintiffs are correct that § 1596 contains "a clear, affirmative indication" that the TVPRA's civil remedy provision applies to foreign conduct, the first step of the two-step test to determine whether a federal statute applies extraterritorially is satisfied. *See Nestlé USA*, 141 S. Ct. at 1936. "[A] finding of extraterritoriality at step one will obviate step two's 'focus' inquiry." *RJR Nabisco*, 579 U.S. at 338 n.5; *see also id*. at 337–38 (explaining that it is only necessary to consider a statute's "focus" if the statute does not apply extraterritorially). Therefore, we do not reach the second step of the extraterritoriality framework and consider whether the case involves a permissible domestic application of § 1595.

Second, we adhere to the "cardinal principle of judicial restraint," which instructs that "if it is not necessary to decide more, it is necessary not to decide more." *Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 617 n.13 (9th Cir. 2017) (quoting *PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)). In addition to any extraterritorial application otherwise provided by law, § 1596 supplies extraterritorial application to §§ 1581, 1583, 1584, 1589, 1590, and 1591, but only if the alleged offender is a United States citizen, a lawful permanent resident, or is present in the United States. 18 U.S.C. § 1596(a). As explained below, we hold that those requirements are not met with respect to Phatthana and S.S. Frozen.[6]

We therefore decline to decide whether § 1595 applies to foreign conduct because whether it does or not, we are left with the same result: we must affirm the district court's judgment in favor of Phatthana and S.S. Frozen. We will assume in this case that § 1595 applies extraterritorially and leave for another day the question of whether that assumption is correct. *Cf. Whitehouse v. Ill. Cent. R.R. Co.*, 349 U.S. 366, 372–73 (1955) ("These are perplexing questions. Their difficultly admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case.").

[6] Defendants do not dispute that Rubicon and Wales were "present in" the United States for purposes of the TVPRA but instead, as we discuss later, argue that Plaintiffs failed to raise triable issues on the merits of their § 1595 claims against these Defendants.

B

We turn now to Plaintiffs' claims that Phatthana and S.S. Frozen trafficked them into Thailand and subjected them to peonage, forced labor, and involuntary servitude at their seafood processing factories. The question here is whether Plaintiffs' claims satisfy § 1596's requirements for extraterritorial application. We hold that Plaintiffs' claims against Phatthana fail because Phatthana was not "present in the United States" at any time relevant to this lawsuit as § 1596 requires. Because the success of Plaintiffs' claims against S.S. Frozen depends on the success of their claims against Phatthana, Plaintiffs' claims against S.S. Frozen also fail. [7]

The TVPRA, in § 1596, provides for extraterritorial jurisdiction over §§ 1581, 1583, 1584, 1589, 1590, and 1591, when "an alleged offender is *present in* the United States, irrespective of the nationality of the alleged offender." 18 U.S.C. § 1596(a)(2) (emphasis added). What it means for "an alleged offender" to be "present in the United States" is a question of statutory construction. Therefore, we "begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Hardt v. Reliance Standard Life Ins.*, 560 U.S. 242, 251 (2010) (alteration in original) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)).

[7] Plaintiffs argue that S.S. Frozen was "present in" the United States because S.S. Frozen and Phatthana were "alter egos" engaged in an "integrated enterprise." Plaintiffs' claims against S.S. Frozen are therefore dependent on their claims against Phatthana.

The plain meaning of the adjective "present" is "in a particular place." New Oxford American Dictionary 1381 (3d ed. 2010). Phatthana and S.S. Frozen are both Thai companies. Neither had any address, employees, or physical presence in the United States during the period at issue in this case. Nonetheless, Plaintiffs argue that Phatthana and S.S. Frozen were "present in" the United States for purposes of § 1596 on three separate grounds. We find none of these arguments persuasive.

1

Plaintiffs first maintain that we should construe the phrase "present in," as used in § 1596, to not require physical presence. Plaintiffs argue that this term is broad and "is understood to mean universal jurisdiction."[8] They assert that, even though "universal jurisdiction does not require physical presence," the Due Process Clause "imposes some limits on the ability of the United States to exercise universal jurisdiction." Thus, Plaintiffs say, a foreign corporate defendant is "present in" the United States so long as it has the "minimum contacts" necessary to allow personal jurisdiction under the Due Process Clause.[9] *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

---

[8] "Universal jurisdiction" applies to "certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism." Restatement (Third) of the Foreign Relations Law of the United States § 404 (1987).

[9] We do not decide whether Plaintiffs' argument rests on a sound premise. "The Due Process Clause requires that a defendant prosecuted in the United States 'should reasonably anticipate being haled into court in this country.'" *United States v. Shi*, 525 F.3d 709, 722 (9th Cir. 2008)

To support their position, Plaintiffs rely primarily on *United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991), but that case hurts more than helps their argument. As relevant here, the defendant in *Yunis* challenged his conviction under the Hostage Taking Act, 18 U.S.C. § 1203, and argued that the statute did not authorize jurisdiction over him because he was not "found in" the United States. *Id.* at 1090; *see also* 18 U.S.C. § 1203(b)(1) (limiting extraterritorial application of the Hostage Taking Act to three scenarios, one of which being when "the offender is found in the United States"). The D.C. Circuit rejected the defendant's argument because the Hostage Taking Act provided an independent basis for jurisdiction. *Id.*

*Yunis* discussed the "universal principle" theory of international law, which authorizes states to prosecute certain offenses that "the community of nations" recognizes are of "universal concern," including the slave trade, "even absent any special connection between the state and the offense." *Id.* at 1091 (citing Restatement (Third) of the Foreign Relations Law of the United States §§ 404, 423 (1987)). But *Yunis* considered the "universal principle" in a context that differs from the one presently before this court. *See id.* at 1090 (explaining the Hostage Taking Act covered an offender's conduct when "the offender is *found in* the

(quoting *United States v. Moreno-Morillo*, 334 F.3d 819, 827 (9th Cir. 2003)). In contrast, "[u]niversal jurisdiction is based on the premise that offenses against all states may be punished by any state where the offender *is found*." *Id.* (emphasis added). Thus, "[d]ue process does not require a nexus between such an offender and the United States because the universal condemnation of the offender's conduct puts him on notice that his acts will be prosecuted by any state *where he is found*." *Id.* at 723 (emphasis added). Plaintiffs present no authority to support their argument that the *International Shoe* definition of presence—i.e., minimum contacts—should be grafted into "universal jurisdiction."

United States" (emphasis added) (quoting 18 U.S.C. § 1203)). The defendant in *Yunis* did not contend that the statute's use of the term "found in" indicated that physical presence in the United States was not required; he instead argued that he was not "found in" the United States because he was brought here "by force." *Id.*

Contrary to Plaintiffs' suggestion that *Yunis* supports an interpretation of the term "present in" that does not require physical presence, the court later analyzed a different statute requiring an offender to be "present in" a specific territory, and it concluded that the term "present in" has a parallel meaning to the term "found in." *Id.* at 1091–92. Thus, the court held, the defendant was "present in" the United States "once in the United States" physically. *Id.* at 1092. If anything, then, *Yunis* supports the conclusion that § 1596's use of the term "present in" requires physical presence, not merely the types of minimum contacts that satisfy due process.

However, we need not decide whether § 1596(a)(2) requires physical presence because even assuming the statute requires foreign companies to possess nothing more than minimum contacts with the United States, Plaintiffs have not established that Phatthana or S.S. Frozen have sufficient contacts to satisfy that standard.[10] "For a court to exercise personal jurisdiction over a nonresident defendant" in a manner consistent with the Due Process Clause, "that defendant must have at least 'minimum contacts' with the

[10] To be clear, we engage in this analysis not to determine whether we have personal jurisdiction over Phatthana and S.S. Frozen, but because Plaintiffs argue that "present in," as used in § 1596, "is limited to a corporation's place of incorporation, principal place of business, or where it is subject to specific jurisdiction."

relevant forum such that the exercise of jurisdiction 'does
not offend traditional notions of fair play and substantial
justice.'"  *Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co.*,
326 U.S. at 316).  In the Ninth Circuit, we measure the extent
of a defendant's contacts with a forum "at the time of the
events underlying the dispute."  *Steel v. United States*,
813 F.2d 1545, 1549 (9th Cir. 1987); *accord Farmers Ins.
Exch. v. Portage La Prairie Mut. Ins.*, 907 F.2d 911, 913 (9th
Cir. 1990).  "The strength of [the] contacts required depends
on which of the two categories of personal jurisdiction a
litigant invokes:    specific   jurisdiction   or   general
jurisdiction."  *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th
Cir. 2015).

"Specific jurisdiction exists when a case 'aris[es] out of
or relate[s] to the defendant's contacts with the forum."  *Id.*
(alterations in original) (quoting *Helicopteros Nacionales de
Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).  It
therefore "depends on an affiliation between the forum and
the underlying controversy, principally, activity or an
occurrence that takes place in the forum [ ] and is therefore
subject to the [forum's] regulation."  *Id.* (quoting *Goodyear
Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919
(2011)).

General jurisdiction is not limited to claims arising out
of or relating to the forum but rather "permits a court to hear
'any and all claims' against a defendant, whether or not the
conduct at issue has any connection to the forum."  *Id.*
(quoting *Goodyear*, 564 U.S. at 919).  Because the scope of
general jurisdiction, once established, is broader than the
scope for specific jurisdiction, "a plaintiff invoking general
jurisdiction must meet an 'exacting standard' for the
minimum   contacts   required."        *Id.* at 1069 (quoting

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1074 (9th Cir. 2011)). Courts may exercise general jurisdiction over a defendant only if the defendant's connections to the forum state "are so 'continuous and systematic' as to render [it] essentially at home" in the forum. *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017) (alteration in original) (quoting *Goodyear*, 564 U.S. at 919). The paradigmatic examples of such connections are when the defendant is incorporated or has its principal place of business in the forum. *Id.*

The evidence in the record here does not support either specific or general jurisdiction as a basis for finding minimum contacts. To establish specific jurisdiction, three requirements must be satisfied. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). First, "the defendant must either 'purposefully direct his activities' toward the forum or 'purposefully avail[ ] himself of the privileges of conducting activities in the forum.'" *Id.* (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). Second, "the claim must be one which arises out of or relates to the defendant's forum-related activities." *Id.* (quoting *Dole Food*, 303 F.3d at 1111). And third, "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Id.* (quoting *Dole Food*, 303 F.3d at 1111). We will consider only the first element of specific jurisdiction because it presents the dispositive issue.

Because the TVPRA's "civil remedy provision creates a cause of action that sounds in tort," *Ditullio*, 662 F.3d at 1096, "we employ the purposeful direction test" derived from *Calder v. Jones*, 465 U.S. 783 (1984), *see Axiom Foods*, 874 F.3d at 1069. To satisfy the purposeful direction test, the defendant must have "(1) committed an intentional

act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 805 (quoting *Dole Food*, 303 F.3d at 1111).[11]

Here, Plaintiffs have not satisfied the purposeful direction prong of the minimum contacts analysis. They primarily point to Rubicon's order of fourteen containers of shrimp from Phatthana's Songkhla factory for distribution in the United States to Walmart. Walmart ultimately rejected that shipment because it had concerns about working conditions in the Thai factory, and Rubicon returned the shrimp to Thailand. Plaintiffs also point to deposition testimony, emails, and a public database to suggest Phatthana sold shrimp to buyers in the United States through importers other than Rubicon, but those documents generally do not specify any particular sales, the dates of such sales, or the factories of origin.[12]

Assuming Phatthana's attempt to sell shrimp to Walmart, and some other sales to entities in the United States, constituted intentional acts expressly aimed at the United States, Plaintiffs have produced no evidence suggesting that those sales caused "harm that [Phatthana] [knew was] likely to be suffered in the" United States.

[11] Although the third prong of the purposeful direction inquiry and the "arise out of or relate to" inquiry are two different steps in the minimum contacts analysis, they are closely related. Satisfying the purposeful direction analysis will often satisfy the "arise out of or relate to" requirement as well. *See Dole Food*, 303 F.3d at 1114.

[12] The only document that provides dates and origins of shrimp shipments is an excerpt from a Human Rights Watch report containing a screenshot of an online database. This screenshot does not include any shipments from Phatthana's Songkhla factory during the relevant period.

*Schwarzenegger*, 374 F.3d at 805 (quoting *Dole Food*, 303 F.3d at 1111). Plaintiffs' evidence thus does not show that Phatthana or S.S. Frozen purposefully directed their activities to the United States in the sense required to establish specific personal jurisdiction over a personal injury claim.[13]

As for Plaintiffs' general jurisdiction argument, Phatthana and S.S. Frozen are not incorporated in the United States, and Plaintiffs have not shown—much less argued—that the United States is their principal place of business, or that their contacts "are so 'continuous and systematic' as to render them essentially at home in the" United States. *Goodyear*, 564 U.S. at 919 (quoting *Int'l Shoe Co.*, 326 U.S. at 317). Thus, even assuming the phrase "present in," as used in § 1596, requires only minimum contacts with the United States, Plaintiffs have not demonstrated that Phatthana and S.S. Frozen have the contacts needed to satisfy that standard.

2

We next consider Plaintiffs' second argument—that Phatthana and S.S. Frozen were present in the United States through an agency relationship or joint venture with Rubicon—and conclude it is unconvincing.

Plaintiffs assert that Phatthana is "present in" the United States for purposes of § 1596 because Rubicon, which *is*

[13] This conclusion still follows even if Phatthana's sales to the United States were more extensive than Plaintiffs' evidence suggests because a larger sales footprint in the United States would not change the fact that the harm caused by Defendants' alleged TVPRA violations was not suffered in the United States. *See Schwarzenegger*, 374 F.3d at 805.

present in the United States acted as Phatthana's agent. The
district court properly rejected this argument. An agent
under California law is "one who represents another, called
the principal, in dealings with third persons." Cal. Civ. Code
§ 2295. "Agency requires that the principal maintain control
over the agent's actions," *Murphy v. DirecTV, Inc.*, 724 F.3d
1218, 1232 (9th Cir. 2013), and generally, "[a] purchaser is
not 'acting on behalf of' a supplier in a distribution
relationship in which goods are purchased from the supplier
for resale," *id.* (quoting Restatement (Third) of Agency
§ 1.01 cmt. g (2006)).

Plaintiffs contend that Rubicon's marketing activities,
on-site visits to Phatthana's factories, management of the
importation and shipping of Phatthana products, and
management of customer relations establish an agency
relationship between Rubicon and Phatthana. But none of
the evidence in the record supports the inference that
Phatthana exercised control over Rubicon's purchasing,
marketing, sales, and customer-relations activities, or that
Phatthana's relationship with Rubicon was anything
more than a purchaser-supplier relationship. While it is true that
Rubicon was registered as Phatthana's "agent" with the Food
and Drug Administration ("FDA"), such an agent acts
merely "as a communications link between FDA and the
foreign   facility   for   both   emergency   and   routine
communications." 21 C.F.R. § 1.227. This narrowly
delineated relationship under federal regulations does not
show that Phatthana exercised the control over Rubicon
necessary to establish a general agency relationship.
Plaintiffs' agency-based argument therefore fails.

Plaintiffs further maintain that Phatthana was present in
the United States because it and Rubicon were engaged in a
joint venture to market and sell shrimp in the United States.

This argument fails largely for the same reasons Plaintiffs' agency argument fails.

To establish a joint venture under California law, Plaintiffs must show "an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." *Connor v. Great W. Sav. & Loan Ass'n*, 447 P.2d 609, 615 (Cal. 1968) (quoting *Holtz v. United Plumbing & Heating Co.*, 319 P.2d 617, 620 (Cal. 1957)); *accord Ramirez v. Long Branch Unified Sch. Dist.*, 129 Cal. Rptr. 2d 128, 137 (Cal. Ct. App. 2002). To support their joint venture argument, Plaintiffs rely on the same evidence they cited to support their agency-based claim. As explained, that evidence establishes only that Rubicon and Phatthana were engaged in a purchaser-supplier relationship; it does not create a triable issue that Rubicon and Phatthana would share profits and losses or would be subject to joint control.

To the contrary, the limited liability company agreement creating Rubicon states that Rubicon was formed as a joint venture between Brian Wynn (the CEO and manager of Rubicon), Wales, Thailand Fishery Cold Storage Public Co. (whose share in Rubicon was later transferred to another company), and P&M Holding Co.; that those four entities would share in Rubicon's net income and losses; and that Wynn had "exclusive authority to manage the operations and affairs of" Rubicon. Neither the original agreement nor its subsequent amendments identifies Phatthana as a member of the joint venture.

Plaintiffs rely on filings by "Rubicon Group" submitted to the Commerce Department as part of an antidumping

proceeding.[14]   The "Rubicon Group" is not synonymous
with Rubicon Resources, LLC, but rather is the term used in
a Commerce Department antidumping proceeding to
describe a collection of "affiliated firms, collapsed for
[antidumping] analysis pursuant to 19 C.F.R. § 351.401(f)."
*See Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327,
1333 n.3 (Ct. Int'l Trade 2010).  Plaintiffs asserts that those
Commerce Department filings show that Phatthana, as well
as other Thai shrimp companies, were "subgroup" members
of the Thailand Fishery Cold Storage group, which in turn
was a member of the Rubicon Group.  The filings state that
"a company within each Rubicon subgroup," including the
signatories to the Rubicon joint venture agreement, "is a
Member (or partner) of Rubicon Resources, and holds a [ ]%
interest in the company," and that "each Rubicon subgroup
encompasses the individual Rubicon Group companies,"
including Phatthana, which is thereby "integrated into the
Rubicon Group business structure."

    At most, these filings confirm that there is a joint venture
relationship between the entities named as members of
Rubicon Resources in the Rubicon joint venture agreement
and that there is some relationship between at least one of
those entities and Phatthana.  But neither these filings nor
Plaintiffs' briefs explain what it means for Phatthana to be
"integrated" into the overall Rubicon Group business
structure, or what it means that a Rubicon subgroup
"encompasses" a sub-subgroup such as Phatthana.  Plaintiffs

---

[14] Antidumping laws "address harm to domestic manufacturing from
foreign goods sold at an unfair price" by imposing a duty on imports.
*United States v. Eurodif S. A.*, 555 U.S. 305, 310–11 (2009).
Antidumping proceedings, like the one referred to here, involve the
government's determination of the duty rates for certain kinds of
imports. *See Certain Frozen Warmwater Shrimp from Thailand*, 74 Fed.
Reg. 47,551-02, 47,551 (Sept. 16, 2009).

offers no evidence of any direct agreement between Rubicon and Phatthana regarding the sharing of profits and losses or a joint right of control. In light of the existence of a Rubicon joint venture agreement that does *not* include Phatthana, as well as the evidence that Rubicon and Phatthana's relationship was that of a purchaser and a supplier, these Commerce Department filings alone cannot support the inference that Phatthana and Rubicon were engaged in a joint venture.

3

Plaintiffs' third argument also falls short. Focusing on the phrase "an alleged offender" as used in § 1596, Plaintiffs contend that § 1596 is satisfied so long as *one* of the defendants involved in the case meets the statutory criteria. But even if this novel interpretation is sound (and we doubt that it is), we conclude below that the district court correctly entered summary judgment on Plaintiffs' claims against Rubicon and Wales. Consequently, there are no other defendants besides Phatthana and S.S. Frozen left to satisfy § 1596's requirements, and as we have explained, neither of those Defendants meet § 1596's demands.[15]

[15] Plaintiffs also contend that they assert a "wholly domestic basis for subject matter jurisdiction" based on a "domestic benefit" arising from Phatthana's alleged sales to customers in the United States other than through Rubicon. To support this theory, Plaintiffs rely on cases in which defendants residing in the United States benefitted from illegal conduct that took place abroad. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 281, 285–86 (1952) (trademark infringement and unfair competition "consummated in a foreign country by a citizen and resident of the United States"); *Vaughan v. Aegis Commc'ns Grp.*, 49 F. Supp. 3d 613, 616, 623 (W.D. Mo. 2014) (corporate defendants based in the United States "benefited in the U.S." from forced labor "performed in India"). But as explained, Phatthana and S.S. Frozen were in no way

* * *

Plaintiffs have not raised a triable issue that Phatthana and S.S. Frozen were "present in the United States," as required by 18 U.S.C. § 1596(a)(2), and thus they have not established that their § 1595 claims against these Defendants involve a permissible extraterritorial application of the TVPRA. We therefore affirm the district court's entry of summary judgment in favor of Phatthana and S.S. Frozen.

C

We next consider Plaintiffs' claims against Rubicon and Wales. Plaintiffs allege that Rubicon and Wales knowingly benefitted from Phatthana's alleged human trafficking and forced labor abuses, financially and by accessing a steady stream of imported seafood. We conclude that summary judgment for these Defendants was appropriate because Plaintiffs failed to produce evidence establishing a triable issue of Rubicon's or Wales's liability under § 1595.

In § 1595, Congress extended a private right of action to victims of substantive violations of the TVPRA, allowing them to sue the direct perpetrator and anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" the TVPRA. 18 U.S.C. § 1595(a). Neither Rubicon nor Wales are alleged to have perpetrated any TVPRA violations

---

present in the United States, and thus they did not "benefit in the United States." Further, Plaintiffs seek to apply § 1595 "to events occurring and injuries suffered outside the United States." *RJR Nabisco*, 579 U.S. at 329. Therefore, absent any domestic presence or domestic benefit, their claims fall squarely within the Supreme Court's definition of extraterritoriality. *See id.*

against Plaintiffs. Thus, to withstand Defendants' motions
for summary judgment, Plaintiffs needed to present evidence
creating a triable issue on whether Rubicon or Wales:
(1) knowingly benefitted, (2) from participation in a venture
(in this case with Phatthana), (3) which they knew or should
have known was engaged in conduct that violated the
TVPRA. *Id.* If Plaintiffs failed to raise a triable issue on any
of these elements, we need not consider the rest.

We separately address the claims against Rubicon and
the claims against Wales. We first explain why no
reasonable jury could infer from the evidence that Rubicon
benefitted, financially or otherwise, from Phatthana's
alleged TVPRA violations. We then explain why Plaintiffs
have not raised a triable issue on whether Wales knew or
should have known that Phatthana was engaged in alleged
violations of the TVPRA when it received a benefit from the
alleged venture.

1

Plaintiffs assert that there is "sufficient evidence" that
Rubicon benefitted from Phatthana's alleged TVPRA
violations. They point to three distinct benefits that Rubicon
allegedly obtained from its relationship with Phatthana. But
none of those allegations presents a triable issue of material
fact.

Plaintiffs first argue that Rubicon "benefitted from
marketing the shrimp produced by Phatthana." They point
to materials stating that "Rubicon has 13 factories,"
including Phatthana's Songkhla factory, "that are 100%
owned and captive to Rubicon Resources." But the page
touting Rubicon's production capabilities and a "Factory
Index" that includes the Songkhla factory are undated. And
Plaintiffs have offered no evidence or explanation of the

purpose of these materials, when they were produced, or when (or even whether) they were distributed to potential customers. Moreover, Plaintiffs' argument rests on Rubicon's marketing role, not on any ownership or production role. We thus find these materials insufficient for a reasonable jury to infer that Rubicon benefitted from its alleged marketing of Phatthana's products.

We reject Plaintiffs' second argument—that Rubicon obtained a "competitive advantage" through its association with Phatthana—for a similar reason. Plaintiffs point to "[d]eclarations from Louisiana shrimpers attest[ing] to the competitive advantage and the impact on American industry" of the Thai shrimp industry. But these general statements from American shrimpers about international market conditions do not suggest that Rubicon benefitted from its alleged venture with Phatthana. Therefore, we find the declarations insufficient to present a genuine dispute of material fact.

Perhaps realizing these deficiencies, Plaintiffs advance a third argument: that an *attempt* to benefit satisfies § 1595(a)'s "knowingly benefits" requirement. We disagree. The text of § 1595 does not extend liability to those who *attempt* to benefit from a perpetrator's TVPRA violation. *See* 18 U.S.C. § 1595(a). And we cannot read the word "attempt" into the "knowingly benefits" portion of § 1595 without violating "a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) (alteration in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012)).

Moreover, Congress's decision to impose civil liability on those who "benefit" but not those who "attempt to

benefit" is significant because attempt liability is plainly authorized elsewhere in the TVPRA. *See, e.g.*, 18 U.S.C. § 1594(a) ("Whoever attempts to violate section 1581, 1583, 1584, 1589, 1590, or 1591 shall be punishable in the same manner as a completed violation of that section.").[16] When "Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). Had Congress intended to create civil liability under § 1595 for attempts to benefit, we can reasonably conclude that it would have done so in express terms. We therefore hold that the phrase "knowingly benefits" as used in § 1595(a) does not encompass attempts to benefit.[17] Consequently, Plaintiffs' assertion that "[i]t is undisputed that Rubicon *attempted* to sell" fourteen containers of Phatthana shrimp fails to raise a triable issue of material fact. We therefore affirm the district court's grant of summary judgment in Rubicon's favor.

2

Turning to Plaintiffs' claims against Wales, we conclude that Plaintiffs failed to present evidence to support a

[16] We find Plaintiffs' citation to § 1594, without explanation, unconvincing. Section 1594 speaks to who might be a "perpetrator" of a TVPRA violation under § 1595(a). More specifically, because § 1594(a) creates liability for an attempt to violate some of the TVPRA's substantive provisions, the term "perpetrator," as used in § 1595(a), could be read to include those who have only attempted to violate the TVPRA. But that possibility does not suggest that an attempt to knowingly benefit from a perpetrator's TVPRA violation would establish liability under § 1595(a).

[17] Our holding is limited to whether an attempt to "knowingly benefit . . . from participation in a venture which that person knew or should have known" violated the TVPRA is actionable under § 1595(a).

reasonable inference that Wales knew or should have known that Phatthana was engaged in conduct violating the TVPRA when it received a benefit from the alleged venture. Wales admits that on February 23, 2012, it became aware of a news article published in the Phnom Penh Post detailing allegations from Plaintiff Ratha's whistleblower report.[18] In light of this admission, we bifurcate our analysis into the periods before and after February 23, 2012. We first conclude that Plaintiffs have not presented a triable issue on whether Wales knew or should have known of Phatthana's alleged TVPRA violations before February 23, 2012. We then conclude that Plaintiffs have not presented a triable issue on whether Wales benefitted from the alleged venture on or after February 23, 2012.

a

We first consider whether a reasonable factfinder could infer from the evidence that Wales knew or should have known of the alleged labor abuses at Phatthana's Songkhla factory between August 2010 (when the factory started operating) and February 22, 2012 (the day before Rubicon was undisputedly aware of Ratha's whistleblower report). Plaintiffs argue that Wales "received industry-specific, country-specific, and Defendant-specific information sufficient to put any reasonable party on notice" that labor abuses were occurring at the Songkhla factory "well before" the allegations in Ratha's whistleblower report were published in February 2012. They point to reports and articles about labor abuses generally in Thailand, as well as their retained experts' reports, to substantiate their claims.

[18] We assume without deciding that Wales possessed actual knowledge of the alleged violations on and after February 23, 2012.

As we explain in the following sections, this evidence falls short of creating a genuine dispute of material fact on whether Wales knew or should have known of Phatthana's alleged TVPRA violations before February 2012. "[T]he phrase 'knew or should have known' usually connotes negligence." *Mayview Corp. v. Rodstein*, 620 F.2d 1347, 1358 (9th Cir. 1980). And "[n]egligence is a less culpable mental state than actual knowledge . . . or recklessness." *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 833 (9th Cir. 2019). Assuming § 1595 imposes a negligence standard, Plaintiffs' evidence suggests, at most, that Wales should have known of labor abuses in the Thai shrimp industry *generally*. Sweeping generalities about the Thai shrimp industry are too attenuated to support an inference that Wales knew or should have known of the specifically alleged TVPRA violations at the Songkhla factory between 2010 and 2012.

i

Plaintiffs first point to evidence generally establishing that abusive labor practices were common in Thailand, particularly in the shrimp industry. They rely upon the 2009 edition of *The Department of Labor's List of Goods Produced by Child Labor or Forced Labor*, which identified the Thai shrimp industry on a list of 58 countries and 122 goods having a "significant incidence of child labor and forced labor in the production of certain goods." But as this report itself cautions, "a listing of any particular good and country does not indicate that all production of the good in that country involves forced labor or child labor, but rather that there is a significant incidence" of such conduct in that country's industry. And the report makes clear that identifying "specific firms or individuals using child labor or forced labor" is beyond its mandate. The identification of

child labor and forced labor as a general problem in the Thai shrimp industry, before the relevant time period, sheds little light on whether labor abuses were occurring at Phatthana's Songkhla factory, let alone whether Wales knew or should have known of such abuses.

Plaintiffs' reliance on a January 2008 report from the AFL-CIO's Solidarity Center, *The Degradation of Work: The True Cost of Shrimp*, is likewise insufficient to overcome their burden at summary judgment. The only reference to Phatthana in this forty-page report appears in a section addressing whether Thai seafood workers earned minimum wage (191 baht per day, as an industry source estimated). The report includes the following statement based on information from a 2005 interview with a worker at a different Phatthana factory: "[A] pay stub from a worker at the Pattana [sic] Seafood Company in Samut Sakhon showed a reported pay of 191 baht per day, but daily take-home pay was closer to 160 baht after deductions for equipment and permits." But Plaintiffs offer no argument or evidence that would allow a reasonable jury to conclude that this reference to one worker's statement, concerning wages at an entirely different processing facility, long before the time period at issue, should have put Wales on notice that it was working with entities engaged in TVPRA violations.[19]

[19] Plaintiffs point to an April 2008 article in the Bangkok Post as evidence that Wales knew of the Solidarity Center report because its CEO, who was quoted in the article in his role as President of the Thai Frozen Foods Association, said "the accusations in the report were based on old information and lack of evidence." But this article establishes only that in 2008, two years before the Phatthana factory in Songkhla opened, Wales and other members of the Thai Frozen Foods Association knew that there were labor abuses in the Thai seafood industry. It does

Plaintiffs assert that news reports referencing the Solidarity Center Report, published between April and June 2008, "identif[ied] Rubicon's customers as the consumers" of shrimp produced in Thailand.  Plaintiffs are correct that one of these articles identified "nine big U.S. supermarket chains" that "sell[ ] Thai shrimp in the U.S.," including Walmart, one of Rubicon's customers.   Another article identified Walmart as a retailer that imports shrimp from Thailand.   This article, however, also stated that the Solidarity Center report "makes clear not all shrimp imports into the United States from Thailand and Bangladesh come from problem plants."  These articles do not identify any Thai companies, much less Phatthana, as a bad actor engaged in labor abuses, and they do not state that Walmart or any of the other U.S. supermarket chains were selling shrimp produced by forced labor.  Therefore, these articles establish nothing more than reported labor abuses in Thailand in 2008 and that some U.S. supermarkets were selling shrimp produced in Thailand.  This evidence cannot support a reasonable inference of Wales's knowledge of alleged labor abuses at the Songkhla factory between 2010 and 2012.

Finally, Plaintiffs cite pages excerpted from the 2010, 2011, and 2012 editions of the *U.S. Department of State's Trafficking in Persons Report*.  These reports also fail to include any company-specific information and do not mention Phatthana.  Instead, they include Thailand on the Tier Two Watch List and contain general statements about labor abuses in Thailand and the Thai government's response to those problems.  The reports thus do not support

---

not support a reasonable inference that Wales knew of alleged labor abuses years later at the Phatthana factory in Songkhla.

a reasonable inference of Wales's knowledge of labor abuses at the Songkhla factory from 2010 to 2012.

We conclude that the reports and articles Plaintiffs have identified are insufficient to create a triable issue of fact on Wales's knowledge of Phatthana's alleged labor abuses before February 2012.

ii

Plaintiffs further argue that a reasonable factfinder could infer that Wales negligently failed to investigate whether Phatthana was engaging in labor abuses at the Songkhla factory given the prevalence of labor abuses in the Thai seafood industry. To support this argument, Plaintiffs rely on reports from their retained experts, Luis DeBaca, Marc Bendick, and Samir Goswami.[20] We consider these reports in turn.

We find the DeBaca report to be irrelevant to the period before February 23, 2012, because it addresses the adequacy of investigations *after* February 23, 2012, and it only opines in generalities about the 2010 to 2012 timeframe. For example, the report concludes that Wales was "on notice in 2010 . . . that . . . the seafood industry in Thailand was considered a 'hot spot' for human trafficking in all its forms." But these are the "type[s] of conclusory

[20] Although the expert reports focus primarily on what Rubicon knew or should have known about the alleged labor abuses, Plaintiffs assert, and at least one report acknowledges, that Rubicon and Wales had intertwined ownership. Because we must construe the evidence in the light most favorable to Plaintiffs and draw all justifiable inferences in their favor, we consider these reports to assess whether there is a triable issue that Wales knew or should have known about Phatthana's alleged TVPRA violations.

allegation[s]" we have "found insufficient to withstand [a] motion for summary judgment." *Broussard v. Univ. of Cal., at Berkeley*, 192 F.3d 1252, 1259 (9th Cir. 1999).

The Bendick and Goswami reports do opine on the issue at hand, but they are not helpful because they rely on the same generalized evidence of country conditions that we have already determined is insufficient to create a triable issue of material fact. Although the Bendick report explicitly focuses on the 2010–2012 period, its conclusions are generalities based on unsupported assumptions. It states, for example, that Rubicon's senior management "can be assumed to have been fully aware of how prevalent were labor practices such as are alleged at Songkhla," and that Phatthana would have "routinely shared information with Rubicon on production issues [and] labor matters including those involving migrant workers would inevitably be part of that information." The report also lists several ways in which audits of the Songkhla factory in 2011 and 2012 did not meet certain standards, but never opines that such audits were even necessary under the circumstances or that a business's failure to conduct such audits would be negligent.

Similarly, the Goswami report states, without identifying any time period, that the lack of "provisions on forced labor" in purchase orders from Rubicon and Wales "fell short of industry standards at the time" and that Rubicon "did not meet industry standards" in its audits and investigations. But the report does not offer any factual basis for its conclusory statements about "industry standards." It therefore fails to raise a genuine issue of material fact. *See Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1008 (9th Cir. 2007) (holding that an expert affidavit failed to create a factual dispute because the expert did "not state a factual basis for his opinion"); *see also Broussard*, 192 F.3d at 1259.

In sum, Plaintiffs' expert reports fail to bridge the gap between their generalized evidence of labor conditions in the Thai shrimp industry and the specific allegations that Wales knew or should have known of the alleged labor abuses at Phatthana's Songkhla factory before February 23, 2012.[21] We therefore affirm the district court's entry of summary judgment in favor of Wales on Plaintiffs' claims predating February 23, 2012.

b

We now turn to Plaintiffs' claims against Wales to the extent they arise from conduct occurring after February 23, 2012. As previously noted, we assume here that the evidence supports a finding that Wales knew of the complained-of TVPRA violations at the Phatthana factory after February 23, 2012, when Wales admits it received a copy of the article describing Ratha's allegations. Therefore, we must ask whether, construing the evidence in the light most favorable to Plaintiffs, there is a triable issue that Wales "knowingly benefit[ted] . . . from participation in" its alleged venture with Phatthana after February 23, 2012. *See* 18 U.S.C. § 1595(a). We conclude there is not.

The only benefit Wales obtained from its alleged venture with Phatthana is a commission "for product inspection services rendered in connection with shrimp ordered by Rubicon and processed at Phatthana's Songkhla factory."

---

[21] Although "[i]t is undisputed that Rubicon engaged Wales to inspect Phatthana's facilities," the record nowhere indicates whether or when Wales inspected any of Phatthana's factories, let alone the Songkhla factory. Rather, Wales maintains, and the evidence in the record suggests, that Wales's actual role was limited to inspecting products Phatthana shipped to the United States, not the factory conditions where Phatthana's products were processed.

The purchase orders for those containers of shrimp are dated October 13, 14, and 31, 2011, and include shipping dates ranging from October 2011 to December 2011. Thus, Wales's inspection of shrimp "destined for the U.S." apparently occurred before the product left Thailand, and therefore before February 23, 2012.

Plaintiffs point to no facts that would support a reasonable inference that Wales inspected those shipments on or after February 23, 2012, or that Wales otherwise benefitted from the alleged venture after it became aware of Ratha's allegations. To be sure, Wales's president declared that the inspection services took place "in late 2011–early 2012." Although that statement may be consistent with the *possibility* that Wales knowingly benefitted from the alleged venture after it learned of Ratha's allegations, we find the statement, without more, to be "insufficient to allow a reasonable juror to conclude that [Plaintiffs'] position more likely than not is true." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993); *see also Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation.").

Because the payment for inspection services is the only benefit Plaintiffs allege Wales received during the relevant time period, and the evidence is insufficient to create a triable issue that this occurred after February 23, 2012, we affirm the district court's summary judgment in favor of Wales.

## IV

Finally, we consider whether the district court abused its discretion by denying Plaintiffs' motion for an extension of

time to respond to Defendants' motions for summary
judgment. Relying on *Ahanchian*, 624 F.3d at 1257–60,
Plaintiffs argue that the district court abused its discretion by
denying their motion because the Thanksgiving holiday
effectively reduced their limited response time to three
business days and Defendants' motions were accompanied
by hundreds of pages of documents. But the circumstances
here are significantly different from those presented in
*Ahanchian* and do not support Plaintiffs' claims of prejudice.

In *Ahanchian*, the plaintiff filed his opposition to a
motion for summary judgment three days after the filing
deadline with a motion for the court to accept the late filing.
*Id.* at 1257. The district court denied the plaintiff's motion
to file his opposition. *Id.* It then granted the defendant's
motion for summary judgment after "review[ing] only the
defense evidence, even though it knew the opposition papers
were already filed," *id.* at 1258, and awarded significant
attorney's fees to defense counsel, *id.* at 1255, 1257–58. We
concluded that the district court abused its discretion and
"effectively flouted" Ninth Circuit precedent, which "bars
. . . granting summary judgment simply because a party fails
to file an opposition or violates a local rule." *Id.* at 1258.

Here, in contrast to the circumstances in *Ahanchian*,
Plaintiffs have not shown that the district court flouted
precedent or that they were prejudiced by the district court's
order denying their motion for an extension. Plaintiffs argue
that they were prejudiced because they were rushed in
preparing their responses and omitted exhibits from their
separate statement of facts. But Plaintiffs stipulated to the
motion deadline. And Plaintiffs filed a notice of errata and
supplemented their separate statement of facts with
additional exhibits they had inadvertently omitted.
Critically, unlike in *Ahanchian*, Plaintiffs do not assert that

the district court refused to consider any evidence or arguments they submitted in their opposition to summary judgment. Thus, notwithstanding any stringent case management deadlines the Central District of California may impose in accordance with its local rules, the district court's order denying Plaintiffs' motion for an extension was not an abuse of discretion.

## V

The district court did not err by entering summary judgment for Defendants. And the district court did not abuse its discretion by denying Plaintiffs' motion for an extension of time.[22]

**AFFIRMED.**

[22] Defendants' Motion to Take Judicial Notice is **DENIED**.